**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**

**IN RE:**

| | |
|---|---|
| **BECKHAM JEWELRY, LLC,** | **CASE NO: 25-01234-JAW** |
| **DEBTOR.** | **CHAPTER 11** |

_____

**MOTION FOR ORDER REJECTING BUSINESS LEASE**
_____

Creditor TDLDC Retail I, LLC ("Landlord"), by and through its undersigned counsel, pursuant to 11 U.S.C. § 363, hereby moves the Court for an order immediately rejecting the Debtor in possession's jewelry store lease and, in support of its motion, would show as follows:

1. Debtor Beckham Jewelry, LLC operates a jewelry store at The District commercial development in Jackson, Mississippi pursuant to a lease with Landlord. A true and correct copy of Debtor's lease is attached as Exhibit A.

2. On December 31, 2024, Landlord gave Debtor written notice of default based on non-payment of rent and other lease charges, the balance of which was $129,615.29. A true and correct copy of a current ledger for Debtor's account is attached as Exhibit B.

3. On January 17, 2025, Landlord gave written notice to Debtor that it would exercise its lease-based right to retake possession of the store. A true and correct copy of this notice is attached as Exhibit C. Debtor, however, refused to remove its jewelry from the store. Landlord did not want to take possession of the store from an unwilling Debtor if it meant having to account for unspecified inventory.

4.     On March 12, 2025, Landlord commenced an eviction proceeding in the County Court of Hinds County against Debtor to obtain the law's protection for court-ordered evictions. The hearing in that matter was set for May 15, 2025.

5.     At a March 12, 2025 in-person meeting, Debtor first proposed the possibility of Wilkerson & Co. conducting of a short liquidation-type sale to generate the revenue to pay Landlord everything owed. Debtor reported that this company specialized in jewelry liquidation sales. Landlord took the position that Debtor needed to make "clear, substantial progress in satisfying the Landlord's concerns" about the viability and timing of such sale, or else the parties needed to shift focus to "quickly closing the store in a way that is respectful, and meets the expectations of, [Debtor's] clients and does not detract from The District's interests in the entire development."

6.     Debtor eventually provided a liquidation sale inventory of 357 items that Debtor had acquired at a cost of $372,549.21 (or about $1,043 per item) without specifying the liquidation sale value of the items. Debtor did not investigate the broad UCC inventory lien filing Landlord shared on March 13, 2025. Nor did Debtor specify the amounts owed to, or lien status, of a number of other identified creditors.

7.     To address its continuing concerns, Landlord agreed to the County Court's entry of an April 30, 2025 Interim Agreed Order (Exhibit D) that permitted Debtor to conduct a sale on the condition that Landlord would be entitled to immediate possession if Debtor did not begin the sale by May 8, 2025 or meet other strict sale-related conditions, including payment of $190,448.10 owed to Landlord in installments every two weeks over the course of an eight-week sale.

8. Debtor provided no logistical, marketing or other information about the sale after the County Court order was entered, only empty assurances (such as an unsigned sale contract) the sale would begin on time. On the afternoon of May 8, 2025, however, Debtor advised Landlord that Wilkerson & Co. had backed out when, as a measure of its own, basic due diligence, the company discovered the County Court Order and the very same broad UCC inventory lien filing that Landlord previously sent to Debtor.

9. Accordingly, on Friday, May 9, 2025, consistent with the terms of the Interim Agreed Order, Landlord applied for a warrant of removal. On May 12, 2025, Debtor notified the Court it planned to file a response the following day. Debtor's May 13, 2025 response asked the Court not to issue the warrant because the Debtor "ha[d] not missed the first scheduled payment date of May 22, 2025" and because it was still the Debtor's "intention to comply with the payment schedule referenced in this Interim Agreed Order." The next morning, however, Debtor commenced this bankruptcy proceeding only a few hours before the Court issued the warrant.[1]

10. Turning to the legal issues, as a debtor-in-possession, Debtor now apparently proposes to liquidate its inventory by remaining in business. To do so, it proposes to stay in possession of the leased premises for which it has not paid any rent in months. The Debtor may not continue to occupy the leased premises without assuming the lease, which it cannot do without curing the prepetition defaults and providing adequate assurance of future performance of the lease. Consistent with 11 U.S.C. § 365(b)(1)(A), Debtor would have to pay Landlord $190,448.10, or assure Landlord of

---

[1] Landlord immediately advised Debtor it would not have the warrant served in view of the intervening bankruptcy filing.

3

prompt payment of this amount, in order to assume the lease. *See also In re: Clinton Care Center, LLC*, 436 B.R. 390, 394 (N.D. Miss. Bankr. 2010) ("Had the debtor assumed the lease, it would have had to timely cure any existing defaults in the lease provisions.").

11. Because the Debtor cannot pay Landlord the substantial sums owed in compliance with § 365(b)(1), the Debtor cannot assume the lease and it should be rejected.

12. The Landlord should not be required to continue to allow this Debtor to remain in possession for an indefinite period of time on the hope that its liquidation sale will generate income to pay the rent.

13. The Debtor has filed a motion to use cash collateral to operate its business as a liquidation. (Dkt. 14). Debtor's "projected budget" [Dkt. 14-1] paints a rosy picture of $8,296.42 monthly net income *after* payment of expenses, including rent. But Debtor's motion does not address the secured lender, claiming not to know who it is, which seems problematic at best. The Debtor cannot sell property subject to a secured creditor's lien without its consent. Further, a debtor must provide adequate protection to prevent the diminution in the creditor's collateral. The likelihood there will be funds to pay the rent on a post-petition basis is minimal, and if there is a secured creditor with a claim in excess of the value of the collateral, then the Landlord will likely receive nothing for the post-petition use of its premises.

14. The Court has the authority on motion of a party to an executory contract to require that the lease be assumed or rejected by a date certain. 11 U.S.C. § 365(d)(2). In this case, it is well within the bankruptcy court's discretion to accelerate a lease rejection decision. *See, e.g.*, *Theatre Holding Corp. v. Maura*, 681 F.2d 102, 105 (2d Cir. 1982) ("What constitutes a reasonable time [to assume or reject] is left to the bankruptcy

4

court's discretion in the light of the circumstances of each case.").[2] The Landlord should not be required to finance the Debtor's operations any further and the Court should order the rejection of the lease immediately.

15. Therefore, for the foregoing reasons, Landlord requests the Court order an immediate rejection of the subject lease for the store so that Landlord can recover possession and begin in earnest to prepare the leased space for a new, paying tenant.

RESPECTFULLY SUBMITTED, this 23rd day of May, 2025.

**TDLDC RETAIL I, LLC**

By: /s/ *Robert B. Ireland, III*
Robert B. Ireland, III (MSB # 100708)
WATKINS & EAGER PLLC
Post Office Box 650
Jackson, Mississippi 39205-0650
Telephone: (601) 965-1900
E-Mail: rireland@watkinseager.com

---

[2] Some courts have relied on a 12 factor test to decide the time frame for rejection of a lease, including: "1. the nature of interests at stake; 2. The balance of the hurt to the litigants; 3. the good to be achieved; 4. The safeguards afforded to the litigants; 5. Whether the action to be take is so in derogation of Congress' scheme that the court may be said to be arbitrary; 6. The debtor's failure or ability to satisfy post-petition obligations; 7. The damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code; 8. The importance of the contract to the debtor's business and reorganization; 9. Whether the debtor has sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan of reorganization; 10. Whether there is a need for judicial determination as to whether an executory contract exists; 11. Whether exclusivity has been terminated; and 12. Above all, the broad purpose of Chapter 11, which is to permit successful rehabilitation of debtors." *In re: Hawker Beechcraft, Inc.*, 483 B.R. 424, 429 (Bankr. S.D.N.Y. 2012) (citing *In re: Adelphia Communications*, 291 B.R. 283, 292-93 (Bankr. S.D.N.Y. 2003)).

**CERTIFICATE OF SERVICE**

I, Robert B. Ireland, III, do hereby certify that I have caused to be served the above and foregoing pleading on all parties requesting notice by using the ECF filing system of the court:

>Thomas Carl Rollins, Jr.
>trollins@therollinsfirm.com
>
>Jennifer A. Curry Calvillo
>jennifer@therollinsfirm.com
>
>Craig M. Geno, Trustee
>cmgeno@cmgenolaw.com
>
>Christopher J. Steiskal, Sr., U.S. Trustee
>Christopher.j.steiskal@usdoj.gov

This 23rd day of May, 2025.

>*/s/ Robert B. Ireland, III*
>ROBERT B. IRELAND, III