

## LEASE AGREEMENT

This Lease Agreement (this "Lease") is made as of April 5, 2017 (the "Effective Date"), by and between **TDLDC Retail I, LLC**, a Mississippi limited liability company ("Landlord") and **Beckham Jewelry, LLC**, a Mississippi limited liability company ("Tenant").

## 1.    BASIC LEASE PROVISIONS

**Demised Premises:** Suite [ D-110 ] as shown on Exhibit "A"

**Building:** A to-be-constructed building situated on Lot 10 of the District at Eastover labeled as Building D-1 as outlined on the Site Plan attached as Exhibit "A-1" (the "Building").

**Rentable Area of the Premises:** 1,873 rentable square feet ("RSF")

**Rentable Area of the Building:** 16,954 square feet

**Tenant's Proportionate Share:** 11.05% (1,873/16,954)

**Building Share of Development Costs:** 10.3%

**Lease Year Term:** Ten (10) Lease Years

**Commencement Date:** May 1, 2017

**Rent Commencement Date:** As defined in Section 4(a)

**Required Opening:** 150 days after Commencement Date

LANDLORD

EXHIBIT
A

TENANT

**Renewals:**          Tenant shall have the option, but not the obligation, to renew this Lease for two (2) successive five (5) year terms on the same terms and provisions as in the original Lease, with the Base Rent to increase two percent (2%) each Lease Year during the renewal term(s).

**Minimum Base Rent:**          As set forth in the table below:

| Lease Year or Period | Annual Rent | Base Rent per RSF | Monthly Installment |
|---|---|---|---|
| 1 | $53,380.50 | $ 28.50 | $4,448.38 |
| 2 | $54,448.11 | $ 29.07 | $4,537.34 |
| 3 | $55,534.45 | $ 29.65 | $4,627.87 |
| 4 | $56,639.52 | $ 30.24 | $4,719.96 |
| 5 | $57,763.32 | $ 30.84 | $4,813.61 |
| 6 | $58,924.58 | $ 31.46 | $4,910.38 |
| 7 | $60,104.57 | $ 32.09 | $5,008.71 |
| 8 | $61,303.29 | $ 32.73 | $5,108.61 |
| 9 | $62,520.74 | $ 33.38 | $5,210.06 |
| 10 | $63,775.65 | $ 34.05 | $5,314.64 |

Base Rent shall increase by two percent (2%) at the start of each Lease Year after the Rent Commencement Date.

**Operating Expenses:**          Tenant shall pay Operating Expenses as set forth in Section 5.

**Prepaid Rent:**          $4,448.38 – to be paid by May 15, 2017

**Security Deposit:**          $8,896.76

**Guarantors:**          Brian L. Beckham and Christopher Alan Burrow

**Brokers:**          For Landlord: The District Management Co., LLC

**Permitted Use:**          Retail jewelry sales and related general office purposes

**Permitted Trade Name:**          Beckham Jewelry

**Minimum Business Hours:**          Tenant shall be open the following hours:

31322953v3

*12*

10:00 a.m. – 5:00 p.m., Monday through Saturday

**Development:**       The District at Eastover

**Address
For Notices:**

To Landlord:                    TDLDC Retail I, LLC
                                c/o The District Management Co., LLC
                                Attn: Breck R. Hines
                                308 E. Pearl Street, Suite 200
                                                Jackson, Mississippi 39201

To Tenant:                      Beckham Jewelry, LLC
                                c/o Brian L. Beckham, Manager
                                                P.O. Box 24032
                                Jackson, MS 39225
                                1808 Meadowbrook Road
                                Jackson, MS 39211

With a copy to Tenant's Attorney:

                                William E. McLeod, Esq.
                                McLeod & Associates, P.A.
                                10 Professional Parkway
                                Hattiesburg, MS 39402

## 2.   DEMISED PREMISES

(a)      **Granting Clause**. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord the demised premises (the "Demised Premises") which is a portion of a to-be- constructed building containing the rentable square feet of Gross Area, as shown on Exhibit "A", to be situated in approximately the location which is shown outlined or hatched on the site plan designated on Exhibit "A-1" (the "Site Plan"). The Demised Premises is located on the real property described in Exhibit "B" (the "Property"). The Demised Premises together with any existing and future buildings, parking area, sidewalks, service area and other improvements now existing or hereafter erected on the Property are sometimes herein referred to as the "Shopping Center". For purposes of this Lease, "Gross Area" of the Demised Premises shall be measured for ground floor area only from the exterior of exterior walls, entries and windows and the mid-point of any shared walls. All calculations of Gross Area shall be determined by Landlord's architect or space planner and shall be binding on the parties hereto. Tenant does not rely on the facts nor does Landlord represent that any specific tenant or number of tenants shall occupy any space in the Development. The Demised Premises do not include the area below the surface of the slab or above the structural supports for the above floor or roof. Landlord reserves the right to place in, under, over or through the Demised Premises and the Property pipes, wires, lines, and

LANDLORD                        #3                           TENANT

facilities serving other areas of the Property or the Development, provided such right is exercised in a manner which does not materially interfere with Tenant's conduct of its business at the Demised Premises.

(b) **Development Construction**. Tenant hereby acknowledges that the Development, in which the Property is located, is being constructed in phases and that by reason of construction or reconstruction activities there may be temporary construction related matters such as dust, dirt, barricades, detours, equipment or material in the Development Common Areas (hereinafter defined). Tenant hereby agrees that Landlord shall not be liable for any loss or damage arising from any such incidents of construction or reconstruction, except to the extent caused by Landlord's gross negligence or wrongful act; provided, however, Landlord agrees to use reasonable efforts to cause the responsible parties to minimize interference with Tenant's business operations in the Demised Premises.

## 3.   TERM

(a) **Initial Term**. The Term of this Lease shall be as set forth in Section 1. The Term shall commence on May 1, 2017 (the "Commencement Date"). Tenant shall begin to pay Rent on the Rent Commencement Date (as defined below). The Term shall expire on that date which is the number of Lease Years set forth in Section 1 from the Rent Commencement Date, unless earlier terminated as provided herein. This Lease is a binding contractual agreement upon the execution by Landlord and Tenant. Within thirty (30) days after the Rent Commencement Date, Landlord and Tenant will execute a Commencement Notice in the form of Exhibit "G".

(b) **Renewals**. Provided Tenant is not in default beyond any applicable cure period at the time of exercise of this renewal option or at the commencement of the applicable Renewal Term, Landlord hereby grants to Tenant the right to extend the Term of this Lease for the number of renewal terms set forth in Section 1 for a term of Lease Years each as set forth in Section 1 (each, a "Renewal Term"). Tenant shall notify Landlord in writing of Tenant's exercise of said renewal option at least one hundred eighty (180) days prior to the expiration of the then current Term hereof. All of the terms and conditions of this Lease shall remain in full force and effect during each Renewal Term, except the Base Rent shall be increased as provided in Section 1.

(c) **Lease Year**. For purposes of this Lease, the "first Lease Year" shall be defined as that period of time from the Rent Commencement Date through that date which is one year from the Rent Commencement Date. If the Rent Commencement Date is a day other than the first day of a calendar month, then the first Lease Year shall expire on the last day of the month following that date which is one year from the Rent Commencement Date. Each subsequent Lease Year shall be successive twelve month periods beginning on the first day following the expiration of the first Lease Year.

## 4.   RENT AND EXPENSE PAYMENTS

(a) **General**. The "Rent" hereunder is composed of "Base Rent" (as set forth in Section 1 hereof and adjustments thereto as hereinafter provided), and "Expenses" (as defined herein). Beginning on that date (the "Rent Commencement Date") which is the earlier of (i) August 1, 2017, or (ii) the date Tenant opens for business in the Demised Premises, Tenant agrees to pay to Landlord all

31322953v3

*14*

Rent required under this Lease, which shall be payable on a monthly basis to Landlord (unless expressly provided otherwise), without deduction or offset (except as expressly provided herein), in lawful money of the United States of America at the address for payment of Rent set forth in Section 1 above, or at such other place as Landlord may from time to time designate in writing upon thirty (30) days advance written notice. Base Rent, Expenses and all other sums of money or charges required to be paid hereunder shall be deemed rental for the Demised Premises. No acceptance by Landlord of partial payment of any Rent or other sum due from Tenant shall be deemed a waiver by Landlord of any of its rights to the full amount due, nor shall any endorsement or statement on any check or accompanying letter from Tenant be deemed an accord and satisfaction. Any Rent payment(s) or other sums received from Tenant or any other person shall be conclusively presumed to have been paid on Tenant's behalf, unless Landlord has been given prior written notice to the contrary by Tenant. Tenant agrees that the acceptance by Landlord of any such payment shall not constitute a consent by Landlord or a waiver of any of its rights under this Lease.

(b)     **Base Rent**. Tenant shall pay the Base Rent set forth in Section 1 hereof on the first day of each month in advance, beginning on the Rent Commencement Date. If the Rent Commencement Date occurs on a day other than the first day of the month, then the Base Rent for the partial month in which the Rent Commencement Date occurs shall be prorated on a daily basis.

(c)     **Prepaid Rent**. Tenant shall pay prepaid Base Rent on or before May 15, 2017, as set forth in Section 1 hereof.

(d)     **Independent Covenant**. The obligation of Tenant to pay Rent hereunder constitutes an independent obligation of Tenant to be performed at all times as provided hereunder.

## 5.     EXPENSES

(a)     **Definitions**. As used in this Lease, the following terms have the meanings indicated:
a

(i)     The term "Administration Fee" shall mean fifteen percent (15%) of CAM Expenses, as defined herein. No Administrative Fee shall be charged on Real Estate Taxes or Insurance Expenses.

(ii)     The term "Expenses" means each and all of the following expenses, costs and fees paid or incurred by Landlord, all as defined herein, Real Estate Taxes, CAM Expenses, Administration Fee, Building Maintenance and Repair Costs, Insurance Expenses, Development CAM and all other items of expense incurred by Landlord in the operation, management, maintenance, replacement and repair of the Demised Premises and the Common Areas and/or the Development, it being understood that this Lease shall be absolutely net to Landlord.

(iii)     The term "Proportionate Share" shall have the meaning as set forth in Article 1.

LANDLORD

TENANT

(b)    **Payment of Expenses**. Tenant shall pay to Landlord the following amounts in the manner specified:

(i)    Commencing on the Rent Commencement Date, Tenant shall pay the monthly estimate of Expenses provided by Landlord as set forth in Section 1. Landlord shall submit to Tenant, prior to January 1 or as soon thereafter as practicable, a reasonably detailed statement showing the estimated Expenses for the subsequent year.  Tenant shall pay to Landlord as Expenses a monthly amount equal to one-twelfth (1/12) of the estimated Expenses for such subsequent year.  If Landlord does not submit a statement to Tenant prior to January 1, Tenant shall continue to pay Expenses at the then existing rate until such statement is submitted.

(ii)    Landlord may revise such estimates at the end of any calendar quarter, and Tenant shall pay Expenses on the basis of such revised estimate after notice thereof as herein provided.  Each determination of estimated Expenses hereunder shall be made by Landlord based upon Landlord's experience with the historical costs incurred by Landlord and/or reasonable projections for such costs.

(iii)    On or before March 31 of each year, Landlord shall submit to Tenant a reasonably detailed statement showing the actual Expenses paid or incurred by Landlord during the previous calendar year and the amounts paid by Tenant.  If there has been an overpayment by Tenant for such calendar year, then Landlord shall credit the amount of such difference against Rent (based on estimated and/or actual figures) which may thereafter be due from Tenant or refund such difference if the Term has ended or otherwise insufficient Rent to credit such difference.  If there has been an underpayment by Tenant for such calendar year, then Tenant shall, within thirty (30) days after the submittal of such statement to Tenant, pay to Landlord the full amount of such difference.

(iv)    Notwithstanding any provision of this Section to the contrary, if at any time during the Term of this Lease any tenant or tenants separately pays any item of Expenses which would normally be paid by Landlord and prorated among the tenants, then Landlord shall make an appropriate adjustment in calculating Tenant's Proportionate Shares to the end that the remaining Expenses are shared proportionately by the tenants to whom the benefits or services covered by such Expenses are provided or available.

(v)    Tenant, at Tenant's cost, shall have the right to examine and audit Landlord's operating costs and records relating to the Expenses within six (6) months after the end of each year at the office of Landlord where such records are maintained, during regular business hours and after ten (10) days advance notice of Tenant's desire to examine or audit such records.  Tenant's prompt payment of Expenses may not be delayed by reason of any such audit then in progress or to be made. If the audit reveals an over charge to Tenant, then Landlord shall promptly refund the amount of such overcharge to Tenant and pay for the cost of such audit if the audit reveals an overcharge of greater than five percent (5%).  If the audit reveals an undercharge to Tenant, then Tenant shall pay the difference to Landlord within ten (10) days of completion of such audit.

(vi)    If less than ninety-five percent (95%) of the Rentable Area of the Building is actually occupied during any Operating Period, Operating Expenses shall be the amount that such Operating Expenses would have been for such Operating Period had ninety-five percent (95%) of the

Rentable Area of the Building been occupied during all such Operating Period, as determined by Landlord; provided, however, this gross up procedure shall not result in Landlord collecting Operating Expenses from tenants that exceed the actual Operating Expenses of the Building.

## 6.    TAXES PAYABLE SOLELY BY TENANT

In addition to the Base Rent and Expenses to be paid by Tenant, Tenant shall, prior to delinquency, pay the full amount of all taxes, assessments, impositions, levies, charges, excises, fees, licenses and other sums levied, assessed, charged or imposed, by any governmental authority or other taxing authority upon Tenant's leasehold interest under this Lease and all alterations, additions, fixtures (including Removable Trade Fixtures), inventory and other property installed or placed or permitted at the Demised Premises by Tenant.  Within thirty (30) days after notice from Landlord, Tenant shall furnish Landlord a true copy of receipts evidencing such payment received by Tenant from the governmental authority or other taxing authority assessing such charges.

## 7.    LATE PAYMENT

In the event that Tenant shall fail to pay to Landlord when due any Rent, or other sums owing to Landlord pursuant to the terms of this Lease, said late payment shall bear interest at the Default Rate and, in addition:

(a)    For each such late payment that is not paid within ten (10) days after the date the same was due, Tenant shall pay to Landlord a service charge equal to five percent (5%) of the overdue amount.  Tenant acknowledges and agrees that such late payment by Tenant will cause Landlord to incur costs and expenses not contemplated by this Lease, the exact amounts of which will be extremely difficult to ascertain, and that such service charge represents a fair estimate of the costs and expenses which Landlord would incur by reason of Tenant's late payment.  Tenant further agrees that such service charge shall neither constitute a waiver of Tenant's default with respect to such overdue amount nor prevent Landlord from exercising any other right or remedy available to Landlord.  Notwithstanding the foregoing, Landlord shall not enforce the late charge provided Tenant pays to Landlord the delinquent charges within ten (10) days of written notice to Tenant and provided such late payment does not occur more than two (2) times during any twelve-month period.

## 8.    SECURITY DEPOSIT

A "Security Deposit" in the amount set forth in Section 1 is to be delivered to Landlord on the Effective Date of this Lease and shall be held by Landlord (without liability for interest, except to the extent required by Law) as security for the performance of Tenant's obligations under the Lease. The Security Deposit is not an advance payment of Rent nor a measure of Tenant's liability for damages. Landlord may, from time to time while an Event of Default remains uncured, without prejudice to any other remedy, use all or a portion of the Security Deposit to satisfy past due Rent, cure any uncured default by Tenant, or repay Landlord for damages and charges for which Tenant is liable under this Lease or resulting from Tenant's breach of this Lease.  If Landlord uses the Security Deposit, Tenant shall on written demand restore the Security Deposit to its original amount, and such use by Landlord

LANDLORD

7

TENANT

of the Security Deposit shall not constitute a cure of any Event of Default until such time as the entire amount owing to Landlord is paid in full, all other portions of such default are cured, and the Security Deposit is fully restored.  Provided that Tenant has performed all of its obligations hereunder, Landlord shall return any unapplied portion of the Security Deposit to Tenant within 30 days after the later to occur of: (a) the date Tenant surrenders possession of the Demised Premises to Landlord in accordance with this Lease; or (b) the Expiration Date.  Tenant does hereby authorize Landlord to withhold from the Security Deposit all amounts allowed by Law and the amount reasonably anticipated by Landlord to be owed by Tenant as a result of an underpayment of the Operating Expenses Payment for the final year of the Term.  To the fullest extent permitted by applicable Law, Tenant agrees that the provisions of this Section shall supersede and replace all statutory rights of Tenant under applicable Law regarding the retention, application or return of security deposits.  If Landlord transfers its interest in the Demised Premises, Landlord shall notify the Tenant of such transfer of the Landlord's interest and shall provide the Tenant with the name and contact information of the transferee, and the Landlord shall assign any unapplied portion of the Security Deposit to the transferee and, following the assignment, notice to the Tenant, and the delivery to the transferee, Landlord shall have no further liability for the return of the Security Deposit.  Landlord shall not be required to keep the Security Deposit separate from its other accounts.

## 9.    CONSTRUCTION; TENANT IMPROVEMENTS

(a)    **Construction of the Demised Premises.**  Landlord shall deliver possession of the Demised Premises to Tenant in a shell condition, with Landlord's Work completed, as defined and set forth in Exhibit "D".  Notwithstanding anything to the contrary herein, Landlord represents that, as of the Commencement Date, the HVAC system is in good working order. Except as expressly set forth herein, Landlord makes no representation or warranty of any kind, express or implied, with respect to the Demised Premises, including without limitation, any representation or warranty as to the habitability or fitness of the Demised Premises for any particular purpose.

(b)    **Tenant's Improvements.** Tenant shall be responsible, at Tenant's expense, to perform that work described in Exhibit "D" in a good and workmanlike manner in accordance with plans and specifications to be agreed upon by Landlord and Tenant as more particularly set forth in Exhibit "D". Tenant shall submit its plans and specifications to Landlord for its approval as soon as practicable after the execution of this Lease by both parties.  Tenant's failure to perform or cause to be performed Tenant's Work within the time limits referred to in Exhibit "D" and any delays however caused in performing Tenant's Work, regardless of whether such delays were beyond the control of Tenant, shall not delay commencement of the Term or Tenant's obligation to pay Rent or Expenses hereunder, unless such delays in performing Tenant's work were not foreseeable and not the result of any action or inaction on the part of the Tenant or its contractors or agents, and if such delays are not more than thirty (30) days beyond the time limits referred to in Exhibit "D".  Tenant agrees, at Tenants' expense, to obtain and maintain public liability insurance and worker's compensation insurance to adequately protect Landlord as well as Tenant from and against any and all liability for death or injury to person, or damage to property by reason of the construction of Tenant's Work. In addition, Tenant shall cause contractors, subcontractors, suppliers, service providers, moving companies and others performing work of any type for or on behalf of Tenant to comply with the insurance requirements set forth on Exhibit "D-1" attached hereto.

*18*

## 10.   SIGNS

Subject to applicable governmental requirements and Landlord's approval, which shall not be unreasonably withheld, Tenant will be entitled to install exterior building signage in compliance with the signage criteria set forth on <u>Exhibit "E"</u>. Landlord makes no warranty or representation regarding signage approvals that may be obtained from the applicable governing authority. Landlord will cooperate with Tenant at Tenant's expense in obtaining any necessary governmental approval, including execution of documents and request for variances. Subject to applicable governmental requirements and Landlord's approval, which shall not be unreasonably withheld, Tenant may install Tenant's logo from its existing sign on the rear exterior of the Demised Premises.

## 11.   USE

(a)   **Permitted Use.** Tenant shall use the Demised Premises solely for the purposes and under the trade name as set forth in Section 1 hereof. Notwithstanding the foregoing, or anything herein to the contrary, Tenant shall not use the Demised Premises for any use which would be in violation of the uses described on <u>Exhibit "H"</u>.

(b)   **Prohibited Use.** Tenant shall not do or permit anything to be done in or about the Demised Premises nor bring or keep anything therein which will in any way increase the existing rate of or affect or cause a cancellation of any fire or other insurance covering the Demised Premises or Development, nor shall Tenant sell or permit to be kept, used or sold in or about the Demised Premises any article which may be prohibited by a standard form policy of insurance. Tenant shall promptly upon demand reimburse Landlord for any additional premium charged for any such insurance by reason of Tenant's failure to comply with the provisions of this Section. Tenant agrees that it will use the Demised Premises in such manner as not to interfere with the rights of other tenants of the Property or the Development. Tenant shall neither use the Demised Premises, nor allow the Demised Premises to be used, for any unlawful purposes, nor cause, maintain or permit any nuisance or waste in, on or about the Demised Premises or the Development. Tenant will not place a load upon any floor exceeding the floor load which such floor was designed to carry, and Landlord reserves the right to prescribe the location of any safe or other heavy equipment in the Demised Premises in a location mutually acceptable to both parties acting reasonably. Tenant shall not use or allow anything to be done in or about the Demised Premises or the Development which will in any way conflict with any law, ordinance or governmental regulation or requirement of any board of fire underwriters or any duly constituted public authority now in force or hereafter enacted or promulgated affecting the use or occupancy of the Demised Premises or any declaration of covenants, conditions and/or restrictions, and shall promptly comply with all such laws or requirements at its sole cost and expense. Tenant may not display or sell merchandise or allow carts, portable signs, devices or any other objects to be stored, or to remain, outside the exterior walls and permanent doorways of the Demised Premises. Tenant shall not place or authorize to have placed or affixed handbills or other advertising material on buildings within the Development. Tenant shall not display, paint or place, or cause to be displayed, painted or placed, any handbills, bumper stickers or other advertising devices on any vehicle parked in the parking area of the Development whether belonging to Tenant, or to Tenant's agent, or to any other person. Tenant will not distribute, or cause or permit to be used, any sandwich board, costumed actors,


LANDLORD

*19*

TENANT

inflatable signs, shapes or characters or other similar advertising devices in the Development. Tenant will not use, or cause to be distributed, any handbills or other advertising devices in the Development. No advertising or entertainment medium shall be utilized by Tenant which can be heard or experienced outside the Demised Premises, including without limitation, flashing lights, searchlights, loudspeakers, phonographs, radios or televisions; provided, however, Landlord shall permit music to be heard within thirty (30) feet of the perimeter of the Demised Premises provided that Tenant agrees to the control the volume of such music in such a manner as to not interfere with other tenants in the Development. Landlord shall have the right to cause Tenant to control the volume of such music experienced outside the Demised Premises if other tenants complain or same violates applicable code or law.

(c)     **Exclusive Use**. For so long as Tenant has not defaulted hereunder beyond any applicable grace or cure period and the Demised Premises is open and used for the operation of a jewelry store, no part of the Building or in the Shopping Center (except the Demised Premises), shall be leased to, or used by, any other party as a jewelry store. The foregoing grant of an exclusive use shall not restrict or prohibit the ancillary sale of jewelry in other stores whose primary business is the sale of goods or services other than jewelry.

(d)     **Continuous Operations.** Tenant shall be required to open within the time set forth in Section1 and continuously operate thereafter fully fixtured and staffed consistent with Tenant's other stores provided any failure to operate is not the result of a damage or casualty, condemnation or other cause beyond the control of Tenant. If Tenant is forced to close because of damage or casualty, condemnation or other cause beyond the control of Tenant, then Tenant agrees to re-open and continuously operate as soon as reasonably possible after the Demised Premises has been restored pursuant to the applicable provisions of this Lease.

(e)     **Use of the Roof.** Tenant shall not use the roof areas above the Demised Premises for any purpose other than for installation and repair of the HVAC System, venting systems and satellite dish subject to the terms of this Lease. In the event that Tenant desires to go upon the roof for any purpose (including, without limitation, maintenance or repair), Tenant shall notify Landlord prior to entering the roof and use only such contractors that have obtained the prior written consent of Landlord in each instance. Tenant shall indemnify and hold Landlord harmless from and against any liability caused as a result of Tenant entering on the roof, including the voiding of any roof warranties.

(f)     **WAIVER OF WARRANTIES**. Except as otherwise expressly provided herein, Tenant agrees that neither Landlord nor any agent of Landlord has made any representation or warranty as to the suitability of the Demised Premises for the conduct of Tenant's business. Subject to subparagraph (c) above regarding Tenant's exclusive use, Tenant agrees that Landlord or affiliates of Landlord may grant to anyone the exclusive right to conduct any business or render any service in the Development, provided such exclusive right shall not operate to exclude Tenant from the use expressly permitted by this Lease during the Term hereof. Tenant agrees that, except as expressly set forth in this Lease, neither Landlord nor Landlord's agents have made any representations or promises with respect to the physical condition of the land upon which the Demised Premises is located, the rents, leases, expenses of operation or any other matter or thing affecting or related to the Demised Premises or the Development, and no rights, easements or licenses are acquired by Tenant by implication or otherwise. Tenant has or will have inspected the Demised Premises and is or will be thoroughly acquainted with their condition, and agrees to take the same "as is" (subject to the Landlord's work to be completed in a

*10*

good and workman like manner in accordance with the plans and specifications attached hereto as Exhibit "D").

(h) **Rules and Regulations.** Tenant agrees that its use of the Demised Premises and the Common Areas shall at all times be subject to rules and regulations set forth on Exhibit "F" and as from time to time promulgated by Landlord and The District at Eastover Owners Association (the "Association"); provided, however, such rules and regulations shall not conflict with the terms of this Lease. Landlord shall apply such rules and regulations to all similarly situated tenants on a consistent basis.

(i) **Hazardous Substances.** Tenant shall not use the Demised Premises or any other portion of the Development for the storage, use treatment, or disposal of any hazardous or toxic substances or petroleum products, except for those used in normal commercial and retail applications including, but not limited to, cleaning materials and other chemicals used when Tenant makes, repairs, or cleans jewelry. Tenant agrees to indemnify, defend and hold Landlord and its officers, partners, directors, shareholders, members, managers, employees and agents harmless from any claims, judgments, damages, fines, penalties, costs, liabilities (including sums paid in settlement of claims) or loss including attorneys' fees, consultants' fees, and expert fees which arise during or after the Term in connection with the presence of hazardous or toxic substances in the soil, groundwater, or soil vapor on or under the Development to the extent caused by the acts or omissions of Tenant, its officers, employees or agents. Landlord agrees to indemnify, defend and hold Tenant and its officers, partners, directors, shareholders, employees and agents harmless from any claims, judgments, damages, fines, penalties, costs, liabilities (including sums paid in settlement of claims) or loss including attorneys' fees, consultants' fees, and expert fees which arise during or after the Term in connection with the presence of hazardous or toxic substances in the soil, groundwater, or soil vapor on or under the Demised Premises to the extent caused by the acts or omissions of Landlord, its officers, employees or agents. Without limiting the generality of the foregoing, the indemnifications set forth in this paragraph shall survive the expiration or earlier termination of this Lease.

## 12.   PROPERTY TAXES

(a) **Payment of Real Estate Taxes**. Tenant agrees to pay to Landlord its Proportionate Share of all general assessments and special assessments assessed for the period during the Term of this Lease upon the land, buildings, fixtures or personal property comprising the Property and the personal property used in connection with the operation of the Property, including Landlord's payments to the Association related to the Common Areas of the Development as a part of Expenses pursuant to the terms of this Lease. Real Estate Taxes for the first and last years of the Term hereof shall be prorated between Landlord and Tenant.

(b) **Definition of Real Estate Taxes**. For the purposes of this Lease, the term "Real Estate Taxes" shall include any form of assessment (general or special), levy, commercial rental tax, charge, tax or similar imposition, imposed by any authority having the direct power to tax, including any city, county, state or federal government, or any school, agricultural, lighting, drainage or other improvement or special assessment district thereof, as against any legal or equitable interest of

LANDLORD

TENANT

Landlord in the Property or Development; provided, however, Tenant shall not be responsible for any special assessments which are specifically assessed as a part of the initial construction of the Development; provided, further, only the installments of any such special assessments which become due during the Term of this Lease shall be included within the term "Real Estate Taxes". Real Estate Taxes shall be deemed to include (but shall not be limited to) the following: any tax on the rents of the Property and Development and any assessment, tax, fee, levy or charge in substitution, partially or totally, of any assessment, tax, fee, levy or charge previously included within the definition of property tax.

(c)     **Exclusions**.   Real Estate Taxes shall not include any income, franchise, excise, gift, estate, inheritance, succession, capital levy or transfer tax payable by Landlord.

## 13.   COMMON AREAS

(a)     **Tenant's Non-Exclusive Right**.  Landlord shall make available at all times during the Term of this Lease, on such portions of the Development as Landlord shall from time to time designate or relocate, such automobile parking and other Common Areas as Landlord shall from time to time deem appropriate. Tenant shall have the non-exclusive right during the Term of this Lease to use the Common Areas for itself, its employees, agents, customers, invitees and licensees.  Landlord may offer valet parking in the Common Areas for selected tenants of the Development and such valet parking shall not be deemed a violation of the terms of this Lease. In addition, Landlord may designate the parking areas on each outparcel of the Development as exclusive parking for the owner/occupant/tenant of such outparcel provided sufficient parking is available on such outparcel to park per code.

(b)     **Definition of the Common Areas**. The term "Common Areas" shall mean the portions of the Shopping Center which have at the time in question been designated and improved for common use by or for the benefit of more than one tenant or concessionaire of the Shopping Center, including any of the following (the specific recitation of which shall not be deemed to limit the definition of "Common Areas"): the land and facilities utilized as parking areas; access and perimeter roads; truck passageways (which may be in whole or in part subsurface); service corridors and stairways providing access from store premises; landscaped areas; exterior walks, arcades, stairways, elevators, escalators and/or ramps; interior corridors, elevators, stairs, arcades and/or balconies; directory equipment, wash rooms, comfort rooms, drinking fountains, toilets and other public facilities; and bus stations and taxi stands; but excluding any portion thereof when designated by Landlord for a non-common use, provided any portion of the Shopping Center which was not included within Common Areas shall be so included when so designated and improved for common use. Landlord shall have the right to designate certain portions of the Common Areas for the exclusive use of Landlord or a particular tenant in the Shopping Center for customer pick-up, loading of items purchased in the Shopping Center, valet parking, short-term parking or other similar uses that are incidental to a retail tenant's business operations.

(c)     **Exclusive Control**.  All Common Areas shall be subject to the exclusive control and management of Landlord or such other persons or nominees as Landlord may have delegated or assigned to exercise such management or control, in whole or in part, in Landlord's place and stead, Tenant acknowledges that Landlord makes no representation or warranty whatsoever concerning the safety of the Common Areas or the adequacy of any security system which is or may be instituted for

*12*

the Common Areas.  In no event shall Tenant have the right to sell or solicit in any manner in any of the Common Areas.  Landlord shall have the right to close, if necessary, all or any portion of the Common Areas to such extent as may in the opinion of Landlord's counsel be legally necessary to prevent a dedication thereof or the accrual of any rights of any person or of the public therein; to close temporarily all or any portion of the Common Areas to discourage non-customer use; to use portions of the Common Areas while engaged in making additional improvements or repairs or alterations to the Shopping Center, and to do and perform such other acts in, to and with respect to, the Common Areas as in the use of good business judgment Landlord shall determine to be appropriate for the Shopping Center provided same does not violate the terms of this Lease.

(d)     **Changing the Common Areas**.  Landlord shall have the right to increase the size of the Common Areas, including the expansion thereof to adjacent property; to reduce the Common Areas; to rearrange the parking spaces and improvements on the Common Areas; and to make such changes therein and thereto from time to time which in its opinion are deemed to be desirable and for the best interests of all persons using the Common Areas. Tenant agrees that it and its concessionaires, agents, employees, and vendors, suppliers, and other independent contractors will use such access roads and will operate trucks and trailers in delivering merchandise to and from the Demised Premises upon and over such access roads as are designated therefor by Landlord as a means of ingress to and egress from the Demised Premises.  Notwithstanding the foregoing, Landlord shall not change the Common Areas in such a manner as to materially and adversely affect (i) Tenant's line of sight from the Demised Premises to a major thoroughfare, (ii) the parking field used by Tenant's customers, or (iii) ingress/egress to and from the Demised Premises by Tenant's customers.

(e)     **Rules and Regulations**. Tenant agrees that its use of the Common Areas shall at all times be subject to rules and regulations from time to time promulgated by Landlord; in this regard, Tenant shall comply with all of the rules and regulations established pursuant to this Lease.  From time to time such rules and regulations may provide, without limitation, the hours during which the Common Areas shall be open for use; provided, however, any such rules and regulations or amendments thereto shall not conflict with the terms of this Lease and are equitably applied to all tenants of the Shopping Center.

(f)     **Employee Parking**. Tenant agrees that the employees of Tenant shall not be permitted to park their automobiles in the automobile parking areas which may from time to time be designated for patrons of the Development. Landlord shall have the right to designate space for employee parking either within the Development parking area or in an area reasonably close thereto, which may be areas on the public streets if allowed by the City in which the Demised Premises are located. Landlord shall have the right to change such designated parking area from time to time. Tenant and its employees shall park their automobiles only in those portions of the parking areas, if any, designated for that purpose by Landlord. Tenant shall furnish Landlord with its and its employees' automobile license numbers within fifteen (15) days after opening for business and Tenant shall thereafter notify Landlord of any changes within five (5) days after such change occurs. Tenant hereby authorizes Landlord to tow away from the Development any improperly parked automobile or automobiles belonging to Tenant or Tenant's employees and/or to attach violation stickers or notices to such automobiles. Landlord shall not have any liability with regard to towing.

LANDLORD                              13                              TENANT

(g)     **Expansion or Reduction of Shopping Center**. Landlord shall have the right to expand the Shopping Center beyond its present boundaries or reduce the Shopping Center beyond its present boundaries and in that event, Landlord may from time to time elect either of the following procedures:

(i)     To exclude all Real Estate Taxes on the land and buildings of said expansion or reduction area as well as all other Expenses with respect to said expansion or reduction area from the Expenses in which Tenant is required to participate, in which case the square footage of floor area of the buildings in the reduction or expansion area shall be excluded from the denominator in computing Tenant's Share of Expenses; or

(ii)     To include all Real Estate Taxes and other Expenses for the expansion area in the charges to be prorated pursuant to the terms of this Lease, in which case the expansion area shall be deemed to be included within the Shopping Center for the purposes of computing Tenant's Share of Real Estate Taxes and other Expenses and the square footage of floor area of buildings in the expansion area shall be included in the denominator for purposes of computing Tenant's Share of Expenses.

Landlord agrees to notify Tenant as to which of the foregoing procedures Landlord elects to follow, which notice shall be sent to Tenant within a reasonable time after any such election has been made. Notwithstanding the foregoing, in exercising its rights hereunder Landlord shall not change the Common Areas in such a manner as to materially and adversely affect (i) Tenant's line of sight from the Demised Premises to a major thoroughfare, (ii) the parking field used by Tenant's customers, or (iii) ingress/egress to and from the Demised Premises. Further, in exercising Landlord's rights to increase or reduce the size of the Shopping Center under this paragraph, Landlord will not reallocate Real Estate Taxes or the Expenses of the Common Areas in a manner that would cause Tenant to bear a disproportionate amount of Real Estate Taxes or Expenses as compared to Tenant's Share of Real Estate Taxes and other Expenses prior to Landlord exercising its rights under this paragraph in Landlord's reasonable opinion.

## 14.   COMMON AREA EXPENSES

During the Term of this Lease, Landlord shall keep or cause the Common Areas to be kept in a neat, clean and orderly condition, lighted and landscaped, and shall repair any damage to the facilities thereof, but all costs and expenses incurred by Landlord in connection therewith shall be charged and prorated in the manner previously set forth. The term "CAM Expenses" shall mean all sums expended by Landlord for payment of all work deemed necessary by Landlord in its reasonable discretion taking into account customary practices for first-class retail and mixed-use centers in the Jackson, Mississippi area for the operation, maintenance, replacement, repair and management of the Common Areas, including, but not limited to, the following: repairing, resurfacing, restriping, cleaning and sweeping the parking areas; painting; janitorial services; security services; maintenance and repair when necessary of sidewalks, curbs, bumpers, all Development signs, planting and landscaping, irrigation systems, and lighting and other utilities; operation, maintenance and repair of any common fire protection systems, automatic sprinkler systems and storm drainage systems; the cost of personnel (including property management personnel) to implement such services, which cost shall include, but shall not be limited to, FICA contributions and the cost of overtime and vacation pay, life and health insurance, and other employee fringe benefits; workers' compensation insurance for personnel; police

1|4

and fire protection services; costs of utility services; depreciation on maintenance and operating machinery and equipment, if owned, and rental paid for such machinery and equipment if rented; and the annual amortization of costs of any equipment, device or improvement installed after completion of the Common Areas incurred to reduce operation or maintenance expenses with respect to the Common Areas, which costs are amortized over the useful life thereof and which do not inure primarily to the benefit of Landlord or any particular tenant or group of tenants, including Landlord in the event Landlord is a tenant. In no event, however, shall CAM Expenses be deemed to include the costs of repairs, restoration or other work occasioned by fire, wind, the elements or other casualty, income and franchise taxes of Landlord, expenses in leasing or procuring tenants such as advertising expenses or expenses for renovating the premises of tenants; interest or principal payments on any mortgage or other indebtedness of Landlord; compensation paid to any employee of Landlord above the grade of property manager; special services rendered to tenants (including Tenant) for which a separate charge is made, costs of preparing space for new tenants, or costs borne solely by Tenant under this Lease. Landlord may cause any or all of said services to be provided by an independent contractor or contractors. Tenant shall pay to Landlord its Proportionate Share of CAM Expenses as a part of Tenant's payment of Expenses pursuant to the terms of this Lease.

## 15.  UTILITIES AND OTHER SERVICES.

(a)  **Payment for Utility Services**. Tenant shall pay, prior to delinquency, all charges for utility service to the Demised Premises, including, but not limited to, water, sewer, gas, electricity, telephone, cable, television, internet, data and all other materials and services used by Tenant in, on or about the Demised Premises from and after the delivery of possession of the Demised Premises by Landlord, together with any taxes thereon. If any such charges are not paid when due, Landlord may pay the same, and any amount so paid by Landlord, together with interest thereon at the Default Rate from the date of payment, shall thereupon become due to Landlord from Tenant as Rent.

(b)  **Metering**.   The Demised Premises shall be separately metered for gas, water, electricity and all other utilities.  The initial cost and installation of any such meters shall be paid out of the Tenant Improvement Allowance. Thereafter, the installation, maintenance, repair or replacement thereof, shall be paid by Tenant.  In the event that any utilities are furnished by Landlord, then the rates charged Tenant by Landlord shall not exceed those of the local public utility company as if its services were furnished directly to Tenant, and shall not be less than its proportionate share of any jointly metered service.  Landlord shall not be liable in damages or otherwise for any failure or interruption of any utility service being furnished the Demised Premises or any portion of the Development, except to the extent caused by Landlord's gross negligence or wrongful act.  No such failure or interruption shall entitle Tenant to terminate this lease or to abate payment of any portion of the Rent or other charge due hereunder.

(c)  **Trash Removal**. Tenant shall deposit its trash and refuse, if applicable, only in those areas and in such manner as designated by Landlord.  Except for the designated garbage room, Tenant will not cause or permit its trash receptacles to remain within the interior of the Demised Premises. Tenant shall provide trash receptacles for Tenant's use, and Tenant shall cause all trash and rubbish of Tenant to be deposited within such receptacles. The cost of the maintenance of the trash receptacles and

LANDLORD

15

TENANT

the cost of regular removal of trash and rubbish shall be at Tenant's expense or, at Landlord's option, be included as a part of CAM Expenses. Notwithstanding anything to the contrary, if the expenses of trash removal are included in CAM Expenses, then such trash removal expenses shall not be included in any cap or limitation on CAM Expenses.

## 16.   ENTRY BY LANDLORD

Landlord and its authorized representatives shall have the right to enter the Demised Premises at all reasonable times during normal business hours with advanced notice as may be practical under the circumstances and at any time in case of an emergency (i) to determine whether the Demised Premises are in good condition and whether Tenant is complying with its obligations under this Lease, (ii) to maintain or to make any repair or restoration to the Demised Premises that Landlord has the right or obligation to perform, (iii) to install any meters or other equipment which Landlord may have the right to install, (iv) to serve, post, or keep posted any notices required or allowed under the provisions of this Lease, (v) to show the Demised Premises to prospective brokers, agents, buyers or tenants (except that showing to prospective tenants shall only be in the last nine (9) months of the Term), (vi) to shore the foundations, footings, and walls of the Demised Premises and to erect scaffolding and protective barricades around and about the Demised Premises, but not so as to prevent entry into the Demised Premises, and (vii) to do any other act or thing necessary for the safety or preservation of the Demised Premises or the Development. Tenant hereby waives any claim for damages for any injury or inconvenience to or interference with Tenant's business and any loss of occupancy or quiet enjoyment of the Demised Premises by reason of Landlord's exercise of its rights of entry in accordance with this Section and Tenant shall not be entitled to an abatement or reduction of Rent in connection therewith. Notwithstanding the foregoing, Landlord shall use reasonable efforts to not interfere with Tenant's business in exercising its rights under this paragraph, including scheduling Landlord's activities around peak customer traffic periods to the extent reasonably practical.

## 17.   MAINTENANCE AND REPAIR

(a)     **Landlord's Obligations**.  Landlord shall maintain or cause to be maintained in good order, condition and repair the roof, load bearing walls and foundation of the Demised Premises (except to the extent of damage caused by Tenant which shall be repaired by Landlord at Tenant's expense subject to the waiver of claims and subrogation set forth in Section 20).  Rent shall not be abated, for any failure by Landlord to maintain and repair areas which are being used in connection with construction or reconstruction of improvements, or for any failure to make any repairs or perform any maintenance, except for the Landlord's gross negligence or wrongful act. Notwithstanding the foregoing, Landlord shall use reasonable efforts to not interfere with Tenant's business in exercising its rights under this paragraph including scheduling Landlord's activities around peak customer traffic periods to the extent reasonably practical and Landlord shall use reasonable efforts to satisfy its repair obligations as set forth herein within thirty (30) days from the date Landlord receives written notice that such repairs are necessary (unless such repairs cannot reasonably be made within such thirty-day period in which event such thirty-day period shall be extended to that number of days which is reasonably necessary to complete such repairs).  Tenant shall reimburse Landlord for the cost of roof maintenance and exterior painting as a part of CAM Expenses.

116

(b)     **Tenant's Obligations**.

(i)     Tenant, at its sole cost and expense, except for the obligations of Landlord expressly set forth above, shall keep in good order, condition and repair the Demised Premises and every part thereof including, without limiting the generality of the foregoing, all plumbing; electrical and lighting facilities and equipment within the Demised Premises (including any heating, ventilation and air conditioning system serving the Demised Premises); fixtures; interior walls; ceilings; windows; doors; plate glass; skylights; entrances and vestibules, storefront, and signage located within the Demised Premises (except to the extent of damage caused by Landlord which shall be repaired by Landlord at Landlord's expense subject to the waiver of claims and subrogation set forth in Section 20).

(ii)     In connection with Tenant surrendering possession of the Demised Premises at the end of the Lease term, Tenant agrees to surrender the Demised Premises in good repair and condition, reasonable wear and tear and damage due to casualty or condemnation excepted. Tenant agrees to repair any material damage to the Demised Premises caused by or in connection with the removal of any article of personal property, business or trade fixtures, machinery, equipment, cabinetwork, furniture, movable partitions or permanent improvements or additions, including without limitation thereto, repairing the floor and patching and painting the walls where required by Landlord to Landlord's reasonable satisfaction, all at Tenant's sole cost and expense. Notwithstanding the foregoing, Tenant's obligation to repair under this paragraph shall not require Tenant to repair minor patching, scratches or holes in the walls or floors which may be caused by the removal of furniture and fixtures in the ordinary course of relocation.

(iii)     If Tenant fails to maintain the Demised Premises in good order, condition and repair, Landlord may give Tenant notice to do such acts which are Tenant's obligation hereunder. If Tenant thereafter fails to promptly complete such obligations within thirty (30) days, or if such obligations cannot be completed within thirty (30) days, to commence such work within ten (10) days and diligently prosecute it to completion, then Landlord shall have the right to do such acts and expend such funds at the expense of Tenant as are reasonably required to perform such work. Any amount so expended by Landlord shall be paid by Tenant promptly after demand, with interest at the Default Rate from the date of such demand. Landlord shall have no liability to Tenant for any damage, inconvenience, or interference with the use of the Demised Premises by Tenant as a result of performing any such work; provided, however, Landlord shall use reasonable efforts to avoid material interference with Tenant's business.

## 18.   ALTERATIONS AND ADDITIONS

Tenant shall make no alterations, additions or improvements, or utility installations (which for purposes of this Section shall be defined to mean ducting, power panels, lighting fixtures, space heaters, conduits and wiring), to the Demised Premises or any part thereof without obtaining the prior written consent of Landlord in each instance, which consent shall not be unreasonably withheld by Landlord. Landlord may impose as a condition to such consent such requirements as Landlord may deem necessary in its reasonable discretion, including (without limitation) the requirement that Landlord be furnished with working drawings before work commences and that a bond be furnished,

A 7

LANDLORD

TENANT

and requirements relating to the manner in which the work is done, the contractor by whom it is performed, and the times during which it is accomplished. Excluding any initial Tenant improvements, Tenant will remove at its expense any and all permanent improvements or additions to the Demised Premises installed by Tenant, and all of its movable partitions, counters, personal property, equipment, fixtures and furniture. Any damage done to the Demised Premises in connection with any such removal shall be repaired at Tenant's sole cost and expense. Landlord may, in connection with any such removal which reasonably might involve damaging the Demised Premises, require that such removal be performed by a bonded contractor or other person for which a bond satisfactory to Landlord has been furnished covering the cost of repairing the anticipated damage. Unless so removed, all such permanent improvements or additions to the Demised Premises shall at the expiration or earlier termination of this Lease become the property of Landlord and remain upon the Demised Premises. All articles of personal property and all business and trade fixtures, machinery and equipment, cabinetwork, counters, furniture and movable partitions owned by Tenant or installed by Tenant at its expense in the Demised Premises shall be and remain the property of Tenant and may be removed by Tenant at any time during the Lease term, provided that Tenant, at its sole cost, repairs any damage to the Demised Premises caused by such removal. All such improvements, alterations, additions or utility installations must be done in a good and workmanlike manner and diligently prosecuted to completion so that the Demised Premises shall at all times be a complete unit except during the period of work. Upon completion of any such work by Tenant, Tenant shall file for record in the office of the County Recorder where the Shopping Center is located a Notice of Completion, if required or permitted by law. Tenant shall deliver to Landlord prior to commencement of such work, a copy of the building permit with respect thereto. All such work shall be performed and done strictly in accordance with the laws and ordinances relating thereto. All such work shall be performed so as not to obstruct the access to the premises of any other tenant in the Development. Tenant agrees to carry insurance as required by this Lease covering any improvements, alterations, additions or utility installations to the Demised Premises made by Tenant under the provisions of this Section, it being expressly agreed that none of such improvements, additions, alterations or utility installations shall be insured by Landlord under the insurance Landlord may carry upon the Property, nor shall Landlord be required under any provision for reconstruction to reinstall any such improvements, additions, alterations or utility installations. In addition, it is expressly agreed that if any tax is imposed, or the amount of taxes on the Property is increased, by reason of any such improvements, alterations, additions or utility installations, Tenant may be solely responsible therefor. Notwithstanding the foregoing, Tenant shall have the right to make interior, non-structural alterations less than $50,000.00 during any Lease Year provided such alterations do not affect the building systems (such as the plumbing, HVAC, sprinkler system or other utilities) without Landlord's approval.

## 19.   INDEMNIFICATION

(a)     **Indemnification by Tenant**. Tenant shall indemnify, defend, and hold Landlord and Landlord's property manager –harmless of and from any loss, attorney's fees, expenses, claims, fines, suits, costs and liability of every kind arising because of any bodily injury, death and/or damage to property occurring in or resulting from any gross negligence or willful misconduct of Tenant, occurring during the Term and any holdover period, except to the extent of any costs, expenses, claims or other liabilities occasioned by the negligence or willful wrongful acts or omissions of Landlord, its employees, agents, contractors, officers and directors (herein "Landlord Parties"). In addition, Tenant indemnifies and holds Landlord harmless from and against any loss, liability or claim arising from the

118

consumption or sale of alcoholic beverages from the Demised Premises. If any action or proceeding shall be brought by or against Landlord Parties in connection with any such liability or claim, Tenant, on notice from Landlord Parties, shall defend such action or proceeding, at Tenant's expense, by or through attorneys reasonably satisfactory to Landlord. The provisions of this Section shall apply to all activities of Tenant whether occurring before or after the Commencement Date of the Term and Tenant's obligations under this Section shall not be limited to the limits or coverage of insurance maintained or required to be maintained by Tenant under this Lease. Notwithstanding the foregoing, this indemnification shall not apply to costs, expenses, losses, damage or claims to property to the extent same are waived pursuant to Section 20(h) and (i) below.

(b) **Indemnification by Landlord**. Landlord shall indemnify, defend, and hold Tenant harmless of and from any loss, attorney's fees, expenses, claims, fines, suits, costs and liability of every kind arising because of any bodily injury, death and/or damage to property occurring or resulting from any gross negligence or willful misconduct of Landlord occurring during the Term except to the extent of any costs, expenses, claims or other liabilities occasioned by the negligence or willful wrongful acts or omissions of Tenant, its employees, agents, contractors, officers and directors herein, "Tenant Parties". If any action or proceeding shall be brought by or against Tenant Parties in connection with any such liability or claim, Landlord, on notice from Tenant Parties, shall defend such action or proceeding, at Landlord's expense, by or through attorneys reasonably satisfactory to Tenant. The provisions of this Section shall apply to all activities of Landlord whether occurring before or after the Commencement Date of the Term and Landlord's obligations under this Section shall not be limited to the limits or coverage of insurance maintained or required to be maintained by Landlord under this Lease. Notwithstanding the foregoing, this indemnification shall not apply to costs, expenses, losses, damage or claims to property to the extent same are waived pursuant to Section 20(h) and (i) below.

(c) **Exemption of Landlord from Liability**. If the Demised Premises, or any part thereof, is damaged by fire or other cause against which Tenant is required to carry insurance pursuant to this Lease, Landlord Parties shall not be liable to Tenant for any loss, cost or expense arising out of or in connection with such damage. Tenant hereby releases Landlord Parties from any liability, claim or action arising out of or in connection with such damage. Furthermore, Landlord Parties shall not be liable to Tenant for loss, injury, or damage which may be sustained by the person, goods, wares, merchandise or property of Tenant, its agents, contractors, employees, invitees or customers, or any other person in or about the Demised Premises, caused by or resulting from fire, steam, electricity, gas, water, or rain, which may leak or flow from or into any part of the Demised Premises, or from the breakage, leakage, obstruction or other defects of the pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures of the same, whether such damage or injury results from conditions arising within the Demised Premises or other portions of the Demised Premises, or from any other source. Landlord Parties shall not be liable to Tenant for any damages arising out of or in connection with any act or omission of any other tenant of the Center. Landlord Parties shall not be liable to Tenant for losses due to theft or burglary or for damages arising out of wrongful acts of third parties.

LANDLORD

#19

TENANT

## 20.   INSURANCE

(a)   **General**. All insurance required to be carried by Tenant and Landlord hereunder shall be issued by responsible insurance companies licensed to do business in the State of Mississippi and acceptable to Landlord and the holder of any deed of trust secured by any portion of the Demised Premises (hereinafter referred to as a "Mortgagee"). All policies of insurance provided for herein shall be issued by insurance companies with general policyholder's rating of not less than A and a financial rating of not less than Class VIII as rated in the most current available "Best Insurance Reports." Each policy shall name Landlord, Landlord's Mortgagee, the manager of the Property, the manager of the Development, and the Association (collectively, "Landlord Entities") as an additional insured, as their respective interests may appear together with an ordinance or law coverage endorsement. Tenant shall deliver duplicate originals of all policies to Landlord, evidencing the existence and amounts of such insurance, at least ten (10) days prior to Tenant's occupancy in the Demised Premises (Tenant may deliver certificates of such insurance in lieu of duplicate originals of policies, provided that such certificates shall in Landlord's sole judgment provide clear and unambiguous evidence of the existence and amounts of such insurance). Failure to make such delivery shall constitute a material default by Tenant under this Lease. All policies of insurance delivered to Landlord must contain a provision that the company writing said policy will give to Landlord thirty (30) days' notice in writing in advance of any modification, cancellation or lapse or reduction in the amounts of insurance. All public liability, property damage and other casualty insurance policies shall be written as primary policies, not contributing with, and not in excess of coverage which Landlord may carry. Landlord shall be notified in writing immediately by Tenant of claims against Tenant that might cause a reduction below seventy-five percent of any aggregate limit of any policy. Tenant shall furnish Landlord with renewals or "Binders" of any such policy at least thirty (30) days prior to the expiration thereof. Tenant agrees that if Tenant does not procure and maintain such insurance, Landlord may (but shall not be required to) obtain such insurance on Tenant's behalf and charge Tenant the premiums therefor together with a fifteen (15%) handling charge, payable upon demand. Tenant may carry such insurance under a blanket policy provided such blanket policy expressly affords the coverage required by this Lease by a Landlord's protective liability endorsement or otherwise.

(b)   **Casualty Insurance**. At all times during the Term hereof, Tenant shall maintain in effect policies of casualty insurance covering (i) all improvements in, on or to the Demised Premises above building shell (including any alterations, additions, improvements or utility installations as may be made by Tenant with the proceeds of the Tenant Improvement Allowance, if any), and (ii) trade fixtures, merchandise and other personal property from time to time in, on or upon the Demised Premises. Such policies shall be in the broadest available "special form" or "all risks" coverage in an amount not less than one hundred percent (100%) of the full replacement cost thereof from time to time during the Term of this Lease. Such policies shall provide protection against any peril included within the classification "Fire and Extended Coverage," against vandalism and malicious mischief, against theft, against sprinkler leakage, against earthquake damage unless waived in writing by Landlord, and against flood damage unless waived in writing by Landlord (and including cost of demolition and debris removal). Replacement cost for purposes hereof shall be determined by an accredited appraiser selected by Landlord or otherwise by mutual agreement of the Landlord and Tenant. The proceeds of such insurance shall be used for the repair or replacement of the property so insured. Upon termination of this Lease following a casualty as set forth herein, the proceeds shall be paid to Tenant, except that

120

Landlord shall be paid the unamortized balance of any Tenant Improvement Allowance from such proceeds to the extent Landlord has not then received payment for any Tenant Improvement Allowance over the initial Term of this Lease.

(c)     **Liability Insurance.** Tenant shall at all times during the Term hereof at its own cost and expense obtain and continue in force commercial general liability insurance ("CGL") covering bodily injury liability and property damage liability insurance adequate to protect Landlord Entities against liability for injury to or death of any person in connection with the activities of Tenant in, on or about the Demised Premises or with the use, operation or condition of the Demised Premises. Such insurance at all times shall be in an amount of not less than Two Million Dollars ($2,000,000.00) for injuries to persons in one accident, not less than One Million Dollars ($1,000,000.00) for injury to any one person and not less than Five Hundred Thousand Dollars ($500,000.00) with respect to damage to property. The limits of such insurance do not limit the liability of Tenant hereunder. All public liability and property damage policies shall contain a provision that Landlord, although named as an insured, shall nevertheless be entitled to recovery under said policies for any loss occasioned to it, its members, managers, partners, agents and employees by reason of the negligence of Tenant. Tenant's CGL Policy shall be written on an occurrence basis which shall include the following coverages/endorsements:

     (i)     Demised Premises/Operations;

     (ii)    Independent Contractors;

     (iii)   Broad Form Contractual Liability;

     (iv)   Broad Form Property Damage; and

     (v)    Personal Injury Liability with employee and contractual exclusions removed.

     (vi)   If the CGL policy contains a general aggregate limit, an aggregate limit per location; and

     (vii)  Landlord Entities will be included as "additional insureds" (and under the commercial umbrella, if any); and

     (viii) A waiver of subrogation in favor of Landlord Entities (and under the commercial umbrella, if any); and

     (ix)   Policy to contain standard CGL "other insurance" wording, unmodified in any way that would make it excess over or contributory with the additional insured's own commercial general liability coverage.

     (x)    No deductible or self-insured retention in excess of $10,000 to apply to any coverage provided by the CGL policy without the prior written approval of Landlord.



LANDLORD

*121*

TENANT

(d)     **Workers' Compensation Insurance and Employer Liability Coverage**. Tenant shall also, at all times during the Term, and at Tenant's own cost and expense, procure and continue in force workers' compensation insurance and Employer Liability (and/or commercial umbrellas) with the following limits: $1,000,000.00 each accident for bodily injury by accident or $1,000,000.00 each employee for bodily injury by disease.  No "alternative" form of coverage shall be accepted for worker's compensation coverage.  Such policies shall contain a waiver of Subrogation in favor of Landlord Entities, if available (and under the commercial umbrella, if any).

(e)     **Comprehensive Automobile Liability**. Tenant shall maintain comprehensive automobile liability insurance on a standard from written to cover all owned, hired and non-owned automobiles with insurance in an amount of not less than One Million Dollars ($1,000,000.00) for injuries to persons in one accident, not less than Five Hundred Thousand Dollars ($500,000.00) for injury to any one person and not less than Two Hundred Fifty Thousand Dollars ($250,000.00) with respect to damage to property.

(f)     **Plate Glass**. Tenant shall at all times during the Term maintain insurance coverage on all plate glass on the Demised Premises. The proceeds of such insurance shall be paid to Landlord upon termination of this Lease following a casualty as set forth herein.

(g)     **Landlord's Insurance**. Landlord shall at all times maintain in effect a policy or policies of insurance covering (i) the Demised Premises in an amount up to one hundred percent (100%) of the actual replacement cost thereof (exclusive of the cost of excavations, foundations and footings) from time to time during the Term of this Lease, providing protection against any peril generally included in the classification "Fire and Extended Coverage" or so called "special form" coverage which shall include insurance against sprinkler damage, vandalism, malicious mischief, and third-party liability, and including such coverages in such amounts as Landlord may designate, and may include earthquake and flood insurance if required by Landlord's lender, (ii) the Rent payable hereunder, and (iii) commercial general liability insurance covering bodily injury and property damage liability insurance adequate to protect Landlord against liability for injury to or death of any person in connection with the activities of Landlord, on or about the Property. Such insurance described in subparagraph (iii) shall at all times shall be in an amount of not less than Two Million Dollars ($2,000,000.00) for injuries to persons in one accident, not less than One Million Dollars ($1,000,000.00) for injury to any one person and not less than Five Hundred Thousand Dollars ($500,000.00) with respect to damage to property; provided, however, Landlord may increase such coverage to such limits as Landlord deems reasonably prudent under the circumstances, provided such increases are in keeping with good practices for similar type developments. The insurance Landlord procures may include boiler and machinery coverage. Tenant shall pay to Landlord its Proportionate Share of the cost of the insurance described in this paragraph as a part of Tenant's payment of the Expenses payable in the manner set forth previously. Landlord's obligation to carry the insurance provided for herein may be brought within the coverage of any so-called blanket policy or policies of insurance carried and maintained by Landlord, provided that the coverage afforded will not be reduced or diminished by reason of the use of such blanket policy of insurance.  The cost of maintaining Landlord's insurance obligations under this Lease is referred to herein as "Insurance Expenses" and shall be included as a part of Expenses to be reimbursed by Tenant pursuant to the terms of this Lease.

122

(h)     **Waiver of Liability**. Both parties agree to waive all claims from the other party as such claims relate to (a) all personal property, fixtures or improvements made to the Demised Premises by Tenant, which property shall be at the risk of Tenant, and Landlord shall not be liable for any loss of or damage to property (of whatever nature) of Tenant, their employees, agents, customers, invitees, or to others, regardless of whether such property is entrusted to employees of the Demised Premises, or such loss or damage is occasioned by casualty, theft, failure of Landlord to maintain the structural portions of the Demised Premises, or any other cause of whatsoever nature, it being the responsibility of Tenant to secure and maintain necessary insurance coverage for such property, or (b) all real property comprising the Demised Premises, the Common Areas or the Development, or any personal property of Landlord, which property shall be at the risk of Landlord, and Tenant shall not be liable for any loss of or damage to property (of whatever nature) of Landlord, their employees, agents, customers, invitees, or to others, regardless of whether such loss or damage is occasioned by casualty, theft, failure of Tenant to maintain the Demised Premises, or any other cause of whatsoever nature, it being the responsibility of Landlord to secure and maintain necessary insurance coverage for such property.

(i)     **Waiver of Subrogation**. Landlord and Tenant hereby waive and relinquish any right or claim against each other's property at or on the Demised Premises or the Property by way of subrogation or assignment. Tenant and Landlord agree to have their respective insurance policies endorsed to waive the carrier's right of recovery under subrogation and a certificate of insurance shall be available to either party on request verifying such waiver.

## 21.     DAMAGE AND DESTRUCTION

(a)     **Partial Damage - Insured**. If the Demised Premises or the Common Areas, are damaged by a risk covered under fire and extended coverage insurance protecting Landlord, then Landlord shall restore such damage provided insurance proceeds are available to Landlord to pay one hundred percent (100%) of the cost of restoration (less any deductible or retention), and provided such restoration by Landlord can be completed within six (6) months after the commencement of work, in the opinion of a registered architect or engineer appointed by Landlord. In such event this Lease shall continue in full force and effect, except that Tenant shall be entitled to an equitable reduction of Rent while such restoration takes place, such reduction to be based upon the extent to which the damage and the restoration efforts materially interfere with Tenant's business in the Demised Premises. If Landlord does not restore the Demised Premises or the Common Areas to substantially the same condition that existed on the date of such damage or casualty within two hundred seventy (270) days from the date of such damage or casualty, then Tenant may, at Tenant's option, terminate this Lease at any time prior to the date of the substantial completion of the Demised Premises or the Common Areas.

(b)     **Partial Damage - Uninsured**. If the Demised Premises or the Common Areas are damaged by a risk not covered by such insurance or the insurance proceeds available to Landlord are less than one hundred percent (100%) of the cost of restoration for any reason whatsoever (including, without limitation, as a result of a Mortgagee requiring the proceeds of insurance to be applied toward any indebtedness owed to Mortgagee), or if the restoration cannot be completed within six (6) months after the commencement of work in the opinion of the registered architect or engineer appointed by Landlord, then Landlord shall have the option either to (i) repair or restore such damage, this Lease

LANDLORD

#23

TENANT

continuing in full force and effect, but the Rent to be equitably reduced as hereinabove provided, or (ii) give notice to Tenant at any time within ninety (90) days after such damage terminating this Lease as of a date to be specified in such notice, which date shall be not less than thirty (30) nor more than sixty (60) days after giving such notice. If such notice is given, this Lease shall expire and any interest of Tenant in the Demised Premises shall terminate on the date specified in such notice and the Rent, reduced by an equitable reduction (except as hereinabove provided) based upon the extent, if any, to which such damage materially interfered with Tenant's business in the Demised Premises, shall be paid to the date of such termination, and Landlord agrees to refund to Tenant any Rent or Expenses theretofore paid in advance for any period of time subsequent to such date.

(c)     **Substantial Destruction**. If the Demised Premises are destroyed such that same cannot be reconstructed to substantially the same condition as when delivered to Tenant within two hundred seventy (270) days from the date of such damage or casualty, then, notwithstanding the availability of insurance proceeds, Landlord or Tenant shall have right to terminate this Lease provided such notice is delivered to the other party within sixty (60) days from the date of such damage or casualty. If there is a dispute as to whether the Demised Premises can be reconstructed within such two hundred seventy-day period, then an independent, mutually acceptable architect shall be hired to resolve the dispute. The parties shall split the cost of such architect evenly and the architect's decision shall be binding on the parties. If such termination notice is timely given, this Lease shall expire and any interest of Tenant in the Demised Premises shall terminate on the date specified in such notice and the Rent, reduced by an equitable reduction based upon the extent, if any, to which such damage materially interfered with Tenant's business in the Demised Premises, shall be paid to the date of such termination, and Landlord agrees to refund to Tenant any Rent or Expenses theretofore paid in advance for any period of time subsequent to such date.  If neither party exercises its right to terminate as set forth above, then Landlord shall reconstruct the Demised Premises to substantially the same condition that existed prior to the date of such damage or casualty and Tenant shall receive an equitable abatement of Rent until sixty (60) days from the date Landlord restores the Demised Premises.  If Landlord does not restore the Demised Premises or the Common Areas to substantially the same condition that existed on the date of such damage or casualty within one (1) year from the date of such damage or casualty, then Tenant may, at Tenant's option, terminate this Lease at any time prior to the date of the substantial completion of the Demised Premises or the Common Areas.

(d)     **Landlord's Obligations**. Landlord shall not be required to carry insurance of any kind on Tenant's property and shall not be required to repair any injury or damage thereto by fire or other cause, or to make any restoration or replacement of any paneling, decorations, partitions, ceilings, floor covering, office fixtures, utility installations or any other improvements or property installed in the Demised Premises by or at the direct or indirect expense of Tenant, and Tenant shall be required to restore or replace same in the event of damage.  Tenant shall have no claim against Landlord for any loss suffered by reason of any such damage, destruction, repair or restoration. Notwithstanding anything to the contrary contained in this Section, Landlord shall have no obligation whatsoever to repair, reconstruct or restore the Demised Premises with respect to damage or destruction as described in this Section occurring during the last twelve (12) months of the Term of this Lease or any extension thereof, in which event this Lease shall terminate as of the date of damage or destruction unless (i) a Renewal Period is available to Tenant pursuant to the terms of this Lease and the time for exercising same has not expired, and (ii) Tenant exercises its right to renew this Lease for a Renewal Period in accordance with the terms set forth herein within the earlier to occur of (x) sixty (60) days from the

124

date of the damage or casualty, and (y) the date Tenant must exercise its Renewal Option as required by the terms of this Lease.

## 22.   CONDEMNATION

If all or any part of the Demised Premises or more than 20% of the parking area servicing Tenant's customers is taken or appropriated for public or quasi-public use by the right of eminent domain or otherwise by a taking in the nature of inverse condemnation, with or without litigation, or is transferred by agreement in lieu thereof (any of the foregoing being referred to herein as a "taking"), either party hereto may, by written notice given to the other within thirty (30) days of receipt of notice of taking, elect to terminate this Lease as of the date possession is transferred pursuant to the taking; provided, however, that before Tenant may terminate this Lease for a taking, such taking shall be of such an extent and nature as to materially and adversely affect Tenant's business in Demised Premises. If any part of the Property other than the Demised Premises shall be so taken, Landlord may elect to terminate this Lease.  No award for any partial or entire taking shall be apportioned, and Tenant hereby assigns to Landlord any and all rights of Tenant now or hereafter arising in or to the same or any part thereof; provided, however, that nothing contained herein shall be deemed to give Landlord any interest in, or to require Tenant to assign to Landlord, any award made to Tenant for the taking of personal property belonging to Tenant. In the event of a partial taking which does not result in a termination of this Lease, Rent shall be equitably reduced to the extent Tenant's business in or use of the Demised Premises is materially and adversely affected and impaired as described above. No temporary taking of the Demised Premises or any part of the Property or Development shall terminate this Lease, except at Landlord's election, or give Tenant any right to any abatement of Rent or Expenses hereunder, except that Rent and Expenses shall be equitably reduced as described above during that portion of any temporary taking lasting more than thirty (30) days. Each party hereto waives the provisions of any applicable law allowing either party to petition the court to terminate this Lease for a partial taking, it being the intent of the parties that this Section shall govern.

## 23.   LIENS

Tenant shall keep the Demised Premises and the Property free from any liens arising out of work performed, materials furnished, or obligations incurred by Tenant, and shall indemnify, hold harmless and defend Landlord from any liens and encumbrances arising out of any work performed or materials furnished by or at the direction of Tenant. Tenant shall give Landlord at least ten (10) days' prior written notice of the expected date of commencement of work relating to alterations or additions to the Demised Premises.  Landlord shall have the right at all times to keep posted on the Demised Premises any notices permitted or required by law, or which Landlord shall deem proper for the protection of Landlord and the Demised Premises, and any other party having any interest therein, from mechanics' and materialmen's liens.  If any claim of lien is filed against the Demised Premises or any similar action affecting title to such property is commenced, the party receiving notice of such lien or action shall immediately give the other party written notice thereof.  If Tenant fails, within twenty (20) days following the imposition of any lien and receipt of written notice thereof, to cause such lien to be released of record by payment or posting of a proper bond, Landlord shall have, in addition to all other remedies provided herein and by law, the right (but not the obligation) to cause the same to be released

LANDLORD

125

TENANT

by such means as it shall deem proper, including payment of the claim giving rise to such lien.  All such sums paid by Landlord and all costs and expenses incurred by it in connection therewith (including attorneys' fees) shall be payable to Landlord by Tenant on demand, with interest at the Default Rate from the date of expenditure.

## 24.    DEFAULTS BY TENANT

The occurrence of any one or more of the following events shall constitute a material default and breach of this Lease by Tenant:

(a)    **Failure to Open**. The failure of Tenant to open for business in the Demised Premises within thirty (30) days of the Rent Commencement Date and continuously operate thereafter.

(b)    **Monetary Default**. The failure by Tenant to make any payment of Rent or of any other sum required to be made by Tenant hereunder within ten (10) days from the date of delivery of written notice of such failure; provided, however, Landlord shall not be required to deliver more than two (2) notices of monetary default during any twelve-month period.

(c)    **Non-Monetary Default**. The failure by Tenant to observe or perform any other covenant, condition or provision of this Lease to be observed or performed by Tenant, if such failure is not cured within thirty (30) days after receipt of written notice thereof from Landlord by Tenant; provided, however, that if the nature of Tenant's default is such that it cannot be cured solely by payment of money and more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within thirty (30) days and thereafter diligently prosecutes such cure to completion; provided, further, that repeated breaches or defaults by Tenant of the same default (more than three (3) in any twelve (12) month period) shall entitle Landlord at its option, to terminate this Lease, and provided, further, that violations by Tenant of the Rules and Regulations described in Exhibit "F" shall be cured by Tenant within seventy-two (72) hours after written notice thereof from Landlord, failing which Landlord may (but need not) cure same, in which event Tenant shall pay Landlord, within ten (10) days after written notice thereof by Landlord, the amount expended by Landlord to effect such cure together with an administrative charge of ten percent (10%) of the amount thereof.

(d)    **Bankruptcy**. The making by Tenant of any general assignment for the benefit of creditors, the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt or of a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within sixty (60) days); the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Demised Premises or of Tenant's interest in this Lease, where such seizure is not discharged within thirty (30) days.

(e)    **Lock-Out**.    Notwithstanding any rule or provision of law to the contrary, in the event Landlord shall for the purpose of reentering or regaining possession of the Demised Premises, as authorized by law and/or the terms of this Lease, change the lock(s) to the Demised Premises, Landlord shall not be obligated to provide Tenant with the new key(s) to the Demised Premises or otherwise provide Tenant with access to the Demised Premises unless and until Tenant shall have (1) brought current all rentals and other sums or charges due to Landlord under the provisions of this Lease; (2)

fully cured and remedied to Landlord's satisfaction all other defaults of Tenant under this Lease; and (3) given Landlord security and assurances satisfactory in all respects to Landlord, in Landlord's sole discretion, that Tenant intends to and is able to meet and comply with Tenant's future obligations under this Lease, both monetary and non-monetary. Further, the provisions of this Lease pertaining to Landlord's waiver of notice and demand in the event of the exercise of any right or remedy by Landlord hereunder shall supersede the provisions of any statute or provision of law pertaining to the affixation of notice on the door of the Demised Premises advising of any lockout and/or disclosing the time at which, and/or person from whom, the new key(s) to the Demised Premises may be obtained, and Tenant hereby waives the requirement of any such notice. If Landlord has formally terminated Tenant's right of possession or has terminated this Lease, then Landlord shall be under no obligation to provide the new key(s) to Tenant regardless of Tenant's payment of past due Rent or other sums due hereunder.

## 25.   LANDLORD'S REMEDIES

In the event of any default or breach of this Lease by Tenant, Landlord may at any time thereafter, without limiting Landlord in the exercise of any other right or remedy at law or in equity which Landlord may have (all remedies provided herein being non-exclusive and cumulative), do any one or more of the following:

(a)   **Right to Relet**. Maintain this Lease in full force and effect and recover the Rent and other monetary charges as they become due, without terminating Tenant's right to possession irrespective of whether Tenant shall have abandoned the Demised Premises. If Landlord elects not to terminate this Lease, Landlord shall use reasonable commercial efforts to relet the Demised Premises at such rent and upon such conditions, and for such a term, as Landlord deems reasonably appropriate taking into account the then current market conditions and to do all acts necessary with regard thereto, without being deemed to have elected to terminate this Lease, including re-entering the Demised Premises to make repairs or to maintain or modify the Demised Premises, and removing all persons and property from the Demised Premises; such property may be removed and stored in a public warehouse or elsewhere at the cost of and for the account of Tenant. Reletting may be for a period shorter or longer than the remaining term of this Lease, and for more or less rent. Landlord at any time may elect to terminate this Lease by virtue of any previous uncured default by Tenant. In the event of any such termination, Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default (including, without limitation, the damages described below), as well as all costs of reletting, including commissions, attorneys' fees, restoration or remodeling costs for subsequent tenants.

(b)   **Termination.** Terminate Tenant's right to possession by any lawful means, in which case this Lease shall terminate and Tenant shall immediately surrender possession of the Demised Premises to Landlord. In such event Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default, including, without limitation: (1) the worth, at the time of award, of any unpaid rent which had been earned at the time of such termination; plus (2) the worth, at the time of award, of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves

LANDLORD                    127                    TENANT

could have been reasonably avoided; plus (3) the worth, at the time of award, of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the fair market rental value of the Demised Premises; plus (4) any other amount, and court costs, necessary to compensate Landlord for all the detriment proximately caused by Tenant's default or which in the ordinary course of things would be likely to result therefrom (including, without limiting the generality of the foregoing, the amount of any commissions and/or finder's fee for a replacement tenant); plus (5) at Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law. As used in subparagraphs (1) and (2) of this Section 25(b), the "worth, at the time of award" is to be computed by allowing interest at the Default Rate, and, as used in subparagraph (3) of this Section 27(b), the "worth, at the time of award" is to be computed by discounting such amount at the discount rate of the Consensus Prime Rate published by *The Wall Street Journal* at the time of award. The term "rent" or "Rent" as used in this Section, shall be deemed to be and to mean all Rent (including any unpaid portion of the Tenant Improvement Allowance, if any, or leasing commissions, if any), Percentage Rent (if any), Expenses and other monetary sums required to be paid by Tenant pursuant to this Lease to the extent not otherwise reimbursed to Landlord. For the purpose of determining the amount of "unpaid rent which would have been earned after termination" or the "unpaid rent for the balance of the term" (as referenced in subparagraphs (2) and (3) hereof), the amount of Percentage Rent, if any, and Expenses shall be deemed to increase annually for the balance of the term by an amount equal to their average annual percentage increase during the three (3) calendar years preceding the year in which this Lease was terminated, or, if such termination shall occur prior to the expiration of the third calendar year occurring during the term of this Lease, then the amount of Expenses shall be deemed to increase monthly for the balance of the term by an amount equal to their average monthly percentage increase during all of the calendar months preceding the month in which this Lease was terminated.

(c)     **Right to Collect Rents.** Collect sublease rents (or appoint a receiver to collect such rent) and otherwise perform Tenant's obligations at the Demised Premises, it being agreed, however, that neither the filing of a petition for the appointment of a receiver for Tenant nor the appointment itself shall constitute an election by Landlord to terminate this Lease.

(d)     **Right to Cure Tenant's Default.** Proceed to cure the default at Tenant's sole cost and expense, without waiving or releasing Tenant from any obligation hereunder. If at any time Landlord pays any sum or incurs any expense as a result of or in connection with curing any default of Tenant (including any administrative fees provided for herein and attorneys' fees), the amount thereof shall be immediately due as of the date of such expenditure and, together with interest at the Default Rate from the date of such expenditures, shall be paid by Tenant to Landlord immediately upon demand, and Tenant hereby covenants to pay any and all such sums.

(e)     **Right to Tenant's Fixtures.** If Tenant does not remove Tenant's fixtures, furniture, equipment, improvements, additions, and other personal property in the Demised Premises within thirty (30) days from the expiration of any cure period, Landlord may at Landlord's option remove, sell, or otherwise dispose of same or require Tenant to forthwith remove same.

(f)     **Remedies are Cumulative**. Notwithstanding any termination of this Lease pursuant to a default by Tenant, Landlord shall be entitled to any and all remedies set forth in this Lease or at law or equity.

128

## 26.    DEFAULTS BY LANDLORD

(a)    **Notice and Cure Period**. Landlord shall not be deemed to be in default in the performance of any obligation under this Lease unless and until it has failed to perform such obligation within thirty (30) days after receipt of written notice by Tenant to Landlord specifying such failure; provided, however, that if the nature of Landlord's default is such that more than thirty (30) days are required for its cure, then Landlord shall not be deemed to be in default if it commences such cure within the thirty (30) day period and thereafter diligently prosecutes such cure to completion. Tenant agrees to give any Mortgagee a copy, by certified mail, of any notice of default served upon Landlord. Tenant further agrees that if Landlord shall have failed to cure such default within the time provided for in this Lease, then any such Mortgagee shall have an additional forty-five (45) days within which to cure such default on the part of Landlord or if such default cannot be cured within that time, then such additional time as may be necessary if within that forty-five (45) days the Mortgagee has commenced and is pursuing the remedies necessary to cure such default (including but not limited to commencement of foreclosure proceedings, if necessary to effect such cure), in which event this Lease shall not be terminated while such remedies are being so pursued. In the event of any default by Landlord, Tenant's exclusive remedy shall be an action for damages. Tenant hereby waives (i) the benefit of any laws granting it a lien upon the property of Landlord and/or upon Rent due Landlord, and (ii) any right it may have to withhold, deduct or offset against any Rent due under this Lease.

(b)    **Tenant's Remedies**

(i)    **Right to Cure Landlord's Default.** Proceed to cure the default at Tenant's sole cost and expense, without waiving or releasing Landlord from any obligation hereunder.  If at any time Tenant pays any sum or incurs any expense as a result of or in connection with curing any default of Landlord, the amount thereof shall be due within ten (10) days of Tenant's demand for payment together with interest at the Default Rate.  If Landlord fails to reimburse Tenant for amounts not disputed in good faith by Landlord within thirty (30) days of the date due, then Tenant shall have the right to offset up to 50% of each subsequent payment of Base Rent until reimbursed in full.

(ii)    **Terminate Lease**. If Landlord fails to cure a material default as provided herein, then Tenant shall give Landlord written notice of its failure to cure and Tenant's intention to terminate this Lease.  If Landlord fails to cure the material default within ten (10) days after such notice, then Tenant shall have the right to terminate this Lease.

(iii)    **Remedies are Cumulative.** Notwithstanding any termination of this Lease pursuant to a default by Landlord, Tenant shall be entitled to any and all remedies set forth in this Lease or at law or equity.

(c)    **Limitation of Tenant's Remedies**.  None of Landlord partners, members, managers, officers, employees or agents shall be personally liable for any such default or for any deficiency.  In no event shall Landlord be liable for any consequential, speculative or punitive damages (including, without limitation, any claims for lost profits or lost business opportunities).  All covenants and agreements to be performed by Landlord and Tenant under this Lease shall be performed by Landlord

and Tenant at such party's sole cost and expense and without any offset to or abatement of Rent. In no event shall the Tenant be liable for any consequential, speculative or punitive damages.

## 27.   COSTS OF SUIT

If either party brings an action for relief against the other, declaratory or otherwise, arising out of this Lease, including any suit by Landlord for the recovery of Rent or possession of the Demised Premises, the unsuccessful party shall pay the successful party its costs incurred in connection with and in preparation for said action, including reasonable attorneys' fees and expenses.

## 28.   SURRENDER OF DEMISED PREMISES

(a)   **Surrender**. On expiration or termination of this Lease, Tenant shall surrender to Landlord the Demised Premises, and all Tenant's improvements thereto and alterations thereof, broom clean and in good condition (except for ordinary wear and tear occurring after the last necessary maintenance made by Tenant), and shall remove all of its personal property including any signs, notices and displays. Tenant shall perform all restoration made necessary by the removal of any such improvements or alterations or personal property, prior to the expiration of the Lease term. Landlord may retain or dispose of in any manner any such improvements or alterations or personal property that Tenant does not remove from the Demised Premises within ten (10) days from the expiration or termination of the Term as allowed or required by this Lease, unless the Landlord has locked the Tenant out of possession of the Demised Premises pursuant to Section 24 (e), in which case the Landlord shall allow the Tenant a reasonable period of time to perform any restoration and to remove its improvements, alterations and personal property. Title to any such improvements or alterations or personal property that Landlord so elects to retain or dispose of shall vest in Landlord. Tenant waives all claims against Landlord for any damage or loss to Tenant arising out of Landlord's retention or disposition of any such improvements, alterations or personal property. Tenant shall be liable to Landlord for Landlord's costs of storing, removing and disposing of any such improvements, alterations or personal property. If Tenant fails to surrender the Demised Premises to Landlord on expiration or termination of this Lease as required by this Section, Tenant shall indemnify, defend and hold Landlord harmless from all damages, loss, cost and expense (including attorneys' fees) arising out of or in connection with Tenant's failure to surrender the Demised Premises.

(b)   **Holding Over**. If Tenant holds over after the Term hereof, with or without the express or implied consent of Landlord, such tenancy shall be from month-to-month only, and not a renewal hereof or an extension for any further term, and in such case Rent shall be payable at a rental in the amount of one hundred twenty-five percent (125%) of the Rent in effect as of the last month of the Term hereof and at the time specified in this Lease, and such month-to-month tenancy shall be subject to every other term, covenant and agreement contained herein. The foregoing shall not, however, be construed as a consent by Landlord to any holding over by Tenant and Landlord reserves the right to require Tenant to surrender possession of the Demised Premises upon expiration or termination of this Lease.

## 29.   TRANSFER OF LANDLORD'S INTEREST

130

Landlord shall have the right to assign its interest in this Lease to any party in Landlord's sole discretion; provided, however, that Landlord gives the Tenant written notice of such assignment and the name and contact information of the assignee. If Landlord sells or transfers its interest in the Demised Premises (other than a transfer for security purposes), Landlord shall be released from all obligations and liabilities accruing thereafter under this Lease, if Landlord's successor has assumed in writing Landlord's obligations under this Lease, and if Landlord has notified Tenant in writing of such sale or transfer of the Demised Premises, including the name and contact information of the Purchaser or Transferee. Any Security Deposit, prepaid Rent or other funds of Tenant in the hands of Landlord at the time of transfer shall be delivered to such successor. Tenant agrees to attorn to the purchaser or assignee, provided all Landlord's obligations hereunder are assumed in writing by such successor. Notwithstanding the foregoing, Landlord's successor shall not be liable to Tenant for any such funds of Tenant which Landlord does not deliver to the successor.

## 30.   ASSIGNMENT AND SUBLETTING

(a)   **Right to Transfer**. Except for a Permitted Transfer (hereinafter defined in Section 30 (g)), Tenant shall not transfer this Lease or any interest therein (any sale, assignment, mortgage, pledge, hypothecation or encumbrance of this Lease shall be deemed a "transfer"), and shall not sublet the Demised Premises or any part thereof, without the prior written consent of Landlord, which consent may be withheld in accordance with the Reasonable Discretion Standard. The term "Reasonable Discretion Standard" shall mean that the consent by Landlord to any transfer, assignment, subletting, license or concession agreement or hypothecation which is not a Permitted Transfer (referred to herein as a "Third Party Transfer" and the intended assignee, sublessee, licensee or other transferee of a Third Party Transfer is referred to herein as a Third Party Transferee) shall be subject to the satisfaction of all of the following criteria:

(i)   The business reputation of the Third Party Transferee and the management and/or principals of the Third Party Transferee shall be one which is of good standing and shall have a reputation of operating profitable business for the same type of business such Third Party Transferee intends on operating in the Demised; and

(ii)   financial condition which shall be reasonably necessary to assume Tenant's obligations under the Lease; and

(iii)   intended use of the Demised Premises, which intended use shall not violate any then exclusive or prohibited use restriction in the Development, shall not directly compete with the primary business of another tenant in the Development, and shall not be illegal or immoral; and

(iv)   the Third Party Transferee shall pay Percentage Rent to Landlord on the same basis as Tenant is required to pay Percentage Rent under the terms of this Lease. Landlord shall retain all right, title and interest in such Percentage Rent payments.

(b)   **Right to Recapture**. If Tenant proposes to transfer this Lease, except a Permitted Transfer, Landlord may, at its option, upon written notice to Tenant given within fifteen (15) days after

LANDLORD

$31

TENANT

its receipt of written notice by Tenant of Tenant's proposal to transfer, elect to recapture the Demised Premises and terminate this Lease. If Tenant proposes to sublease all or part of the Demised Premises, Landlord may, at its option upon written notice to Tenant given within fifteen (15) days after its receipt of said notice, elect to recapture such portion of the Demised Premises as Tenant proposes to sublease and upon such election by Landlord, this Lease shall terminate as to the portion of the Demised Premises recaptured. In the event a portion only of the Demised Premises is recaptured, the Rent payable under this Lease and the Security Deposit shall be proportionately reduced based on the gross square footage retained by Tenant and the gross square footage leased by Tenant hereunder immediately prior to such recapture and termination, and Landlord and Tenant shall thereupon execute an amendment of this Lease in accordance therewith. If Landlord recaptures only a portion of the Demised Premises, it shall construct and erect at its sole cost such partitions as may be required to sever the space retained by Tenant from the space recaptured by Landlord; provided, however that said partitions need only be finished in paint grade condition. Landlord may, without limitation, lease the recaptured portion of the Demised Premises to the proposed subtenant or transferee without liability to Tenant. Notwithstanding the foregoing, Landlord's right to recapture under this subparagraph (b) shall not apply to Permitted Transfers.

(c)     **Excess Rental**. If Landlord shall give its consent to any assignment, sublease or transfer of the Demised Premises, Tenant shall, in consideration therefor, pay to Landlord, as additional Rent 100% of any rents, additional charges, or other consideration payable under the assignment, sublease or transfer by the assignee, sublessee or transferee to Tenant that are in excess of the Rent accruing during the Term of the sublease in respect of the assigned, subleased or transferred space, together with the reasonable costs incurred by Landlord in connection with such assignment, subletting or transfer (at the rate per square foot payable by Tenant hereunder) pursuant to the terms hereof (including, without limiting the generality of the foregoing, all sums paid for the sale or rental of Tenant's fixtures or leasehold improvements, less, in the case of the sale thereof, the then net unamortized or undepreciated cost thereof determined on the basis of Tenant's Federal income tax returns), less the costs actually incurred by Tenant for commissions (at fair market rates), advertising and subtenant leasehold improvements, all of such costs to be amortized without interest over the length of the sublease term. The sums payable under this subparagraph shall be paid to Landlord as and when payable by the sublessee to Tenant. Within fifteen (15) days after written request therefor by Landlord, Tenant shall at any time and from time to time furnish evidence to Landlord of the amount of all such sums or other consideration received or expected to be received. Tenant immediately and irrevocably assigns to Landlord, as security for Tenant's obligations under this Lease, all rent from any subletting of all or any part of the Demised Premises, and Landlord, as assignee and as attorney-in-fact for Tenant for purposes hereof, or a receiver for Tenant appointed on Landlord's application, may collect such rents and apply same toward Tenant's obligations under this Lease; except that, until the occurrence of an act of default by Tenant, Tenant shall have the right and license to collect such rents.

(d)     **Liability of Tenant**.  No consent by Landlord to any transfer or subletting by Tenant shall relieve Tenant of any obligation to be performed by Tenant under this Lease, whether occurring before or after such consent, transfer or subletting nor shall Tenant be relieved of any liability in connection with a Permitted Transfer. The consent by Landlord to any transfer or subletting shall not relieve Tenant from the obligation to obtain Landlord's express prior written consent to any other transfer or subletting, in no event shall any permitted subtenant transfer its sublease, further sublet all or any portion of its sublet space, or otherwise suffer or permit the sublet space, or any part thereof, to

1

be used or occupied by others, except upon compliance with, and subject to, provisions of this Section. The acceptance by Landlord of payment from any other person shall not be deemed to be a waiver by Landlord of any provision of this Lease or to be a consent to any subsequent transfer or sublease, or to be a release of Tenant from any obligation under this Lease. The joint and several liability of Tenant and any immediate or remote successor in interest to Tenant, and the due performance of the obligations of this Lease on Tenant's part to be performed or observed, shall not be discharged, released or impaired in any respect by any agreement or stipulation made by Landlord extending the time of, or modifying any of the obligations of, this Lease, or by any waiver or failure of Landlord to enforce any of the obligations of this Lease, except as expressly set forth above.

(e)     **Assumption of Obligations**.  Each transferee of Tenant shall assume all obligations of Tenant under this Lease and shall be and remain liable jointly and severally with Tenant for the payment of the Rent and the performance of all the terms, covenants, conditions and agreements herein contained on Tenant's part, to be performed for the term of this Lease.  No transfer shall be binding on Landlord unless the transferee or Tenant delivers to Landlord a counterpart of the instrument of transfer in recordable form which contains a covenant of assumption by the transferee satisfactory in substance and form to Landlord, and consistent with the requirements of this Section. The failure or refusal of the transferee to execute such instrument of assumption shall not release or discharge the transferee from its liability to Landlord hereunder.  Landlord shall have no obligation whatsoever to perform any duty to or respond to any request from any sublessee, it being the obligation of Tenant to administer the terms of its subleases.

(f)     **Fees for Review**.  Simultaneously with the giving of the notice of Tenant's desire to sublet the Demised Premises or to assign this Lease, Tenant shall pay to Landlord or Landlord's designee a non-refundable fee in the amount of One Thousand Dollars ($1,000.00) as reimbursement for expenses incurred by Landlord in connection with reviewing each such transaction.

(g)     **Permitted Transfers**. Tenant shall have the right to transfer (herein, a "Permitted Transfer") this Lease with thirty (30) days advance notice to Landlord but without the necessity of approval from Landlord to any person or entity with whom Tenant is merged, consolidated or to a person or entity that purchases substantially all of Tenant's assets or a franchisee or franchisor of Tenant or Tenant's franchisor (hereinafter, a "Permitted Transferee"), provided the combined financial net worth of Tenant and the Permitted Transferee subsequent to the Permitted Transfer are not less than the financial net worth of Tenant prior to the Permitted Transfer.  Notwithstanding any Permitted Transfer, Tenant shall not be released from any liability under this Lease.

(h)     **Involuntary Assignment**. No interest of Tenant in this Lease shall be assignable by operation of law (including without limitation, the transfer of this Lease by testacy or intestacy). Each of the following acts shall be considered an involuntary assignment: (i) If Tenant is or becomes bankrupt or insolvent, makes an assignment for the benefit of creditors, or institutes a proceeding under any bankruptcy law in which Tenant is the bankrupt; (ii) if a writ of attachment or execution is levied on this Lease; (iii) if, in any proceeding or action to which Tenant is a party, a receiver is appointed with authority to take possession of the Demised Premises. An involuntary assignment shall constitute

LANDLORD

132

TENANT

a default by Tenant and Landlord shall have the right to elect to terminate this Lease, in which case this Lease shall not be treated as an asset of Tenant.

## 31.   ATTORNMENT

If any proceeding is brought for default under any ground or underlying lease to which this Lease is subject, or in the event of foreclosure or the exercise of the power of sale under any mortgage or deed of trust made by Landlord covering the Demised Premises, Tenant shall attorn to the successor upon any such foreclosure or sale and recognize that successor as Landlord under this Lease, provided such successor expressly agrees in writing to be bound to all future obligations by the terms of this Lease, and, if so requested, Tenant shall enter into a new lease with that successor on the same terms and conditions as are contained in this Lease (for the unexpired term of this Lease then remaining). Notwithstanding the foregoing, any successor of Landlord shall provide written notice to Tenant of any such foreclosure or sale and shall provide Tenant with the successor's name and contact information.

## 32.   SUBORDINATION

Without the necessity of any additional document being executed by Tenant for the purpose of effecting a subordination, this Lease shall be subject and subordinate at all times to the lien of any mortgage or deed of trust which may now exist or hereafter be executed in any amount for which the Demised Premises or Landlord's interest or estate in any of them, is specified as security. Notwithstanding the foregoing, Landlord shall have the right to subordinate or cause to be subordinated any such liens to this Lease. Tenant shall, notwithstanding any subordination, attorn to and become Tenant of the successor in interest to Landlord at the option of such successor in interest. Tenant covenants and agrees to execute and deliver, upon demand by Landlord and in such form as shall be reasonably requested by Landlord, any documents evidencing the priority or subordination of this Lease with respect to any lien of any such first mortgage or first deed of trust, and specifically to execute, acknowledge, and deliver to Landlord from time to time within ten (10) days after requested to do so a subordination of deed of trust, in such form as may be customarily required by any Mortgagee of Landlord and failure of Tenant to do so shall be a material default hereunder.

## 33.   ESTOPPEL CERTIFICATE

Tenant shall from time to time within ten (10) days after prior written notice from Landlord execute, acknowledge and deliver to Landlord a statement in writing in a form customarily required by Landlord's Mortgagee or a potential purchaser, (i) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect) and the date to which the Rent and other charges are paid in advance, if any, (ii) acknowledging that there are not, to Tenant's knowledge, any uncured defaults on the part of Landlord hereunder, or specifying such defaults if they are claimed, and (iii) containing such other matters as are set forth in such form.   Any such statement may be conclusively relied upon by any prospective purchaser or lender. Tenant's failure to deliver such statement within such time shall be conclusive upon Tenant that this Lease is in full force and effect, without modification except as may be represented by Landlord, that there are no uncured defaults in Landlord's performance, and that not more than one month's Rent has been paid in advance. Failure of Tenant to so deliver such statement shall be a material default hereunder.

_133_

**34.   QUIET ENJOYMENT**

So long as Tenant pays all Rent and other sums due under this Lease, performs its covenants and obligations under this Lease and recognizes any successor to Landlord in accordance with the terms of this Lease, Tenant shall lawfully and quietly have, hold and enjoy the Demised Premises without hindrance or molestation by Landlord or anyone claiming by, through or under Landlord, subject, however, to all the provisions of this Lease and subject to any and all title matters of record in the Real Property Records of Hinds County, Mississippi, including without limitations those certain declarations, reciprocal easement agreements and restrictions as set forth below:

**35.   RESERVED.**

**36.   TAX INCREMENT FINANCING**

Tenant (i) acknowledges that affiliates of Landlord intend to obtain tax increment financing ("TIF") for all or a portion of the Development and (ii) agrees that in no event shall Tenant be entitled to participate or receive any reimbursements from the TIF; Tenant hereby waiving all claims thereto. Furthermore, Tenant agrees that, for so long as the Property or any portion of the Development is under the jurisdiction of governing authorities involved in the TIF, Tenant shall not challenge any increases in taxes, assessments, or valuations imposed on the Property by the applicable taxing units. Tenant shall reasonably cooperate with Landlord and its affiliates in connection with the TIF, and as part of such cooperation, Tenant shall provide and/or authorize the appropriate governmental entities to disclose information, including, without limitation, sales and other tax payments by Tenant, for purposes of the TIF.

**37.   RULES AND REGULATIONS**

The Rules and Regulations attached hereto as <u>Exhibit "F"</u> are expressly made a part hereof. Tenant agrees to comply with such Rules and Regulations and any reasonable amendments, modifications or additions thereto as may hereafter be adopted and published by notice to Tenant, and to cause its concessionaires, agents, contractors and employees to comply therewith, and that the violation of the Rules and Regulations by any of them shall constitute a default by Tenant under this Lease. Tenant shall use its reasonable efforts to cause its customers, invitees and licensees to comply with the Rules and Regulations. If there is a conflict between the Rules and Regulations and any of the provisions of this Lease, the provisions of this Lease shall prevail. Landlord shall not be responsible to Tenant for the non-performance by any other tenant or occupant of the Development of any of the Rules and Regulations.

**38.   RELOCATION**

Landlord reserves the right to relocate the Premises to reasonably comparable space within the Development. Landlord shall give Tenant written notice of its intention to relocate the Premises, and Tenant will complete such relocation within one hundred twenty (120) days after receipt of such notice.

LANDLORD                                                                                                    TENANT

Upon relocation, this Lease will be amended by deleting the description of the original Premises and substituting for it a description of such new space. Landlord agrees to reimburse Tenant for its actual reasonable moving costs within the Development, the reasonable costs of reprinting reasonable quantities of stationery, and the costs of rewiring for telephone, cable television and computers comparable to the original Premises and utility connections, as well as the costs for all improvements and alterations made by Tenant to the original Demised Premises, or in lieu of reimbursement of such costs for improvements and alterations by Landlord to Tenant, Landlord shall provide Tenant with a Tenant Improvement Allowance to make improvements and alterations to the new space comparable to the original Premises, and the Tenant shall be allowed a reasonable period of time not to exceed ninety (90) days within which to complete the improvements and alterations to the new space in the Development.

### 39.   NOTICES

Any notice, demand or communication required or permitted to be given hereunder shall be personally served, deposited in the United States mails, duly registered or certified with postage fully prepaid thereon or by Federal Express or other reputable overnight courier service, addressed to the other party at the address set forth in Section 1 hereof, or to such other address requested in writing by either party upon thirty (30) days' notice to the other party. Notices shall be deemed to have been given upon the date same is post-marked if sent by registered or certified mail or the day deposited with Federal Express or such reputable overnight courier or the day sent if by personal service, but shall not be deemed received until one (1) business day following deposit with Federal Express or other reputable overnight courier or three (3) days following deposit in the United States Mail if sent by certified or registered mail or upon receipt if by personal service. Any notice, demand or communication required or permitted to be given to Tenant under this Lease shall also be given to the Tenant's attorney:

> William E. McLeod, Esq.
> McLeod & Associates, P.A.
> 10 Professional Parkway
> Hattiesburg, MS 39402

### 40.   NON-WAIVER

No delay or omission in the exercise of any right or remedy of Landlord for any default by Tenant shall impair such right or remedy or be construed as a waiver. The receipt and acceptance by Landlord of delinquent payments shall not constitute a waiver of any other default, and shall not constitute a waiver of timely payment of the particular payment involved. No act or conduct of Landlord, including, without limitation, the acceptance of keys to the Demised Premises, shall constitute an acceptance of the surrender of the Demised Premises by Tenant before the expiration of the Term. Only an express notice to such effect from Landlord to Tenant shall constitute acceptance of the surrender of the Premised sufficient to terminate this Lease. Landlord's consent to or approval of any act by Tenant requiring Landlord's consent or approval shall not constitute a consent or approval of any subsequent act by Tenant. Any waiver by Landlord of any default must be in writing and shall not be a waiver of any other default concerning the same or any other provision of this Lease.

135

## 41.   GUARANTOR INCAPACITY

In the event either Guarantor passes away or is physically no longer able to work for a period of at least six (6) months, Tenant shall have the right to terminate this Lease ("Right to Terminate"), provided that Tenant will pay the total unamortized sum of (i) the Tenant Improvement Allowance distributed by Landlord to Tenant and (ii) any commission paid by Landlord to any Broker associated with the Lease Agreement. Tenant must provide at least forty-five (45) days' prior written notice of its intention to exercise the Right to Terminate described in this Section 41.

## 42.   MISCELLANEOUS

(a)   **Not an Offer**. The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or an option for, the Demised Premises.

(b)   **Execution**. This document becomes effective and binding only upon execution and delivery hereof by Tenant and by Landlord. No act or omission of any employee or agent of Landlord or of Landlord's broker shall alter, change or modify any of the provisions hereof.

(c)   **Landlord and Tenant**. As used in this Lease, the words "Landlord" and "Tenant" include the plural as well as the singular. Words used in the neuter gender include the masculine and feminine and words in the masculine or feminine gender include the neuter, If there is more than one person or entity constituting Landlord or Tenant, the obligations imposed hereunder upon Landlord or Tenant are joint and several, If Tenant consists of a husband and wife, the obligations of Tenant hereunder extend individually to the sole and separate property of each of them as well as to their community property. The obligations contained in this Lease to be performed by Landlord shall be binding on Landlord's successors and assigns only during their respective periods of ownership of the Demised Premises.

(d)   **Brokers**. Except for the brokers identified in Article 1, if any (the "Brokers"), Landlord and Tenant represent and warrant that no brokerage fee or commission is due in connection with this Lease. Each party shall indemnify and hold the other party harmless from all damages (including attorneys' fees and costs) resulting from any claims that may be asserted by any broker, finder, or other person claiming by, through or under the party (except that Landlord shall pay the Broker(s) in accordance with a separate written agreement with such Brokers).

(e)   **Parking**. Except as expressly set forth herein, Tenant acknowledges that neither Landlord nor any agent of Landlord has made any representation or warranty as to the suitability of the parking areas, or as to the availability of parking spaces, for the conduct of Tenant's business. Landlord may, if in its opinion the same be advisable, establish a system or systems of validation or other type operation to control the parking areas, including a system of charges against non-validated parking checks of users.

(f)   **Lease Not to be Recorded**. Landlord and Tenant agree that in no event shall this Lease or a memorandum hereof be recorded.

_____
LANDLORD

134

_____
TENANT

(g)     **Matters of Record**. This Lease and Tenant's rights hereunder are subject and subordinate in all respects to matters affecting Landlord's title recorded in the official records of the county recorder's office for the county in which the Property is located prior or subsequent to the date of execution of this Lease. Tenant agrees that as to its leasehold estate it, and all persons in possession or holding under it, will conform with and will not violate any such covenants, conditions and restrictions, or other matters, of record.

(h)     **Severability**. If any provision of this Lease shall, to any extent, be determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Lease shall not be affected thereby, and every other term and provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

(i)     **Construction**. All provisions hereof, whether covenants or conditions, shall be deemed to be both covenants and conditions.   The definitions contained in this Lease shall be used to interpret this Lease.

(j)     **Interest**. Except as expressly provided otherwise in this Lease, any amount due to Landlord or Tenant which is not paid when due shall bear interest from the date due at the consensus prime rate published from time to time by *The Wall Street Journal*, plus five percent (5%) per annum, but not to exceed the maximum rate of interest allowable under the law (the "Default Rate"). Payment of such interest shall not excuse or cure any default by Tenant or Landlord under this Lease.

(k)     **Binding Effect; Choice of Law**.  Except as expressly provided otherwise in this Lease, all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.  This Lease shall be governed by the laws of the state where the Property is located.

(l)     **Time; Rights Cumulative**. Time is of the essence of this Lease and each and every provision hereof, except as to the provisions relating to delivery of possession of the Demised Premises to Tenant.  All rights and remedies of the parties shall be cumulative and non-exclusive of any other remedy at law or in equity.

(m)     **Inability to Perform**. This Lease and the obligations of Tenant hereunder shall not be affected or impaired because Landlord is unable to fulfill any of its obligations hereunder or is delayed in doing so, if such inability or delay is caused by reason of force majeure, strike, labor troubles, acts of God, acts of government, unavailability of materials or labor, or any other cause beyond the control of Landlord (the "Permitted Delays").   Notwithstanding the foregoing, (i) nothing contained in this Section 42(m) shall excuse either party from paying in a timely fashion any payments required to be made under this Lease, when due under the terms of this Lease, (ii) financial inability or inconvenience shall never excuse or delay the performance of any obligations under this Lease and (iii) with respect to Tenant's construction obligations under Section 9(b) and Exhibit "D" hereof, (a) no delay under this Section 42(m) shall be effective unless Tenant shall have notified Landlord of the delay within ten (10) days of the event giving rise to such delay, and (b) no delay under this Section 42(m) shall be permitted in connection with delays caused by local governmental ordinances, codes or regulations in effect as of the date of this Lease or the implementation of same.

137

(n)     **Corporate Authority**. If Tenant is a corporation, each individual executing this Lease on behalf of Tenant represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of Tenant, and that Tenant is qualified to do business in the state where the Development is located, and shall deliver appropriate certification to that effect if requested.

(o)     **Partnership Authority**. If Tenant is a partnership, joint venture, limited liability company, or other unincorporated association, each individual executing this Lease on behalf of Tenant represents that this Lease is binding on Tenant. Furthermore, Tenant agrees that the execution of any written consent hereunder, or of any written modification or termination of this Lease, by any general partner, member, or manager of Tenant or any other authorized agent of Tenant, shall be binding on Tenant.

(p)     **Submittal of Financial Statement**. At any time and from time to time during the term of this Lease, within twenty (20) days after request therefor by Landlord, Tenant shall supply to Landlord and/or any Mortgagee a current financial statement or such other financial information as may be required by any such party.  Landlord shall not require any such financial information more than twice during any calendar year and Landlord shall keep such information confidential except that Landlord may disclose such financial information to current or future lenders or purchasers of the Property or the Development.

(q)     **No Partnership**. Nothing herein contained, either in the method of computing Rent or otherwise, shall create between the parties hereto, or be relied upon by others as creating, any relationship or partnership, association, joint venture, or otherwise. The sole relationship of the parties hereto shall be that of landlord and tenant.

(r)     **Financing Contingency; Lender Approval**.

(i)     **Lease Subject to Lender's Approval**.  It is understood and agreed that until this Lease is fully executed and delivered by both Tenant and by the authorized corporate officers of Landlord and approved by Landlord's lender, there is not and shall not be an agreement of any kind between the parties hereto upon which any commitment, undertaking or obligation can be founded against Landlord. Landlord covenants that upon receipt of a fully executed copy of this Lease, it will promptly submit this Lease to its lender for approval.   It is further agreed that this Lease contains the entire agreement between the parties hereto and that in executing this lease, Tenant does not rely upon any statement, promise, or representation not herein expressed; that this Lease once executed and delivered shall not be modified, changed or altered in any respect except by a writing executed and delivered in the same manner as required for this Lease.

(ii)     **Modifications Required by Lender**. In the event that any mortgagee requires modification to this Lease, Tenant agrees to work in a reasonable fashion to satisfy the mortgagee provided it does not in any way materially alter the terms and conditions of this Lease or affect Tenant's obligations hereunder or costs for the of the Demised Premises.


LANDLORD

438

TENANT

(iii)     **Mortgagees' Liability**. No mortgagee or lender of Landlord's shall have any liability hereunder.

(s)     **Financing Contingency**. Landlord's obligations under this Lease shall be conditioned on Landlord obtaining financing acceptable to Landlord to perform Landlord's construction obligations as set forth herein.

(t)     **Lease Guaranty**. Concurrently with its execution of this Lease, Tenant shall cause each Guarantor to execute a separate Guaranty Agreement, attached hereto as Exhibit "I". Each Guarantor's liability shall be limited to $125,000.00, for an aggregate of $250,000.00. If either Guarantor dies, then Tenant shall provide a substitute guarantor reasonably satisfactory to Landlord within 90 days.

(u)     **Exhibits**. Each of the following exhibits is incorporated herein as a part of this Lease:

| | | | |
|---|---|---|---|
| (i) | Exhibit "A" | - | Demised Premises |
| (ii) | Exhibit "A-1" | - | Site Plan |
| (iii) | Exhibit "B" | - | Legal Description of the Property |
| (iv) | Exhibit "C" | - | Reserved |
| (v) | Exhibit "D" | - | Landlord's and Tenant's Work |
| (vi) | Exhibit "D-1" | - | Contractors Insurance Requirements |
| (vii) | Exhibit "E" | - | Signage Criteria |
| (viii) | Exhibit "F" | - | Rules and Regulations |
| (ix) | Exhibit "G" | - | Commencement Notice |
| (x) | Exhibit "H" | - | Use Restrictions |
| (xi) | Exhibit "I" | - | Guaranty Agreement |

## 43.     INTEGRATED AGREEMENT; AMENDMENT

This Lease contains all of the agreements of the parties hereto with respect to any matter covered or mentioned in this Lease, and no prior agreement, negotiations, brochures, arrangements, or understanding pertaining to any such matter shall be effective for any purpose unless expressed herein. No provisions of this Lease may be amended or added to except by an agreement in writing signed by the parties hereto or their respective successors in interest.

[Signatures on Following Page]

B9

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the Effective Date.

LANDLORD:

TDLDC Retail I, LLC,
a Mississippi limited liability company
By: The District Management Co, LLC

By: _____
Name: Breck R. Hines
Title: Manager
Date: _____4/5/17_____,2017

TENANT:

Beckham Jewelry, LLC
a Mississippi limited liability company

By: _____
Name: Brian L. Beckham
Title: Manager
Date: _____4/5/17_____,2017

LANDLORD

140

TENANT

# EXHIBIT "A"

LANDLORD

TENANT

**Demised PremisesEXHIBIT "A-1"**

INSERT SITE PLAN AND MARK:

1. DEMISED PREMISES AND PROPERTY
2. DEVELOPMENT

_____
LANDLORD

_____
TENANT



43

## EXHIBIT "B"

### Legal Description of the Property

A portion of Lot 10 of The District at Eastover, a subdivision according to a map or plat thereof recorded in Plat Book 41 at Page 42 in the Office of the Chancery Clerk of Hinds County, Mississippi at Jackson.

44

LANDLORD

TENANT

EXHIBIT "C"

RESERVED



LANDLORD

45



TENANT

## EXHIBIT "D

## LANDLORD'S AND TENANT'S WORK

## ARTICLE I. CONSTRUCTION OF THE DEMISED PREMISES AND TENANT'S IMPROVEMENTS

Tenant shall accept the Demised Premises in its "as-is" condition.

## ARTICLE II. GENERAL SPECIFICATIONS

A.   All plans, diagrams, designs, schedules, specifications and other data required to be furnished by Tenant (all of which shall be prepared by Tenant at Tenant's sole expense) under this Exhibit "D" must be submitted to Landlord complete, sufficient to obtain a building permit, and ready for Landlord's consideration and final approval within thirty (30) calendar days from Commencement Date. Such plans and specifications must be signed and sealed by a registered architect and/or engineer as required for the design work contained therein.

Upon review, Landlord shall, in writing, accept or notify Tenant of its objections to said plans and specifications within ten (10) calendar days after receipt; provided, however, for each day Landlord delays responding to Tenant's plans and specifications beyond such ten-day period, the period set forth in Section 4(a) of the Lease shall likewise be extended day for day. Tenant shall reimburse Landlord for any loss or extra cost which may result to Landlord by reason of failure on the part of Tenant to submit any such plans, diagrams, designs, schedules, specifications and/or other data within said period of time, or, alternatively, and at Landlord's sole option, Landlord may elect to immediately terminate this Lease by reason of such failure by giving written notice of such election to Tenant (whereupon Landlord shall have no further obligations to Tenant hereunder).

B.   Tenant shall secure Landlord's written approval, which shall not be unreasonably withheld, of all plans, diagrams, designs, schedules, specifications, contracts and contractors for Tenant's Work before beginning the work, and Tenant, at its sole expense, shall secure all necessary licenses and permits necessary to commence, or otherwise to be used in performing, the Tenant's Work. Three (3) sets of bluelines and one bound set of specifications must be submitted for the review process. Changes to said plans and specifications shall be made only by written change order describing the scope of work and exact cost of same signed by both parties.

C.   As soon as Tenant's plans and specifications have been approved by Landlord, Tenant shall commence construction (and shall be required to diligently pursue said construction) no later than the later of (a) thirty (30) calendar days after the date upon which Landlord approves Tenant's plans and specifications and (b) two (2) business days after the Commencement Date. If Tenant has not commenced construction within said time period, Landlord shall have the option to terminate this Lease by giving written notice of such termination to Tenant at any time prior to the date on which Tenant


LANDLORD

44

TENANT

actually commences construction (whereupon Landlord shall have no further obligations to Tenant hereunder); or, if Tenant has not completed construction of such improvements within ninety (90) calendar days after the date upon which Tenant's plans and specifications have been approved by Landlord, then Landlord shall have the option to terminate this Lease by giving written notice of such termination to Tenant, which notice of termination, if given, shall be effective as of the date which is thirty (30) days following the giving thereof, unless Tenant actually completes construction of its improvements within said 30-day period, in which event Landlord's termination notice as aforesaid shall be deemed ineffective and of no force or effect. If, pursuant to the foregoing provisions, Landlord elects to terminate this Lease, then upon any such termination, Tenant shall be deemed to have forfeited any pre-paid rent and/or security deposit previously made by Tenant under this Lease, and such amounts shall be retained by Landlord as liquidated damages for the failure of Tenant to timely perform its obligations hereunder.

## ARTICLE III. TENANT IMPROVEMENT ALLOWANCE

A.    Subject to the provisions of this Article III, Landlord shall contribute towards the cost of Tenant's Work to the Demised Premises by paying to Tenant an allowance (the "Tenant Improvement Allowance") equal to Forty-five Dollars ($45.00) per RSF for improvements to the interior of the Demises Premises.   The Tenant Improvement Allowance shall be paid, provided that Tenant is not in default under the Lease, within thirty (30) days from the date Tenant delivers the following to Landlord:

1.    A copy of the Certificate of Occupancy issued by the applicable municipality, or other evidence reasonably satisfactory to Landlord that the Tenant's Work has been approved by such municipality;

2.    A certification from Tenant's general contractor of the completion of Tenant's Work, including all invoices associated with Tenant's Work;

3.    True and correct original releases or lien waivers from Tenant's general contractor and all subcontractors and materialmen used by Tenant's general contractor; and

4.    Record drawings of Tenant's Work.

The completed Tenant's Work shall be subject to Landlord's reasonable approval and acceptance, which shall be a condition to the payment by Landlord of any Tenant Improvement Allowance, which approval and acceptance shall not be unreasonably withheld.

B.    The Tenant Improvement Allowance shall be used only for the following costs approved by Landlord:


LANDLORD

47

TENANT

1.      Payment of any fees associated with the submission of any plans to governmental agencies for review, permit, and license relating to construction of the Premises, including all architectural and engineering fees and expenses related to such plans.

2.      Construction of the Tenant's Work, which are those items identified in Article V of this Exhibit "D".

## ARTICLE IV. DESCRIPTION OF LANDLORD'S WORK

A.  Roof.  Any roof modifications required to support loads in excess of the existing roof design will be the sole responsibility of the Tenant. This includes engineering, permitting and construction.

Three (3) curbs are provided as well as twenty-nine (29) roof penetrations and shafts for power and refrigerant. See HVAC for refrigerant lines provided.

B.  Vertical Clearance.  Landlord shall provide a minimum of 15'-4" feet vertical clearance above slab floor.  Sprinkler mains and branch distribution may intrude on this vertical clear space.

C.  Floor.  Landlord shall provide a concrete floor slab, smooth and ready for floor finishes, not to exceed ¼" of vertical variation per 10'-0".

The slab is a structural slab with crawlspace beneath.  TENANT CONTRACTOR MUST NOT CORE OR SAWCUT WITHOUT FIRST X-RAYING THE SLAB AND RECEIVING WRITTEN PERMISSION FROM THE LANDLORD.

D.  Demising Walls. Not provided.

E.  Exterior Walls.  The exterior walls between parking deck, exterior of building, exterior hallways, and elevator lobby will be constructed.  Rear wall will be constructed of CMU. All other walls will be metal stud construction with no insulation or interior finish.  Stair walls (i.e. the residential stairs from above that exit ground level) in the retail space are CMU, the wall between the residential lobby and the retail has insulation (R-13).

F.  Storefront. Not provided.

G.  Ceilings / Underside of Structure.  Exposed structural concrete. Floor to ceiling will be a minimum of 15'-4".  Fire Sprinkler mains and branch lines will encroach on this clear space.  Modifications to the Fire Sprinkler system are the sole responsibility of the Tenant within its space.

H.  Service doors. Hollow metal service door location and number are "as is" in the existing shell. Adding, moving, and or removing service doors and frames will be the responsibility of the Tenant.

LANDLORD

48

TENANT

I.   <u>Exterior Canopies</u>. Base building exterior canopies and integral lighting, if any, will be provided and not to be modified without written approval from the Landlord.

J.   <u>Exterior Cameras</u>. Landlord agrees that Tenant may install, at Tenant's sole cost and expense, security cameras for the storefront and exit door for the Demised Premises. Tenant agrees to keep footage from such security cameras for a period of thirty (30) days and to allow Landlord access to view such camera footage upon written request to Tenant.

K.   <u>Service Yard</u>. Provided by Landlord.

L.   <u>Electrical and Data Systems</u>.

Power: Conduits with pull strings will be installed in locations along the rear wall of the Tenant space. The conduit will provide a pathway to retail meter centers and pathway to a telephone / data room. Meter banks and switchgear will be provided and ready for Tenant tie-in. It is the Tenant's responsibility to confirm locations and run lengths for power, data, telephone, etc. Electrical voltage available is 208v, 3-Phase.

Lighting: Only emergency lighting will be installed over the rear exit doors.

M.   <u>HVAC</u>.

1.   Six (6) line sets to be installed per structural bay. A 50' length of coiled line will be suspended in the structure for future tenant use. Chases for restaurant refrigerant piping will be installed at the two locations (Far north space & far south space) per plans.

2.   Two (2) exhaust fans will be installed for crawlspace ventilation.

3.   Provision for Tenant fresh air will be through sidewall grilles installed at the exterior walls of each prospective restaurant space, north and south walls. Grilles should be connected to a return plenum duct. Once mechanical systems are installed by the tenant, outside air ducts can be connected to the return air plenum. Minimum free area for each grille should be no less than 0.26 sq. ft.

4.   Mechanical block outs are provided above the northernmost retail space that extends to the roof. For other restaurant spaces, a block out can be left in the rear masonry wall and exhaust venting routed through the deck. Engineering provided by the Tenant will be required to confirm design & routing.  If Tenant block out info is unavailable prior to wall construction, future tenants can saw cut through the top of the CMU wall. Routing exhaust venting through the deck during Tenant buildout may require some fire sprinkler reconfiguration at the expense of the Tenant.

LANDLORD

49

TENANT

5.   Subject to any applicable governmental approvals and regulations, Tenant shall be permitted, at Tenant's cost and expense, to install an exhaust ventilation system to accommodate exhaust from Tenant's casting equipment in accordance with plans approved by Landlord.

N.   <u>Plumbing</u>.

1.   A 2" domestic cold water line with minimum 35 PSI residual pressure will be provided above ceiling across the rear of all tenant spaces. The line will be stubbed and 1" valves installed for connection by future tenants.

2.   Waste piping trunk lines are installed in the crawl space for Tenant tie-in.

3.   Two (2) grease traps are provided for retail tenants in the northern and middle retail bays. Location shown on plans.

4.   TENANT CONTRACTOR MUST NOT CORE WITHOUT FIRST X-RAYING THE SLAB AND RECEIVING WRITTEN PERMISSION FROM THE LANDLORD.

O.   <u>Gas</u>. Gas service is provided to the building.  The gas meter is located on the south end of the garage.  Tenant shall be responsible for coordinating a connection to the service with the utility and running a gas line to the leased space.

P.   <u>Fire Alarm</u>.  Junction boxes will be installed in each of the 3 retail "pods" to allow for future expansion by tenants. The main building panel is built to accommodate the retail spaces.  Landlord shall assist Tenant with tying into existing fire system as required by City Code.

Q.   <u>Fire Protection</u>.  Fire sprinkler supply is stubbed into space. Sprinkler distribution lines and heads are the responsibility of Tenant.

R.   <u>Communications.</u> None provided. Conduit installed on back wall.

S.   <u>Fire Ratings</u>. Tenant shall be responsible for all required fire ratings required in demising walls, ceiling, interior space and shafts / duct runs.

T.   <u>Signage</u>.  Tenant shall be responsible for all signage.  A junction box with pull string has been installed above each canopy (12 total) for signage power. Blocking has been provided around each junction box for signage mounting. All penetrations made to the building during signage installation are to be sufficiently sealed and any damage to the building's skin will be the responsibility of the Tenant to correct.  All signage shall be approved in writing in a timely manner by Landlord prior to installation, which approval shall not be unreasonably withheld.   Subject to Landlord's approval, not to be unreasonably withheld, Tenant may use Tenant's logo from its existing signage for installation on the rear exterior wall of the Demised Premises.


LANDLORD

450

TENANT

6.     **ARTICLE V. DESCRIPTION OF TENANT'S WORK**

A.     <u>Signs & Exterior Graphics</u>: Tenant shall pay for all signs and the installation thereof, subject to the Sign Criteria attached to this Lease as Exhibit "E".

B.     <u>Utilities</u>: <u>All meters</u>, sub-meters or other measuring devices in connection with utility services shall be provided by Tenant at Tenant's expense. Tenant will be responsible for tapping into provided domestic water line including line tap and shut off valve. All service deposits shall be made by Tenant at Tenant's expense.

C.     <u>Service Entrances and Awnings</u>: Tenant shall be responsible for the exterior doors, ramp or stairs required at service entrances, weatherproofing, and awnings. Awnings shall be designed and installed per Landlord's building elevations, which have been approved by the City of Jackson. Awning shop drawings shall be submitted to Landlord for approval prior to fabrication, which approval shall be made in a timely manner and not be unreasonably withheld.

D.     <u>Interior Work</u>: The work to be done by Tenant shall include, but not be limited to, the purchase and/or installation and/or performance of the following:

    1.     Electrical panel, wiring, and fixtures.

    2.     Interior partitions including finishing, electrical wiring, and connections within the Demised Premises. Furring, insulation and drywall on all exterior walls.

    3.     Light covers and special hung and furred ceilings.

    4.     Interior painting.

    5.     Store fixtures and furnishings.

    6.     Plumbing fixtures within the Demised Premises.

    9.     Ceiling to no lower than the header at storefront glass.

    10. Heating, air conditioning and ventilating equipment, including electrical, duct work and roof penetrations.

    11.     Floor covering.

    12. Modifications to the fire sprinkler system provided pursuant to Landlord's Work.

E.     All work undertaken by Tenant shall be performed at Tenant's expense and shall not damage the building, or any part thereof. Any roof penetration shall be made and sealed by Landlord's approved roofer and shall be performed only after Landlord has given its written consent, which consent shall in part be conditioned upon Tenant's plans to include materials acceptable to Landlord and to include roof top curbs to spread the weight of the


LANDLORD

451

TENANT

equipment being installed in order to prevent damage to the roof and/or impairment of Landlord's roof warranty(ies). All such installation of equipment and roof penetrations shall be professionally engineered so that structural modifications shall be made to the roof so that sufficient support exists for any equipment on the roof. Tenant shall be responsible for installing roof manufacturer approved roof walk pads around all rooftop equipment and to extend them to connect to any shell building walk pad system. Tenant shall also be responsible for obtaining, and paying for, professional inspections of any structural work and/or mechanical work (including, without limitation, any roof work or concrete work) as required by Landlord. All roof mounted HVAC units and other roof mounted equipment shall be installed in such a fashion that they will not be visible from street level.

F.     All of Tenant's Work to the Demised Premises made by Tenant shall be in good and workmanlike manner, free of any mechanic's or materialman's lien, and shall be in conformity with the applicable building code or other applicable governmental requirements of the city in which the Demised Premises is located. All leasehold improvements will be comprised of new materials and equipment.

G.     Landlord shall have the right to remeasure the demised premises after the demising walls have actually been constructed. Rent (including Tenant's Share of Expenses) and Tenant's Improvement Allowance, if any, shall be appropriately adjusted based on the actual square feet of Gross Area contained in the Demised Premises as verified by Landlord's architect. If adjustments are necessary, such will be shown as an amendment to this Lease, which Tenant agrees to execute within thirty (30) days after presentation by Landlord and after verification by the Tenant's architect or contractor. Upon written notice to the Tenant, Landlord shall also have the right to make minor variations to the location of the demising wall which may vary from plans and specifications delivered to Tenant in order to create architectural harmony or preserve structural integrity of the building in which the Demised Premises is located such as locating the demising wall as close as possible to mullions, provided, however, that such variations do not cause a material increase in the Tenant's construction costs for the Demised Premises.



LANDLORD

152

TENANT

## EXHIBIT "D-1"

### CONTRACTOR INSURANCE REQUIREMENTS

All consultants, contractors, subcontractors, suppliers, service providers, moving companies, and others performing work of any type for Tenant in the Demised Premises shall:

    a.    carry the insurance listed below with companies acceptable to Landlord; and

    b.    furnish Certificates of Insurance to Landlord evidencing required coverages at least 10 days prior to entry in the Property and Renewal Certificates at least10 days prior to the expiration dates of Certificates previously furnished.

Certificates of Insurance must provide for thirty (30) days' prior written notice of cancellation or material change to Landlord.

    1.    <u>Rating</u>. Certificates of Insurance will be accepted only from insurance companies with an A- rating or better per A.M. Best Company's rating guide.

    2.    <u>Builder's Risk.</u> Contractor shall provide All Risk Builder's Risk Insurance in an amount equal to the replacement cost of the improvements to be built by the Contractor, insuring against all risks of direct physical loss or damage to materials, equipment, machinery and other property incorporated in the job, subject to policy exclusions and deductibles. Builder's Risk insurance will not provide coverage for tools, equipment or other items which Contractor uses in connection with the Work and which are not incorporated into or intended to become permanent part of the Work. Contractor shall waive its right of subrogation against Landlord for damage caused by fire or other perils, covered by the policy. Deductibles on the policy shall be paid by Tenant and/or Contractor.

    3.

a.    <u>Workman's Compensation</u>: Statutory workers compensation insurance covering full liability under applicable Workers Compensation Laws at the required statutory limits. The Worker's Compensation Coverage must cover all job site employees and include a waiver of subrogation in favor of Landlord.

b.    <u>Employers' Liability</u>: Employers' liability insurance with the following minimum limits of liability:

        $500,000    Each Accident
        $500,000    Disease-Policy Limit
        $100,000    Disease-Each Employee

    4.    <u>Commercial General Liability</u>: This insurance policy must:

    a.    Be written on a standard liability policy form (sometimes known as commercial general liability insurance) <u>but without</u> exclusionary

endorsements that may delete coverage for products/completed operations, personal and advertising injury, blanket contractual, fire legal liability, or medical payments.

b.  Be endorsed to provide that:

   i.  aggregate limits, if any, apply separately to each of the insured's jobs or projects away from premises owned by or rented to the insured;

   ii.  the insurance is primary and non-contributory to any insurance provided by Landlord; and

   iii.  include the following minimum limits:

|  |  |
|---|---|
| $2,000,000 | General Aggregate |
| $1,000,000 | Products-Completed Operations Aggregate |
| $1,000,000 | Bodily Injury & Property Damage |
| $1,000,000 | Personal & Advertising Injury |
| $1,000,000 | Each Occurrence |
| $ 50,000 | Fire Damage (Any one fire) |
| $ 5,000 | Medical Expense (Any one person) |

5.  Automobile Liability: Automobile liability insurance for claims of ownership, maintenance, or use of owned, non-owned, and hired motor vehicles at, upon, or away from the Development with the following minimum limits:

$1,000,000 Combined Single Limit Bodily Injury and Property Damage per Occurrence

6.  Excess Liability: Following form excess liability insurance with coverages at least as broad as the required commercial general liability insurance with the following minimum limits:

|  |  |
|---|---|
| $5,000,000 | Each Occurrence |
| $5,000,000 | Aggregate |

7.  General Requirements: All policies enumerated above must be:

a.  written on an occurrence basis and not on a claims-made basis;

b.  endorsed to name as additional insureds Landlord, Manager, Landlord's architect, Landlord's construction manager and their respective officers, directors, employees, agents, partners and assigns; (excludes Workers Compensation Coverage)

54

c.      endorsed to waive any rights of subrogation against Landlord, Manager, Landlord's architect, Landlord's construction manager and their respective officers, directors, employees, agents, partners and assigns; and

d.      primary and non-contributing with, and not in excess of, any other insurance available to Tenant, Landlord, and Manager (or any other entity named as an additional insured).

55

## EXHIBIT E - SIGN CRITERIA

Tenant shall be responsible for the installation and design of all signage, provided, however, that all signage shall be approved in a timely manner in writing by Landlord prior to installation, which approval shall not be unreasonably withheld. A junction box with a pull string will be installed above a canopy on the Demised Premises for signage power. Blocking has been provided around such junction box for signage mounting. All penetrations made by Tenant to the Building during signage installation are to be sufficiently sealed and any damage to the Building's skin will be the responsibility of the Tenant to correct.

EXHIBIT "F"

**RULES AND REGULATIONS**

A.  **FOR THE STORE AREA:**

1.  All floor areas of the Demised Premises (including vestibules, entrances, and air returns), doors, fixtures, windows, and plate glass shall be maintained in a clean, safe and good condition.

2.  All trash, refuse and waste materials shall be stored in adequate containers and regularly removed from the Demised Premises. These containers shall not be visible to the general public and shall not constitute a health or fire hazard or nuisance to any tenant. In the event that any tenant shall fail to remedy such a health or fire hazard or nuisance within five (5) days after written notice by Landlord, Landlord may remedy and/or correct such health or fire hazard or nuisance at the expense of Tenant.

3.  No portion of the Demised Premises shall be used for lodging purposes.

4.  Neither sidewalks nor walkways shall be used to display, store or place any merchandise, equipment or devices, except in connection with sidewalk sales held with Landlord's prior written approval in each instance.

5.  No public telephone, newsstand, shoeshine stand, refreshment, vending or other coin operated machine shall be installed or placed on the sidewalk or walkway area adjacent to the Demised Premises or on the Common Areas without Landlord's prior written approval in each instance.

6.  No person or persons shall use the Demised Premises, or any part thereof, for conducting therein a second-hand store, auction, distress or fire sale or bankruptcy sale, or "going-out-of-business" sale or "lost our lease" sale, without Landlord's prior written consent in each instance.

7.  No portion of the Demised Premises shall be used for the storage of any merchandise, materials or other properties, other than those reasonably necessary for the operation of a tenant's business. Landlord may, from time to time, inspect the Demised Premises to ensure compliance with the foregoing provisions.

8.  No display areas of the Demised Premises shall be left vacant, and Tenant shall not black-out or otherwise obstruct the windows of the Demised Premises, without Landlord's prior written consent.

9.  Landlord shall have the absolute right to enter upon the Demised Premises to perform such cleaning and clearing of the pipes and drains servicing the Demised Premises, and any grease traps and exhaust systems servicing the Demised Premises, as Landlord shall deem necessary.

10.     If Tenant shall operate a carry-out food operation, including any ice cream store, Tenant shall pay Landlord for all sidewalk and walkway cleanup work (including without limitation steam cleaning), that Landlord shall determine is necessary to preserve the sanitation, cleanliness, clean appearance, of the Property. Tenant shall pay Landlord on an estimated monthly basis, adjusted annually, and will be responsible for a cleanup of not less than one hundred feet (100') in radius from the entrance(s) to the Demised Premises.

11.     If Tenant provides its customers with the use of shopping carts and/or baskets, Tenant shall be responsible for causing said carts and/or baskets to be stored only in areas designated by Landlord. If Tenant fails to routinely collect and store said carts as necessary (at least twice on a daily basis). Landlord may assume the responsibility of same and may bill Tenant on an estimated monthly basis for such service.

12.     The sidewalks, exits and entrances shall not be obstructed by Tenant or used by it for any purpose other than for ingress to and egress from the Demised Premises. The exits, entrances and roof are not for the use of the general public and Landlord shall in all cases retain the right of control and prevent access thereto by all persons whose presence in the Judgment of Landlord, might be prejudicial to the safety, character, reputation and interests of the Property and its tenants, provided that nothing herein contained shall be construed so as to prevent such access to persons with whom Tenant normally deals in the ordinary course of Tenant's business unless such persons are engaged in illegal activities or are creating a nuisance.

13.     Tenant shall not alter any lock or install any new or additional locks or any bolts on any door of the Demised Premises without the prior written consent of Landlord (except as to safes and vaults of Tenant).

14.     The toilet rooms and urinals, wash bowls and other apparatus therein shall not be used for any purpose other than that for which they were constructed and no foreign substance of any kind whatsoever shall be placed therein; the expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the tenant, who, or whose employees, invitees, contractors or agents, shall have caused it.

15.     Except as to normal pictures and furnishings, Tenant shall not mark, drive nails, screw or drill into the partitions, woodwork or plaster or in any way deface the Demised Premises or any part thereof. No boring, cutting or stringing of wires shall be permitted except with the prior written consent of Landlord and as Landlord may direct. Tenant shall not lay linoleum tile, carpet or other similar floor covering so that the same shall be affixed to the floor of the Demised Premises in any manner except as approved by Landlord.  The expense of repairing any damage resulting from a violation of this rule or removal of any floor covering shall be borne by Tenant.

16.     Tenant shall not be permitted to use and keep any noxious gas or substance in the Demised Premises or permit or suffer the Demised Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Property or Development by reason of noise, odors, and/or vibrations, or interfere in any way with other tenants or those having business therein. Notwithstanding the foregoing, Tenant may use gases and substances which are commonly used in the jewelry business in strict compliance with all laws and regulations. Further, Tenant's equipment and chemicals used in making, cleaning or casting

jewelry results in noises, vibrations, and odors which are common to the jewelry business, and such commercially reasonable noises, vibrations, and odors shall not be deemed to be a breach of this Lease. Tenant shall not make or permit to be made any loud or disturbing noises or disturb or interfere with occupants of the Property or Development or those having business with them, whether by the use of any musical instrument, radio, phonograph, shouting, or in any other manner. Tenant shall not throw anything out of doors.

17.     Tenant shall not use or keep in the Demised Premises or the Building or Development, any kerosene, gasoline or flammable or combustible fluid or material, or use any method of heating or air conditioning other than that supplied or permitted by Landlord. Notwithstanding the foregoing, the Tenant shall be allowed to use and store materials such as compressed oxygen and propane tanks which are materials needed for the Tenant to perform its jewelry business as long as such materials are stored and used in accordance with applicable laws and regulations.

18.     Landlord will direct electricians as to where and how electrical, telephone and telegraph wires are to be introduced to the Demised Premises. No boring or cutting for wires will be allowed without the prior consent of Landlord. The location of telephone call boxes and other office equipment in the Demised Premises shall be subject to the approval of Landlord.

19.     All keys to offices, rooms and toilet rooms shall be obtained from Landlord and Tenant shall not duplicate or obtain such keys from any other sources. Upon termination of this Lease, Tenant shall deliver to Landlord the keys of the offices, rooms, and toilet rooms which were previously furnished to Tenant, failing which Tenant shall pay Landlord the cost of replacing same or of changing the lock or locks opened by any unreturned key if Landlord deems it necessary to make such changes.

20.     No furniture, packages, supplies, equipment or merchandise will be received in the Building except between such hours as shall be designated by Landlord.

21.     Tenant shall be responsible for assuring that doors to the Demised Premises are not left unlocked during non-business hours, except while moving furniture or other items in or out of the Demised Premises.

22.     Tenant shall not canvass or solicit in the Development, and Tenant shall cooperate to prevent any such canvassing and/or solicitation.

23.     Landlord reserves the right to exclude or expel from the Property any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or is violating the rules and regulations of the Property or the Development.

24.     The requirements of Tenant will be attended to only upon application to Landlord's designated property manager. Employees of Landlord shall have no obligation to perform any work for Tenant or do anything outside their regular duties for Tenant unless under special instructions from Landlord, and no employee shall have any obligation to admit any person (Tenant or otherwise) to any office of Landlord without specific instruction from Landlord.

25.     Tenant shall be allowed to mount exterior security cameras in and around the Demised Premises, including, but not limited to, on the exterior storefront and the rear of the Demised Premises. Tenant agrees to keep such security camera footage for a period of at least thirty (30) days and to allow Landlord access to view such security camera footage upon written request to Tenant.

B.     **FOR THE COMMON AREAS:**

1.     Tenant and its authorized representatives and invitees shall use any roadway, walkway, or mall (including the enclosed mall, if any) only for ingress to and egress from the stores in the Development. Use of the Common Areas shall be in an orderly manner in accordance with directional or other signs or guides. Roadways shall not be used at a speed in excess of ten (10) miles per hour and shall not be used for parking or stopping, except for the immediate loading or unloading of passengers. Walkways and malls (including the enclosed mall, if any) shall be used only for pedestrian travel.

2.     All tenants and their authorized representatives and invitees shall not use the parking areas for anything but parking motor vehicles. All motor vehicles shall be parked in an orderly manner within the painted lines defining the individual parking places. During peak periods of business activity Landlord can impose any and all controls Landlord deems necessary to operate the parking lot including but not limited to the length of time for parking use.

3.     No person shall use any utility area, truck loading area, or other area reserved for use in conducting business, except for the specific purpose for which permission to use these areas has been given.

4.     No employee shall use any area for motor vehicle parking except the area specifically designated for employee parking for the particular period of time the use is to be made. No tenant shall designate an area for employee parking except the area designated in writing by Landlord.

5.     Without the consent of Landlord, no person shall use any of the Common Areas for:

(a)     "Vending, peddling or soliciting orders for sale or distributing of any merchandise, device, service, periodical, book, pamphlet, or other matter;

(b)     Exhibiting any sign, placard, banner, notice or other written material;

(c)     Distributing any circular, booklet, handbill, placard, or other material;

(d)     Soliciting membership in any organization, group, or association, or soliciting contributions for any purpose;

(e)     Parading, patrolling, picketing, demonstrating, or engaging in conduct that might interfere with the use of the Common Areas or be detrimental to any of the business establishments in the Development;

60

(f)     Using the Common Areas for any purpose when none of the business establishments in the Development is open for business;

(g)     Discarding any paper, glass, or extraneous matter of any kind, except in designated receptacles;

(h)     Using a sound-making device of any kind or making or permitting any noise that is annoying, unpleasant, or distasteful; or

(i)     Damaging any sign, light standard, or fixture, landscaping material or other improvement or property within the Development.

The above listing of specific prohibitions is not intended to be exclusive, but is intended to indicate the manner in which the right to use the Common Areas solely as a means of access and convenience in shopping at the business establishments in the Development is limited and controlled by Landlord.

## C.    IN GENERAL:

1.      No pets shall be allowed in or about the store areas or Common Areas of the Development, without Landlord's prior written consent.  Notwithstanding the foregoing, the Tenant shall be allowed to keep one (1) pet dog of less than 100 pounds in the Demised Premises as long as one of the Tenant's owners or employees is with the pet.  Tenant shall be responsible for proper disposal of any pet waste.

2.      Tenant and its authorized representatives and invitees shall not loiter in the parking or other Common Areas. They shall in no way obstruct the sidewalks, entry passages, pedestrian passageways, driveways, entrances, and exits; they shall use them only as ingress to and egress from their work areas.

3.      Tenant and its authorized representatives and invitees shall not throw cigar or cigarette butts or other substances or litter of any kind in or about the buildings of the Development, except in receptacles placed in it for that purpose.

4.      The toilet rooms, toilets, urinals, washbowls, and other apparatus in the Development shall not be used for any purpose than that for which they were constructed. No foreign substance of any kind shall be thrown into them.

5.      Landlord shall not be responsible to any tenant or to any other person for the nonobservance or variation of these rules and regulations by any other tenant or other person. Tenant shall be deemed to have read these rules and to have agreed to abide by them as a condition to Tenant's occupancy of the space leased.

6.      Landlord reserves the right upon written notice to Tenant, to rescind, alter or waive any rule or regulation at any time prescribed for the Building or the Development, or to establish additional rules and regulations when, in Landlord's sole judgment, it is necessary, desirable or proper for the best interests of the Building or the Development.

7.      Tenant must obtain Landlord's prior approval, which approval shall not be unreasonably  withheld, for installation of any solar screen material, window shades, blinds, drapes, awnings, window ventilators, or other similar equipment and any window treatment of any kind whatsoever.   Landlord may control all internal lighting that is visible from the exterior of the Demised Premises and may change any unapproved lighting without notice to Tenant, at Tenant's expense.

## EXHIBIT "G"

### COMMENCEMENT NOTICE

Tenant represents to Landlord and to _____ and any other future lender who makes a loan to Landlord ("Landlord's lender") that the following information is a true and accurate representation regarding the terms of the Lease:

Address of the Demised Premises:   _____, _____, _____

Landlord:   _____

Tenant:_____

Landlord and Tenant have entered into a Lease (the "Lease") dated _____, 2017 whereby Landlord leased the Demised Premises for a Term of Ten (10) Years, which Lease has been amended as follows:

The Commencement Date of the Term of the Lease is May 1, 2017.

The Term of the Lease shall expire on July 31, 2027.

Tenant has two (2) options of five (5) years each which are to be exercised by the presentation of notice to Landlord by no later than (a) January 1, 2027 with respect to the First Option; and (b) January 1, 2032, with respect to the Second Option.

The Rent Commencement Date under the Lease is August 1, 2017, and Tenant has been paying Rent under the Lease since _____.

The Monthly Base Rent due under the Lease beginning on the Rent Commencement Date is $_____ and no moneys have been paid to Landlord in advance of the due date except as set forth in the Lease.

The Gross Area of the Demised Premises is ___1,873 rentable_ square feet (RSF).

Tenant represents and warrants to Landlord and Landlord's lender the truth and accuracy of the following statements pertaining to said Lease.

      1.     Tenant has accepted, is satisfied with (except for only non-substantial defects, notice of which has previously been given to Landlord), and is in full possession of said Demised Premises, including all improvements, additions and alterations thereto required to be made by Landlord under the said Lease, and Tenant is not aware of any patent or latent defects in construction of said improvements (except for only non-substantial defects, notice of which has previously been given to Landlord) which would constitute a default by Landlord pursuant to the Lease.

      2.     Tenant is paying the full Rent stipulated in said Lease to be paid by Tenant as of the date hereof with no offsets, defenses or claims.

3.     To the best of Tenant's knowledge, Landlord is not presently in default under any of the terms, covenants or provisions of said Lease.

4.     Landlord has satisfactorily complied with all of the requirements and conditions precedent to the commencement of the term of said Lease as specified in said Lease.

5.     Tenant acknowledges that Landlord's lender assumes no liability for its security deposits, if any, or for sums escrowed with the Landlord for taxes or insurance or other expenses in the event that Lender acquires the Demised Premises through foreclosure or through a transfer of title in lieu of foreclosure.

6.     Tenant hereby acknowledges (a) that there have been no modifications or amendments to said Lease other than herein specifically stated, (b) that it has no notice of a prior assignment, hypothecation or pledge of rents or of the Lease, (c) that the Lease is in full force and effect and Tenant has no defenses, setoffs or counterclaims against Landlord arising out of the Lease or in any way relating thereto, or arising out of any other transaction between Tenant and Landlord (d) that the Lease represents the entire agreement between the parties thereto as to the Demised Premises, and Tenant neither has nor claims any right or interest in or under any contract, option or agreement involving the sale or transfer of the Demised Premises except as specifically provided in the Lease, (e) that no prepayment or reduction of rent, and no modification, termination or acceptance of surrender of the Lease will be valid as to Landlord's lender without the consent of Landlord's lender.

TENANT:

Beckham Jewelry, LLC

_____

By: Brian L. Beckham
Its: Manager
Date: _____,2017

64

## EXHIBIT "H"

## USE RESTRICTIONS

7.

The following uses and occupancies shall not be permitted by Tenant under the Lease:

1.    Any office use other than the office uses incidental to the management or operation of a restaurant, or any use not involving the sale of goods, wares, merchandise, food, beverages and services to the public at retail;

2.    Any business furnishing care for children without the supervision or involvement of a parent or guardian;

3.    Any unlawful use;

4.    Repair or service center (except that service centers or service uses which are incidental to a store selling goods and/or services not prohibited hereunder);

5.    Auditorium, meeting hall, church or other place of public assembly;

6.    Bingo, lotto, off-track betting hall or other gambling establishment, except state lottery tickets lawfully sold;

7.    Repair, sale, lease or display of cars, trucks, boats, recreational vehicles, trailers or mobile homes (new or used) or a gasoline service station;

8.    Any veterinary hospital or animal clinic or animal raising facilities;

9.    Karate or martial arts studio, gymnasium or similar business;

10.    Car wash;

11.    So-called "head shops"; or tattoo parlor;

12.    Any business or use that emits offensive odors, fumes, dust or vapors; or any business or use which emits loud noise or sounds which are reasonably objectionable such as noises and sounds that are objectionable due to intermittency, beat, frequency, shrillness or loudness; any use which is a public or private nuisance;

13.    Massage parlor, adult bookstore or store selling or exhibiting pornographic materials; pornographic adult theater; or the display of male or female dancers or a so-called "strip-tease" establishment; or other pornographic use (except that a bookstore may carry adult materials up to 10% of their inventory);

14.    Bowling alley; arcade, amusement center, game room or other entertainment facility; carnival; skating rink; or billiard room or pool room; sporting events;

ας

15.    Ballroom, dance hall or discotheque;

16.    Warehouse for storage of goods not intended to be sold on or from the premises (other than storage areas as may be reasonably needed in connection with the operation of the Shopping Center);

17.    Bail bondsman;

18.    Central laundry, dry cleaning plant or Laundromat; or any dry cleaning business other than pick-up/drop-off location;

19.    Lumber yard;

20.    Blood bank; mortuary; or funeral parlor;

21.    Beauty school, barber college or reading room; or any training school or educational facility (except where incidental to a retail business located at the premises);

22.    Auction, liquidation, going out of business, fire or bankruptcy sales;

23.    Flea market, "second-hand" store or army, navy or governmental "surplus" store;

24.    Manufacturing use;

25.    Shooting gallery;

26.    Any use that creates any unusual fire hazard;

27.    Nightclub, discotheque or social club;

Exclusive Uses

1.    Movie Theatre
2.    Bank
3.    Financial Services Company
4.    Physical Therapy and Chiropractic Services
5.    Jewelry Store
6.    Fitness / workout training facility
7.    Seated upscale Mexican restaurant
7.    Freshii's – As long as the Demised Premises is used for the operation of a fast express food restaurant under the trade name "Freshii's", no part of the Development, shall be leased to, or used by, any of the following named competitive businesses:

Ultimate Foods
Fresh Healthy Cafe
Tropical Smoothie Cafe
Fresh to Order
Sweetgreen
MADgreens

66

Pure Health
Tossed
Togo's
Fresh City
Salad Creations
Saladworks
Chopped

## EXHIBIT "I"

### GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT (this "Guaranty") is executed and delivered by [BRIAN L. BECKHAM] [CHRISTOPHER ALAN BURROW] ( referred to herein as "Guarantor") to and for the benefit of TDLDC RETAIL I, LLC, a Mississippi limited liability company (referred to herein as "Landlord").

### W I T N E S S E T H:

A.     Landlord has entered into, or will enter into, a certain Lease Agreement (the "Lease") with Beckham Jewelry, LLC, a Mississippi limited liability company (referred to herein as "Tenant"), for those certain Demised Premises in The District at Eastover, City of Jackson, Hinds County, Mississippi, reference to which Lease is hereby made for all purposes.

B.     In order to induce Landlord to execute and enter into the above-described Lease, Guarantor has agreed to execute and deliver this Guaranty to Landlord.

NOW, THEREFORE, for and in consideration of the premises, and of other good valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged by Guarantor, Guarantor does hereby agree as follows:

1.     Guarantor has guaranteed, and by this instrument does hereby guarantee, the prompt payment and timely performance of all liabilities, obligations and duties (including, but not limited to, payment of Rent) imposed upon Tenant under the terms of the Lease, as fully and to the same extent as if Guarantor had executed the Lease as Tenant thereunder.  Guarantor's obligation hereunder, exclusive of the cost incurred by Landlord to enforce this Guaranty, shall be limited to $125,000.00.

2.     Guarantor hereby waives notice of acceptance of this Guaranty and all other notices in connection herewith or in connection with the liabilities, obligations and duties guaranteed hereby, and waives diligence, presentment and suit on the part of Landlord in the enforcement of any liability, obligation or duty guaranteed hereby.

3.     Guarantor further agrees that Landlord shall not be first required to enforce against Tenant or any other person any liability, obligation or duty guaranteed hereby before seeking enforcement thereof against Guarantor.  Suit may be brought and maintained against Guarantor by Landlord to enforce any liability, obligation or duty guaranteed hereby without joinder of Tenant or any other person.  The liability of Guarantor hereunder shall not be affected by any indulgence, compromises, settlement or variation of terms which may be extended to Tenant by Landlord or as may otherwise be agreed upon by Landlord and Tenant, and shall not be impaired, modified, changed, released or limited in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of Tenant, or its estate in bankruptcy, or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the federal Bankruptcy Code, or any similar law or statute of the United States, or of any state thereof.  Landlord and Tenant, without notice to or consent by the undersigned Guarantor, may at any time or times enter into such extensions, amendments, assignments,

subleases or other covenants with respect to the Lease as they may deem appropriate, and the undersigned Guarantor shall not be released thereby, but shall continue to be fully liable for the payment and performance of all liabilities, obligations and duties of Tenant under the Lease as so extended, amended, assigned or otherwise modified.

4.      It is understood that other agreements similar to this Guaranty may, at Landlord's sole option and discretion, be executed by other persons or parties with respect to the Lease. This Guaranty shall be cumulative of any such agreements and the liabilities and obligations of the undersigned Guarantor hereunder shall in no event be impaired, diminished or otherwise affected by reason of such other agreements. Moreover, in the event Landlord obtains additional guaranty agreements (or Guarantor hereunder is comprised of more than one person or entity), Guarantor agrees that Landlord, in Landlord's sole discretion, may (i) bring suit against all guarantors of the Lease jointly and severally or against any one or more of them, (ii) compromise or settle with any one or more of the guarantors for such consideration as Landlord may deem proper and (iii) release one or more of the guarantors from liability. Guarantor further agrees that no such action shall impair the rights of Landlord to enforce the Lease against any remaining guarantor or guarantors, including the undersigned Guarantor.

5.      Guarantor agrees that if Landlord shall employ an attorney to present, enforce or defend Landlord's rights or remedies hereunder, Guarantor shall pay any reasonable attorneys' fees, related legal expenses and costs of court incurred by Landlord in connection therewith.

6.      This Guaranty shall be binding upon Guarantor and the heirs, legal representatives and successors of Guarantor, and shall inure to the benefit of Landlord and Landlord's heirs, legal representatives, successors and assigns.

7.      It is fully understood that until each and every one of the covenants and agreements of this Guaranty is fully performed, Guarantor's obligations hereunder shall not be released, in whole or in part, by any action or thing which might, but for this provision of this instrument, be deemed a legal or equitable discharge of a surety or guarantor, or by reason of any waiver, extension, renewal, modification, forbearance or delay or any other act or omission of Landlord or its failure to proceed promptly or otherwise or by reason of any action taken or omitted by Landlord, whether or not such action taken or omitted by Landlord, whether or not such action or failure to act varies or increases the risk of, or affects the rights or remedies of, Guarantor, and Guarantor hereby expressly waives and surrenders any defense to Guarantor's liability hereunder based upon any of the foregoing acts, omissions, things, agreements or waivers of any of them, it being the purpose and intent of the parties hereto that the covenants, agreements and all obligations of Guarantor hereunder are absolute, unconditional and irrevocable. An assignment of the Lease, whether permitted or otherwise, shall not affect the obligations of Guarantor hereunder.

8.      In the event it shall be asserted that Tenant's obligations are void or voidable due to illegal or unauthorized acts by Tenant in the execution of the Lease, Guarantor shall nevertheless be liable hereunder to the same extent as Guarantor would have been if the obligations of Tenant had been enforceable against Tenant.

9.      This Guaranty shall terminate upon the complete and final satisfaction of all of Tenant's obligations under the Lease; provided, however, if any obligation of Tenant is reinstated due to a bankruptcy or similar insolvency proceeding, then this Guaranty shall be reinstated as well.

EXECUTED this _____5_____ day of April, 2017, to be effective the same day as the effective date of the Lease.

GUARANTOR:

[_____
Name: Brian L. Beckham]

[_____
Name: Christopher Alan Burrow]

36002768.v1

# FIRST AMENDMENT TO LEASE AGREEMENT

*30* This First Amendment to Lease Agreement (this "Amendment") is entered into as of the _____ day of April, 2021 (the "Effective Date"), by and between **TDLDC RETAIL I, LLC, a Mississippi limited liability company** ("Landlord"), and **BECKHAM JEWELRY, LLC, a Mississippi limited liability company** ("Tenant").

## WITNESSETH

WHEREAS, pursuant to that certain LEASE AGREEMENT made and entered into by and between Tenant and Landlord on April 5, 2017, (the "Lease"), Tenant leases from Landlord certain premises known as Suite D-110 consisting of 1,873 rentable square feet and being more particularly described in the Lease (the "Premises");

WHEREAS, on March 13, 2020, the President of the United States of America declared a national emergency due to the coronavirus pandemic ("COVID-19");

WHEREAS, due to COVID-19, the Landlord has agreed to forgive the Tenant's payment of Base Rent for the months of March 2020 and April 2020 in exchange for an extension of the Initial Lease Term by two (2) months at the then current rental rate;

WHEREAS, the Landlord and Tenant desire for Christopher Alan Burrow to be removed as a Guarantor of the Lease; and

WHEREAS, Landlord and Tenant desire to amend the Lease as set forth in this Amendment.

NOW THEREFORE, in consideration of the above premises, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. **Definitions**. Unless otherwise defined herein, the capitalized terms used in this Amendment shall have the same definitions as set forth in the Lease.

2. **Rent Forgiveness**. Base Rent for the months of March and April 2020 is hereby forgiven and waived by the Landlord.

3. **Extension of the Initial Lease Term**. The Initial Lease Term shall be extended for two (2) months at the then current rental rate.

4. **Removal of Guarantor.** Christopher Alan Burrow is hereby removed as a Guarantor of the Lease and shall have no liability to Landlord or Tenant under the Lease, or the Guaranty Agreement attached as **Exhibit "I"** to the Lease. Brian Lee Beckham hereby replaces Christopher Alan Burrow as a Guarantor of the Lease and his liability to the

Landlord                                                                                      Tenant

Landlord under the Lease and Guaranty Agreement shall be limited to Two Hundred Fifty Thousand Dollars ($250,000.00).

5. **No Default by Landlord.** Tenant agrees that Landlord is not in default under any of the terms, conditions, provisions or agreements of the Lease.  Tenant has no offsets, claims or defenses (a) against Landlord or (b) to the enforcement of the Lease.  No sums are due by Landlord to Tenant other than the monthly rent pursuant to the Lease.

6. **No Default by Tenant.**  Landlord agrees that Tenant is not in default under any of the terms, conditions, provisions or agreement of the Lease.  Landlord has no offsets, claims or defenses (a) against Tenant or (b) to the enforcement of the Lease.  No sums are due by Tenant to Landlord except for the monthly rent under the Lease.

7. **No Other Amendments.**  It is expressly understood and agreed that the terms, covenants and conditions of the Lease shall remain in full force and effect and shall in no manner be affected by the execution of this Amendment except as the same are expressly contemplated herein.  In the event there is a conflict between the Lease and this Amendment, the terms of this Amendment shall govern and control as to the specific matters addressed herein.

8. **Entire Agreement.**  This Amendment and the Lease constitute and contain the entire agreement of the parties hereto with respect to the subject matter hereof and no prior or contemporaneous oral or written representations or agreements between the parties and affecting the subject matter hereof shall have any force or effect.

9. **Counterparts; Electronic Signatures.**  This Amendment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one Amendment binding on all parties.  Telecopied signatures or scanned and electronically transmitted signatures may be used in place of original signatures on this Amendment.  Landlord and Tenant intend to be bound by the signatures on the telecopied document or electronic transmission, are aware that the other party will rely on such signatures, and hereby waive any and all defenses to the enforcement of the terms of this Amendment based on the form of signature.

*[SIGNATURES TO FOLLOW ON NEXT PAGE]*

_____
Landlord

Page **2** of **3**

_____
Tenant

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the date and year first written above.

LANDLORD:            **TDLDC Retail I, LLC**
                     By: The District Management Co, LLC

                     By: _____
                        Breck Hines, Manager


TENANT:              **Beckham Jewelry, LLC**

                     By: _____
                        Brian L. Beckham, Manager

57351944.v1

_____              Page **3** of **3**              _____
Landlord                                                Tenant