

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 9, 2020**

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Tuesday Morning Corporation, *et al.*,[1] | § | Case No. 20-31476-HDH-11 |
| | § | |
| Debtors. | § | Jointly Administered |

### FINAL ORDER GRANTING THE DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO ASSUME THE CONSULTING AGREEMENT; (II) APPROVING PROCEDURES FOR STORE CLOSING SALES; (III) APPROVING THE SALE OF STORE CLOSURE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; (IV) WAIVING COMPLIANCE WITH APPLICABLE STATE LAWS AND APPROVING DISPUTE RESOLUTION PROCEDURES; (V) APPROVING PROCEDURES TO CONDUCT SALES IN ADDITIONAL CLOSING STORES; AND (VI) GRANTING <u>RELATED RELIEF</u>

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Tuesday Morning Corporation (8532) ("<u>TM Corp.</u>"); TMI Holdings, Inc. (6658) ("<u>TMI Holdings</u>"); Tuesday Morning, Inc. (2994) ("<u>TMI</u>"); Friday Morning, LLC (3440) ("<u>FM LLC</u>"); Days of the Week, Inc. (4231) ("<u>DOTW</u>"); Nights of the Week, Inc. (7141) ("<u>NOTW</u>"); and Tuesday Morning Partners, Ltd. (4232) ("<u>TMP</u>"). The location of the Debtors' service address is 6250 LBJ Freeway, Dallas, TX 75240.

Upon the motion (the "Motion")[2] of the Debtors for the entry of  an order (the "Final Order"), (i) authorizing the Debtors to assume the Consulting Agreement; (ii) approving the Sale Guidelines; (iii) approving the Sale of Store Closure Assets free and clear of all liens, claims and encumbrances; (iv) waiving compliance with Applicable State Laws and approving Dispute Resolution Procedures; (v) approving procedures to conduct Sales in Additional Closing Stores; and (vi) granting related relief; and the Court having reviewed the Motion and the First Day Declaration and having considered the statements of counsel and the evidence adduced with respect to the Motion at any hearing before the Court (the "Hearing"); the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334, (ii) venue is proper in this District pursuant to 28 U.S.C. § 1409, (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), (iv) the notice of the Motion and the Hearing was sufficient under the circumstances, and (v) there is good cause to waive the stay of Bankruptcy Rules 6004(h) and 6006(d); after due deliberation determined that the relief requested in the Motion is necessary and essential for the Debtors' reorganization and such relief is in the best interests of the Debtors, their estates and their creditors; and upon the record herein; and after due deliberation thereon; and good and sufficient cause have been shown; it is hereby:

FOUND AND DETERMINED THAT:[3]

1.      The Debtors have advanced sound business reasons for seeking to assume the Consulting Agreement and adopt the Sale Guidelines, as set forth in the Motion and at the Hearing and entering into the Consulting Agreement is a reasonable exercise of the Debtors' business judgment and in the best interests of the Debtors and their estates.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion or the Agreement (defined below).

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.  *See* FED. R. BANKR. P. 7052.

2.     Conducting the Store Closings in accordance with the Sale Guidelines will provide an efficient means for the Debtors to dispose of the Store Closure Assets.

3.     The Consulting Agreement was negotiated, proposed, and entered into by the Consultant and the Debtors without collusion, in good faith and from arm's length bargaining positions.

4.     The assumption of the Consulting Agreement is a sound exercise of the Debtors' business judgment.

5.     The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

6.     The Store Closings and the Sales are in the best interest of the Debtors' estates.

7.     The entry of this Final Order is in the best interest of the Debtors and their estates, creditors, interest holders, and all other parties in interest; and now therefore;

**IT IS HEREBY ORDERED THAT:**

8.     The Motion is GRANTED ON A FINAL BASIS as provided herein.

9.     The Debtors are authorized and empowered to take any and all further actions as may be reasonably necessary or appropriate to give effect to this Final Order.

10.     To the extent of any conflict between this Final Order, the Sale Guidelines, and the Consulting Agreement, the terms of this Final Order shall control over all other documents and the Sale Guidelines shall control over the Consulting Agreement.

11.     Notwithstanding Bankruptcy Rules 6003(b), 6004(h), and 6006(d), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

A.      **Authority To Assume the Consulting Agreement**

12.      The Consulting Agreement, a copy of which is attached to this Final Order as **Schedule 1**, is hereby assumed in its entirety including amendments thereto, pursuant to Bankruptcy Code § 365 on a final basis; *provided however*, entry into such amendments is subject to the prior written consent of the DIP Agent.  The Debtors are authorized to act and perform in accordance with the terms of the Consulting Agreement, including making payments required by the Consulting Agreement to the Consultant without the need for any application of the Consultant or a further order of the Court; provided however, such payments are subject to the DIP Order (defined below).

13.      Subject to the restrictions set forth in this Final Order, the DIP Order, and the Sale Guidelines, the Debtors and the Consultant are hereby authorized to take any and all actions as may be necessary or desirable to implement the Consulting Agreement and the Sales; and each of the transactions contemplated by the Consulting Agreement, and any actions taken by the Debtors and the Consultant necessary or desirable to implement the Consulting Agreement and/or the Sales prior to the date of this Final Order, hereby are approved and ratified.

B.      **Authority To Engage in Store Closing Sales**

14.      The Debtors are authorized, pursuant to Bankruptcy Code §§ 105(a) and 363(b)(1), to immediately continue and conduct Sales at the Closing Stores in accordance with this Final Order, the Sale Guidelines, and the Consulting Agreement.

15.      The Sale Guidelines, which are attached to this Final Order as **Schedule 2**, are approved in their entirety on a final basis.

16.      The Debtors are authorized to discontinue operations at the Closing Stores in accordance with this Final Order and the Sale Guidelines.

17.     All entities that are presently in possession of some or all of the Merchandise or FF&E in which the Debtors hold an interest that are or may be subject to the Consulting Agreement or this Final Order are hereby directed to surrender possession of such Merchandise or FF&E to the Debtors or the Consultant.

18.     Neither the Debtors nor the Consultant nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined in Bankruptcy Code § 101(27)) or landlord, to conduct the Store Closings and to take the related actions authorized herein.

## C.     Conduct of the Sales

19.     All newspapers and other advertising media in which the Sales may be advertised and all landlords are directed to accept this  Final Order as binding authority so as to authorize the Debtors and the Consultant to conduct the Sales and the sale of Merchandise and FF&E pursuant to the Consulting Agreement, including, without limitation, to conduct and advertise the sale of the Merchandise and FF&E in the manner contemplated by and in accordance with this Final Order, the Sale Guidelines, and the Consulting Agreement.

20.     Except as provided for in this Final Order, the DIP Order, and any applicable Side Letter, the Debtors and Consultant are hereby authorized to take such actions as may be necessary and appropriate to implement the Consulting Agreement and to conduct the sale without necessity of further order of this Court as provided in the Consulting Agreement or the Sale Guidelines, including, but not limited to, advertising the sale as a "store closing sale", "sale on everything", "everything must go", or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall Closing Locations, and at enclosed mall Closing Locations

to the extent the applicable Closing Location entrance does not require entry into the enclosed mall common area), use of sign-walkers, and street signage.

21.     Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise and FF&E, to the extent that disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners or other advertising and the Debtors and the Consultant are unable to resolve the matter consensually with a Governmental Unit, any party may request an immediate telephonic hearing with this Court pursuant to these provisions. Such hearing will, to the extent practicable, be scheduled no later than within two business days of such request. This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

22.     Except as expressly provided in the Consulting Agreement, the sale of the Merchandise and FF&E shall be conducted by the Debtors and the Consultant notwithstanding any restrictive provision of any lease, sublease or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Sales, the rejection of leases, abandonment of assets, or "going dark" provisions. The Consultant and landlords of the Closing Locations are authorized to enter into agreements ("Side Letters") between themselves to govern the conduct of the Sales and modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Consultant and any such landlords, *provided* that (1) nothing in such Side Letters affects the provisions of this Final Order and (2) in the event that the Side Letter affects Collateral (as defined in the DIP Order) at the applicable Closing Location, such Side Letter is in a form and substance acceptable to the DIP Agent. In the event of any conflict between the Sale Guidelines, applicable lease provisions, and any Side Letter, the terms of such Side Letter shall control. Further, in the event of any conflict between a Side Letter and this Final Order, the terms

of any Side Letter governing signage and the day-to-day conduct of the Sale, including but not limited to advertising, method for removal of FF&E, and landlords' access to the premises during the Sale, shall control over this Final Order.

23. Except as expressly provided for herein or in the Sale Guidelines, no person or entity, including, but not limited to, any landlord, licensor, service providers, utilities, and creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Sales or the sale of Merchandise or FF&E, or the advertising and promotion (including the posting of signs and exterior banners or the use of sign-walkers) of such sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service providers, utilities, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Sales and/or (ii) instituting any action or proceeding in any court (other than in the Bankruptcy Court) or administrative body seeking an order or judgment against, among others, the Debtors, the Consultant, or the landlords at the Closing Locations that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sales or sale of the Merchandise or FF&E or other liquidation sales at the Closing Locations and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

24. In accordance with and subject to the terms and conditions of the Consulting Agreement, the Consultant shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment and other assets of the Debtors for the purpose of conducting the Sales, free of any interference from any entity or person, subject to compliance with the Sale Guidelines and this Final Order.

25.     All sales of Store Closure Assets shall be "as is," final, and not subject to the Debtors' refund policy.  Returns related to the purchase of Store Closure Assets shall not be accepted at stores that are not participating in the Store Closings; provided, however, the Consultant shall accept return of any goods that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within the time period proscribed by the Debtors' return policy that was in effect when the merchandise was purchased, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect which good shall be considered returned Merchandise, and to the extent counted as Merchandise shall be re-characterized as "Excluded Defective Merchandise."

26.     The Consultant shall not be liable for sales taxes except as expressly provided in the Consulting Agreement and the payment of any and all sales taxes is the responsibility of the Debtors.  The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due, provided that in the case of a bona fide dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  Sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected.  The Consultant shall collect, remit to the Debtors and account for sales taxes as and to the extent provided in the Consulting Agreement.  This Final Order does not enjoin, suspend or restrain the assessment, levy or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

27.     Pursuant to Bankruptcy Code § 363(f), the Consultant, on behalf of the Debtors, is authorized to sell and all sales of Merchandise or FF&E (each as defined in the Consulting Agreement) pursuant to the Sales, whether by the Consultant or the Debtors, shall be free and clear of any and all encumbrances; provided, however, that any such encumbrances shall attach to the proceeds of the Sales with the same validity, in the amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Merchandise and FF&E, subject to any claims and defenses that the Debtors may possess with respect thereto and the Consultant's fees and expenses (as provided in the Consulting Agreement).

28.     To the extent that the Debtors propose to sell or abandon FF&E which may contain personal and/or confidential information about the Debtors' employees and/or customers, as such term is defined in Bankruptcy Code § 101(41A) (the "Personally Identifiable Information"), the Debtors shall remove the Personally Identifiable Information from such items of FF&E before such sale or abandonment.

29.     The Debtors and/or the Consultant (as the case may be) are authorized and empowered to, upon prior written notice to the DIP Agent, transfer Merchandise and FF&E among the Stores.  The Consultant is authorized to sell the Debtors' FF&E and, subject to the prior written consent of the DIP Agent, abandon the same, in each case, as provided for and in accordance with the terms of the Consulting Agreement.

30.     Notwithstanding this or any other provision of this Final Order, nothing shall prevent or be construed to prevent the Consultant (individually, as part of a joint venture, or otherwise) or any of its affiliates from providing additional services to and/or bidding on the Debtors' assets not subject to the Consulting Agreement pursuant to an agency agreement or otherwise ("Additional Assets"). The Consultant (individually, as part of a joint venture, or

otherwise) or any of its affiliates are hereby authorized to bid on, guarantee, or otherwise acquire such Additional Assets, or offer to provide additional services, notwithstanding anything to the contrary in the Bankruptcy Code or other applicable law, provided that such services guarantee, transaction, or acquisition is approved by separate order, acceptable in form and substance to the DIP Agent, of this Court.

**D.      Procedures Relating to Additional Store Closings**

31.     To the extent that the Debtors seek to conduct the Sales at any Additional Closing Stores, the Sale Guidelines and this Final Order shall apply to the Additional Closing Stores. The Consultant and landlords of any Additional Closing Stores may enter into Side Letters between themselves to govern the conduct of the Sales and modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Consultant and any such landlords, *provided* that (1) nothing in such Side Letters affects the provisions of this Final Order and (2) in the event that the Side Letter affects Collateral (as defined in the DIP Order) at the applicable Closing Location, such Side Letter is in a form and substance acceptable to the DIP Agent. In the event of any conflict between the Sale Guidelines, applicable lease provisions, and any Side Letter, the terms of such Side Letter shall control. Notwithstanding anything to the contrary herein, in the event of any conflict between a Side Letter and this Final Order, the terms of any Side Letter governing signage and the day-to-day conduct of the Sale, including but not limited to advertising, method for removal of FF&E, and landlords' access to the premises during the Sale, shall control over this Final Order. Any requests to conduct such Sales at Additional Closing Stores pursuant to this Final Order shall be made prior to the date of confirmation of any chapter 11 plan and this Final Order shall only apply to such Sales through the effective date of such chapter 11 plan.

32.     Prior to conducting the Sales at any Additional Closing Store, the Debtors will file a list, in form and substance acceptable to the DIP Agent, of such Additional Closing Stores with this Court (the "Additional Closing Store List") and serve a notice of their intent to conduct the Sales and the Additional Closing Stores on the applicable landlords (the "Additional Closing Store Landlords") and interested parties, including the U.S. Trustee, secured creditors, and any statutory committee of creditors appointed in the Chapter 11 Cases, by email (to the extent available to the Debtors) or overnight mail. With respect to Additional Closing Store Landlords, the Debtors will mail such notice to the notice address set forth in the lease for such Additional Closing Store (or, if none, at the last known address available to the Debtors).

33.     The Additional Closing Store Landlords and any interested parties shall have seven days after service of the applicable Additional Closing Store List to object to the application of this Final Order. If no timely objections are filed with respect to the application of this Final Order to an Additional Closing Store, the Debtors shall be authorized, pursuant to Bankruptcy Code §§ 105(a) and 363(b) and (f), to proceed with conducting the Sales at the Additional Closing Store in accordance with this Final Order, as applicable, the Sale Guidelines, the Consulting Agreement, or any Side Letter that the parties may negotiate, *provided* that (1) nothing in such Side Letters affects the provisions of this Final Order and (2) in the event that the Side Letter affects Collateral (as defined in the DIP Order) at the applicable Closing Location, such Side Letter is in a form and substance acceptable to the DIP Agent. If any objections are filed with respect to the application of this Final Order, to an Additional Closing Store, and such objections are not resolved, the objections and the application of this Final Order to the Additional Closing Store will be considered by the Court at the next regularly scheduled omnibus hearing, subject to the rights of any party to seek relief on an emergency basis on shortened notice, to the extent necessary so that

the Debtors can move promptly to maximize value and minimize expenses for the benefit of their creditors and stakeholders.

34. The Debtors, in the exercise of their reasonable business judgment, subject to the prior written consent of the DIP Agent, and depending on the outcome of the Lease Negotiations, may remove stores from the Additional Closing Store List at any time and without notice or further order of this Court.

**E.    Dispute Resolution Procedures with Governmental Units and Landlords**

35. Nothing in this Final Order, the Consulting Agreement, or the Sale Guidelines, releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Final Order. Nothing contained in this Final Order, the Consulting Agreement, or the Sale Guidelines shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code. The Store Closings and the Sales shall not be exempt from laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws"). Nothing in this Final Order, the Consulting Agreement, or the Sale Guidelines, shall alter or affect obligations to comply with all applicable federal safety laws and regulations. Nothing in this Final Order shall be deemed to bar any Governmental Unit (as such term is defined in Bankruptcy Code § 101(47)) from enforcing General Laws in the applicable non-bankruptcy

forum, subject to the Debtors' rights to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code or this Final Order. Notwithstanding any other provision in this Final Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Final Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Final Order shall be deemed to have made any rulings on any such issues.

36.     To the extent that the sale of Store Closure Assets is subject to any Liquidation Sale Laws, including any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws, laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the sale of the Store Closure Assets, the dispute resolution procedures in this section shall apply:

    i.    Provided that the Sales are conducted in accordance with the terms of the Interim Order, or the Final Order, as applicable, and the Sale Guidelines, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, the Debtors and the Consultant will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Sales in accordance with terms of the Interim Order, or the Final Order, as applicable, and the Sale Guidelines without the necessity of further showing compliance with any Liquidation Sale Laws.

    ii.    Within three business days after entry of the Final Order, the Debtors will serve by first-class mail, copies of the Final Order, the Consulting Agreement, and the Sale Guidelines on the following: (a) the Attorney General's office for each state where the Sales are being held; (b) the county consumer protection agency or similar agency for each county where the Sales are being held; (c) the division of consumer protection for each state where the Sales are being held; (d) the chief legal counsel for the local

jurisdiction; (e) the landlords for the Closing Stores; and their counsel of record; and (f) Consultant (collectively, the "Dispute Notice Parties").

iii.     With respect to any Additional Closing Stores, within three business days after filing any Additional Closing Store List with the Bankruptcy Court, the Debtors will serve by first-class mail, copies of the Interim Order or Final Order, as applicable, the Consulting Agreement, and the Sale Guidelines on the Dispute Notice Parties.

iv.     To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Consulting Agreement, or the Sale Guidelines, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Bankruptcy Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of the Interim Order, or service of an Additional Store Closing List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (a) Haynes and Boone, LLP, 2323 Victory Avenue, Suite 700, Dallas, Texas 75219, Attn: Ian Peck, Steve Pezanosky, and Jarom Yates; (b) Vinson & Elkins, LLP, Trammel Crow Center, 2001 Ross Avenue, Suite 3900, Dallas, Texas 75201, Attn: William L. Wallander and Bradley R. Foxman, as counsel to the DIP Agent; (c) counsel to the official committee of unsecured creditors, if one is appointed, (d) the United States Trustee for the Northern District of Texas; (e) Consultant and Consultant's counsel; and (f) the landlord for the Closing Store that is the subject of the Reserved Dispute. If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the notice, the Governmental Unit may file a motion with the Bankruptcy Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

v.     In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order, or the Final Order, as applicable, shall preclude the Debtors, a landlord, the Consultant, or any other interested party from asserting (A) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (B) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order, violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of any Interim Order or Final Order or to limit or interfere with the Debtors' or the Consultant's ability to conduct or to continue to conduct the Sales pursuant to the Interim Order or the Final Order, absent further order of the Bankruptcy Court. Upon the entry of the Interim Order or the Final Order, as applicable, the Bankruptcy Court grants authority for the Debtors and the Consultant to conduct the Sales pursuant to the terms of the Interim Order or the Final Order, as applicable, the Consulting Agreement, and/or the Sale Guidelines and to take all actions reasonably related thereto or

arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

vi.     If, at any time, a dispute arises between the Debtors and/or the Consultant and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (iv) and (v) above by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo.*

37.     Notwithstanding anything to the contrary in paragraph 36 above, the term "Liquidation Sale Laws" shall be deemed not to include any public health or safety laws or any state and local laws, regulations, ordinance, or police powers of general applicability (the "General Laws") regarding matters such as consumer protection, labor and employment, taxes (including, but not limited to, the collection of Sales Taxes), the sale of gift certificates, layaway programs, return of goods, express or implied warranties of goods, and "weights and measures" regulation and monitoring, and the Debtors and the Agent shall continue to be required to comply, as applicable, with such Safety Laws and General Laws, subject to any applicable provision of the Bankruptcy Code and federal law, and nothing in this Final Order shall be deemed to bar Governmental Units (as defined in Bankruptcy Code § 101(27)) or public officials from enforcing Safety Laws or General Laws.

38.     Subject to paragraphs 35 and 36 above, each and every federal, state, or local agency, departmental, or Governmental Unit with regulatory authority over the Sales and all newspapers and other advertising media in which the Sales are advertised shall consider this Final Order as binding authority that no further approval, license, or permit of any Governmental Unit

shall be required, nor shall the Debtors or the Consultant be required to post any bond, to conduct the Sales.

39.    Provided that the Sales are conducted in accordance with the terms of this Final Order, the Consulting Agreement, and the Sale Guidelines, and in light of the provisions in the laws that exempt court-ordered sales from their provisions, the Debtors, the landlords, and Consultant shall be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Sales in accordance with the terms of this Final Order and the Sale Guidelines without the necessity of further showing compliance with any such Liquidation Sale Laws.

40.    Within three business days of the entry date of this Final Order, the Debtors shall serve copies of this Final Order, the Consulting Agreement, and the Sale Guidelines via email, facsimile, or regular mail on: (i) the Office of the United States Trustee for the Northern District of Texas, (ii) counsel to the DIP Agent; (iii) counsel to the official committee of unsecured creditors (if any) appointed in the Chapter 11 Cases; (iv) all state attorneys general in which Store Closure Assets are located; (v) municipalities in which the Store Closure Assets are located, (vi) all of the Debtors' landlords at the closing locations of the Stores and their counsel of record, (vii) all applicable state and consumer protection agencies, (viii) all parties who are known by the Debtors to assert liens against the Store Closure Assets, and (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002.

41.    Notwithstanding anything to the contrary in this Final Order, the DIP ABL Credit Agreement, or the Prepetition Credit Agreement, upon the occurrence and continuation of a postpetition event of default, the Agent may enter upon a lease premises for the purposes of exercising remedies pursuant to the Event of Default only when permitted by:  (i) applicable non-

bankruptcy law; (ii) written consent of the landlord; or (iii) further Order of this Court following a motion filed with appropriate notice given to all Dispute Notice Parties.

42.     Notwithstanding anything to the contrary in this Final Order, the DIP ABL Credit Agreement, or the Prepetition Credit Agreement, no liens shall attach to the Debtors' leases of nonresidential real property, but liens may attach to the proceeds of such leases.

43.     Notwithstanding any other provisions of this Final Order, any DIP Order, or any agreements validated by any such orders, from the proceeds of the sale of the Debtors' assets at the Wave 1 Closing Stores, the amount of $48,467.90 shall be set aside by the Debtors in a segregated account (the "Texas Tax Account") as potential adequate protection for the asserted unpaid secured claims for the pre-petition taxes owed on any Wave 1 Closing Stores located in Allen, Allen ISD, Angelina County, Bexar County, Cameron County, City of Harlingen, Cypress Fairbanks ISD, Dallas County, Denton County, Ector CAD, El Paso, Ellis County, Fort Bend County, Galveston County, Grayson County, Gregg County, Harris County, Harlingen CISD, Hood CAD, Hidalgo County, Irving ISD, Jefferson County, La Porte, Lewisville ISD, McAllen, McLennan County, Montgomery County, Northwest ISD, Nueces County, Parker CAD, Rockwall CAD, San Marcos CISD, Smith County, Tarrant County, Tom Green CAD, Victoria County, and Wise County (collectively, the "Local Texas Taxing Authorities") and together with Williamson County the "Texas Tax Jurisdictions", prior to the distribution of any proceeds to any other creditor. The amount in the Texas Tax Account is comprised of $3,575.31 for Williamson County and $44,892.59 for the Local Texas Tax Authorities.  The Debtors will supplement the Texas Tax Account with additional counties and amounts in the event that additional Stores located in Texas are added to the Store Closing Sales through an Additional Store Closing List filed with this Court and additional claims are asserted by the Texas Tax Jurisdictions, subject to the prior consent of

the Agent and DIP Agent. The supplemental amount shall reflect the amount asserted or shown to be due in ad valorem taxes to any Texas Tax Jurisdictions for asserted unpaid secured claims for pre-petition taxes for Stores on the Additional Store Closing List. The liens of the Texas Tax Jurisdictions shall attach to these proceeds to the same extent and with the same priority as the liens they now assert against the property of the Debtors. These funds shall be on the order of potential adequate protection and shall constitute neither the allowance of the asserted claims of the Texas Tax Jurisdictions, nor a cap on the amounts they may be entitled to receive. Furthermore, the asserted claims and liens of the Texas Tax Jurisdictions shall remain subject to any objections any party would otherwise be entitled to raise as to the priority, validity, or extent of such liens. These funds may be distributed only upon agreement between the Texas Tax Jurisdictions and the Debtors, with the prior consent of the Agent and DIP Agent, or by subsequent order of the Court. All such funds, as applicable, shall be Cash Collateral of the Agent and DIP Agent with all rights reserved. Notwithstanding any other provisions included in any DIP Order, or any agreements approved hereby, any statutory liens (collectively, the "Tax Liens") of the Texas Tax Jurisdictions shall not be primed by or made subordinate to any liens granted to any party hereby to the extent such Tax Liens are valid, senior, perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount, avoidability, and extent of the claims and liens asserted by the Texas Tax Jurisdictions are fully preserved.

**F.      Other Provisions.**

44.      The Consulting Agreement and related documents may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court; *provided however*, entry into any such modifications, amendments, or supplements is subject to the prior written consent of the DIP Agent.

45.    The Debtors, in the exercise of their reasonable business judgment, subject to the prior written consent of the DIP Agent, and depending on the outcome of the Lease Negotiations, may remove stores from the list of Closing Stores attached to the Consulting Agreement as **Exhibit A** at any time and without notice or further order of this Court.

46.    The Consultant shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Consultant, in each case, other than as expressly provided for in the Consulting Agreement.

47.    To the extent the Debtors are subject to any state "fast pay" laws in connection with the Store Closings, the Debtors shall be presumed to be in compliance with such laws to the extent, in applicable states, such payroll payments are made by the later of: (a) the Debtors' next regularly scheduled payroll; and (b) seven calendar days following the termination date of the relevant employee, and in all such cases consistent with, and subject to, any previous orders of this Court regarding payment of same.

48.    Notwithstanding anything to the contrary herein, nothing in this Final Order authorizes the use of cash collateral or debtor-in-possession financing. Any payments authorized to be made pursuant to the Motion shall be made only to the extent authorized under the cash collateral and debtor-in-possession financing order approved by the Court in effect as of the time such payment is to be made (together with any approved budgets in connection therewith, the "<u>DIP Order</u>"), and such payments shall be subject to the terms, conditions, limitations, and requirements of the DIP Order in all respects.

49.    Subject to the terms of the DIP Order and the DIP Credit Agreement, the Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order.

### # # #  END OF ORDER  # # #

**Submitted by:**

**HAYNES AND BOONE, LLP**
Ian T. Peck
State Bar No. 24013306
Stephen M. Pezanosky
State Bar No. 15881850
Jarom J. Yates
State Bar No. 24071134
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 214.651.5000
Facsimile:  214.651.5940
Email: ian.peck@haynesboone.com
Email: stephen.pezanosky@haynesboone.com
Email: jarom.yates@haynesboone.com

**PROPOSED ATTORNEYS FOR DEBTORS**

**<u>Schedule 1</u>**

**CONSULTANT AGREEMENT**

## **CONSULTANT AGREEMENT**

This Consultant Agreement (collectively with all Exhibits hereto, the "Agreement") is made as of May 6, 2020, by and between Tuesday Morning Corp., a  Delaware corporation ("Merchant"), as debtor in possession, and Great American Group, LLC, a California limited liability company ("Consultant" and together with Merchant, the "Parties" and each a "Party").

## RECITALS

WHEREAS, Merchant operates retail stores and desires that Consultant act as Merchant's Consultant for the limited purposes of (a) selling all of the Merchandise (as hereinafter defined) from Merchant's retail store locations listed on **Exhibit A** attached hereto, which list may be amended in writing from time to time (including by adding or removing Stores), by mutual agreement of the Parties (each individually a "Store," and collectively the "Stores"), by means of a "store closing", "location closing", "sale on everything", "everything must go", or similar themed sale, as agreed between the Parties, and (b) disposing of the FF&E (defined below) in the Stores, on the terms and conditions set forth in this Agreement (the "Sale").

WHEREAS, Merchant and certain of its affiliates expect to commence voluntary chapter 11 bankruptcy cases (the "Bankruptcy Cases") in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") in May 2020.

WHEREAS, subject to the approval of the Bankruptcy Court, Consultant is willing to serve as Merchant's consultant for the purpose of providing such consulting services, upon the terms and conditions and in the manner set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

**Section 1.**        **Appointment of Consultant**

Effective as of the date hereof, subject to approval by the Bankruptcy Court pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code"), Merchant hereby appoints Consultant, and Consultant hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale and assisting Merchant in the sale of the Merchandise and FF&E (each as defined below) in accordance with the terms and conditions of this Agreement.  Subject to the above, Consultant shall be authorized to advertise the Sale as a "store closing", "location closing", "sale on everything", "everything must go", or similar-themed sale, and shall not be authorized to advertise the Sale as a "going out of business" sale.

**Section 2(a).**        **Merchandise**

As used in this Agreement, "Merchandise" means all first quality goods, saleable in the ordinary course, located in the Stores on the Sale Commencement Date (defined below) or delivered thereto after the Sale Commencement Date pursuant to the terms of this Agreement.  "Merchandise" excludes (1) goods that belong to sublessees, licensees, or concessionaires of Merchant, as identified by Merchant prior to the Sale Commencement Date; (2) goods, saleable in the ordinary course that Merchant desires to retain and transport to its store locations that are not listed on **Exhibit A** attached hereto, (3) FF&E (defined below) and improvements to real property that are located in the Stores; (4) damaged or defective goods; (5) goods held by Merchant on memo, on consignment, or as bailee; and (6) gift cards (third party and Merchant branded).

**Section 2(b).   FF&E.**

As used in this Agreement, "FF&E" means the furniture, furnishings, trade fixtures, machinery, equipment, office supplies, supplies, conveyor systems, racking, rolling stock, and other tangible personal property owned by Merchant and located in the Stores.

**Section 3.   Sale Term**

The Sale shall commence on or about June 1**,** 2020 (the "Sale Commencement Date") and conclude no later than August 7**,** 2020 (the "Sale Termination Date"); provided, however, that the Parties may mutually agree in writing to extend or terminate the Sale at any Store(s) prior to the Sale Termination Date.  The date on which the Sale has concluded at all of the Stores is the "Sale Termination Date" and the period between the Sale Commencement Date and the Sale Termination Date, inclusive, is the "Sale Term".  At the conclusion of the Sale for each Store, Consultant shall surrender the premises for such Store to Merchant in broom clean condition with any unsold FF&E to be left in place at the Stores.

At any time prior to the Sale Termination Date, with the consent of Consultant and, ((if necessary) the approval of the Bankruptcy Court, Merchant shall have the right to designate one or more stores for inclusion in the Sale (upon such designation, each such additional store shall be a "Store" or an "Additional Store," and collectively all of such shall be the "Additional Stores").  Upon Merchant's designation of the Additional Store(s), the parties shall agree upon a revised Expense Budget for the Additional Store(s) (together with a mutually agreed adjustment to the Expense Budget (as defined below)).

**Section 4.   Project Management**

(A)   Consultant's Undertakings

During the Sale Term, Consultant shall, in collaboration with Merchant: (a) provide qualified supervisors (the "Supervisors") engaged by Consultant to oversee the Sale and management of the Stores in an effort to maximize revenue and sell all of the Merchandise prior to the end of the Sale, as set forth in the Expense Budget (defined below in Section 6.(iv) below), and with the any additional Supervisors to be subject to the reasonable advance approval of Merchant; (b) determine appropriate point-of-sale and external advertising, subject to the reasonable advance approval of Merchant; (c) determine appropriate discounts of Merchandise, staffing levels, and appropriate bonus and incentive programs, if any, for the Stores' employees, each subject to the reasonable advance approval of Merchant; (d) oversee display of Merchandise for the Stores; (e) evaluate sales of Merchandise by category, provide sales reporting (but only if, and to the extent that, Merchant provides Consultant access to the point of sale data in the normal course), and monitor expenses; (f) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; (g) communicate with Merchant, on a weekly basis, to review the sales of Merchandise and the sales reporting and expenses, in an effort to minimize expenses and maximize overall net recovery of the Sale; (h) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (i) to the extent necessary, assist Merchant in obtaining any required permits and governmental consents required to conduct the Sale; (j) price, market, and sell the FF&E on behalf of Merchant; and (k) provide such other related services deemed necessary or appropriate by Merchant and Consultant.

Consultant shall have the right to sell all FF&E at the Stores, except the FF&E that Merchant designates for transfer to stores not listed on **Exhibit A** attached hereto. Merchant shall reimburse Consultant for its reasonable costs and expenses incurred by Consultant in connection with the sale of the FF&E, based upon a mutually agreed upon budget.  Consultant shall have the right to abandon at the Stores any unsold FF&E. Unless otherwise agreed to by Merchant, the sale of the FF&E in each Store shall conclude at the same time as Merchandise sales conclude.

The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination, or any other liability arising from Consultant's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

The Parties further acknowledge that Consultant does not warranty or guarantee that it will be able to assist Merchant in obtaining all of the permits and governmental consents required to conduct the Sale, and Consultant shall have no liability to Merchant or any permitting or governmental agencies for the payment of any fines, costs or assessments that may be charged to Merchant or Consultant to the extent that any such required permits or governmental consents are not properly or timely obtained.

The Parties acknowledge that this Agreement is being entered into in the midst of the outbreak of the COVID-19 virus pandemic and that local, state and national laws and responses are continuously developing, often in unpredictable ways. Merchant hereby agrees that, while Consultant will fully cooperate with Merchant to adhere to any restrictions, regulations or recommendations imposed by local, state or federal governmental entities, or similar regulatory or authoritative agencies, that may be imposed on any aspect of Merchant's ability to operate the Stores in response to the COVID-19 pandemic, the responsibility and expense of complying with any such laws, regulations or orders, including their enforce and implementation, shall be the sole responsibility of Merchant. Examples of such restrictions, regulations or recommendations may include, without limitation: (a) providing protective gear (such as masks, sanitizers, and similar items) aimed at reducing the spread of the virus to Merchant's employees, customers, vendors, etc.; (b) implementing physical restrictions with regard to Store operations, including monitoring the number of customers allowed into a Store at any given time; and (c) enforcing daily cleaning and sanitizing procedures at the Stores. Merchant and its employees shall be solely responsible to facilitate, enforce, and implement any such restrictions or regulations, at Merchant's sole cost and expense.

      (B)    <u>Merchant's Undertakings</u>

During the Sale Term, Merchant shall (a) be the employer of the Store's employees, other than the Supervisors; (b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Stores, the Stores' employees and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales taxes and pay them to the appropriate taxing authorities; (e) use reasonable efforts to cause Merchant's employees to cooperate with Consultant and the Supervisors; (f) execute all agreements determined by Merchant and/or Consultant to be necessary or desirable for the operation of the Stores during the Sale; (g) arrange for maintenance and repairs reasonably required to allow for the conduct of the Sale and operation of the Stores in order to ensure a reasonably comfortable work and shopping environment for Merchant's employees and customers at the Stores; and (h) provide peaceful use and occupancy of, and full access (including reasonable before and after hours access and normal utilities/phone service) to, the Stores, and to Merchant's warehouse, distribution center, and corporate offices, if and as applicable, for the purpose of preparing for, conducting, and completing the Sale, and performing its obligations under this Agreement.

Merchant shall provide throughout the Sale Term central administrative services necessary for the Sale, including internal payroll processing, MIS services, cash and inventory reconciliation, data processing and reporting, email preparation and distribution, information technology updates, functionality, and maintenance, and accounting, all at no cost to Consultant.

Consultant shall have no liability to Merchant's employees for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Consultant.

**Section 5.**        **The Sale**

All sales of Merchandise and FF&E shall be made on behalf of, and solely in the name of, Merchant. Consultant does not have, nor shall it have, any right, title, or interest in the Merchandise or FF&E.  All sales of Merchandise or FF&E shall be by cash, gift card, gift certificate, merchandise credit, debit card, or credit card and, at Merchant's discretion, by check or otherwise in accordance with Merchant's policies, and shall be "final" with no returns accepted or allowed, unless otherwise directed by Merchant.

**Section 6.**        **Consultant Fee and Expenses in Connection with the Sale**

> (i)   Gross Proceeds

With respect to Merchandise or FF&E, as applicable, that is sold through the Sale, "Gross Proceeds" means the sum of all gross proceeds thereof (including, as a result of the redemption of any gift card, gift certificate, or merchandise credit as well as wholesale sales to third parties) during the Sale Term, after the application of all discounts including, without limitation, any discount coupons issued by Merchant in the ordinary course of its business, and net only of sales taxes.  For the avoidance of doubt, proceeds from the sale of Additional Consultant Goods pursuant to Section 7 hereof shall not constitute "Gross Proceeds."

> (ii)   Consultant's Fee

As consideration for its services under this Agreement, Merchant shall pay to Consultant a base fee (the "Base Fee") equal to (a) one and one-half of one percent (1.5%) of all Gross Proceeds of Merchandise, calculated from the first dollar recovered, *plus* (b) fifteen percent (15.0%) of all Gross Proceeds of FF&E.

If during the period from the date of this Agreement through the Sale Termination Date, the Consultant modifies existing agreements and/or enters into new agreements with other clients that contain a lower Base Fee, the Consultant shall lower the Base Fee in this Agreement to that of the other more favorable agreements.

> (iii)   Gross Rings

For purposes of calculating Gross Proceeds and the Base Fee, the Parties shall use the "Gross Rings" method, wherein Consultant and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable sales taxes and (ii) cash reports of sales within each Store.  Register receipts shall show for each item sold the retail price (as reflected on Merchant's books and records) for such item, and the markdown or other discount granted in connection with such sale.  All such records and reports shall be made available to Consultant and Merchant during regular business hours upon reasonable notice.

> (iv)   Expenses

Merchant shall be responsible for all costs and expenses of the Sale, including but not limited to all Store-level operating expenses.  To control the Sale expenses, Merchant and Consultant have established a budget (the "Expense Budget") of certain expenses in connection with the Sale, including payment of the costs of supervision (including Supervisors' wages, fees, travel, and deferred compensation), advertising costs, and Consultant's corporate travel/legal expenses, which aggregate sum Consultant shall not exceed absent Merchant's prior written consent.  The Expense Budget is attached hereto as **Exhibit B**.  The Expense Budget shall not be modified absent mutual written agreement of the Parties. Upon Merchant's designation of any Additional Store(s), the Parties shall agree upon a revised Expense Budget to account for the adjustment relating to the Additional Store(s). Merchant shall not be responsible for Consultant's expenses that exceed the Expense Budget. The Parties acknowledge that the Expense Budget will be updated in connection with any modification of the lists of Stores and agree to cooperate in good faith with respect to such updates.

        (v)    <u>Advance on Expenses</u>

In the event that Sale Commencement Date is scheduled to occur before Merchant commences the Bankruptcy Cases, as an advance against the expenses of the Sale, and to secure payment of the same and any other amounts due Consultant, no later than one week before the Sale Commencement Date, Merchant shall pay to Consultant a deposit in the amount of **$300,000** which shall be applied against Consultant Expenses or Base Fee at the end of the Sale Term and to the extent not expended when the Sale concludes (assuming Consultant claims no other amounts are due under the Agreement by Consultant or no other damages were incurred) shall be returned to Merchant as part of the Final Reconciliation or such other time that Merchant and Consultant mutually agree.

        (vi)    <u>Reconciliation</u>

Consultant shall submit invoices to Merchant on a weekly basis setting forth (i) the Base Fee earned during the preceding week, and (ii) any expenses incurred by Consultant during the preceding week for which Consultant is entitled to reimbursement. No later than seven (7) days of submission, such invoices shall be paid in full by Merchant via wire transfer to Consultant.

The Parties shall complete a final reconciliation and settlement of all amounts payable to Consultant under this Agreement (including, without limitation, Expense Budget items and fees) no later than forty-five (45) days following the Sale Termination Date for the last Store.

**Section 7.**      **<u>Additional Consultant Goods</u>**

Consultant shall also be entitled to include in the Sale supplemental goods of like kind and no lesser quality to the Merchandise ("<u>Additional Consultant Goods</u>") located in the Stores and shall be procured by Consultant. The sale of Additional Consultant Goods, including, but not limited to, the specific products to be sold and the volume of products to be sold, shall be subject to Merchant's prior approval, which shall be exercised in Merchant's sole discretion.  Consultant shall be responsible for payment of the out-of-pocket costs directly associated with procuring any Additional Consultant Goods, which costs shall not constitute expenses reimbursable pursuant to the Expense Budget under this Agreement; <u>provided, however</u>, that such costs shall not include any occupancy expenses related to the Stores.  Merchant shall have no liability whatsoever for any shrink relating to the Additional Consultant Goods.  Consultant will ring the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other manner as will enable the Parties to distinguish sales of the Additional Consultant Goods from sales of the Merchandise. Consultant shall pay Merchant six and one-half of one percent (6.5%) of the aggregate gross proceeds of the sale of Additional Consultant Goods during the Sale (net only of sales taxes related thereto) (the "<u>Additional Consultant Goods Fee</u>").

Consultant and Merchant intend that the transactions relating to the Additional Consultant Goods are, and shall be construed as, a true consignment from Consultant to Merchant in all respects and not a consignment for security purposes. At all times and for all purposes the Additional Consultant Goods and the proceeds thereof shall be the exclusive property of Consultant, and no other person or entity shall have any claim against any of the Additional Consultant Goods or its proceeds. The Additional Consultant Goods shall at all times remain subject to the exclusive control of Consultant.  Subject solely to Consultant's obligations to pay Merchant the Additional Consultant Goods Fee, the Additional Consultant Goods and the identifiable proceeds thereof are not property of Merchant (or Merchant's estate) and do not constitute property of Merchant (or Merchant's estate) subject to any lender's lien.

Consultant acknowledges, and the Approval Order shall provide, that the Additional Consultant Goods shall be consigned to the Company as a true consignment under Article 9 of the Code and, to the extent necessary, Consultant is hereby granted a first priority security interest in and lien upon the Additional Consultant Goods and the proceeds thereof, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured

parties (provided that Consultant is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying its interest in the Additional Consultant Goods as consigned goods thereunder and the Company as the consignee therefor).

Upon Consultant's request, the Company at Consultant's sole expense, and not as a Sale Expense, shall insure the Additional Consultant Goods and, if required, promptly file any proofs of loss with regard to same with its insurers.  Consultant shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Consultant Goods, which amount shall not be deemed a Sale Expense.

**Section 8.**      **Indemnification**

(i)      Merchant's Indemnification

Merchant hereby indemnifies, defends, and holds Consultant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, principals, affiliates, and Supervisors (collectively, the "Consultant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs, and expenses (including reasonable attorneys' fees) arising from or related to (a) the acts or omissions of Merchant or Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant; (c) any liability or other claims, including, without limitation, product liability claims, asserted by customers, any Store employees (under a collective bargaining agreement or otherwise), or any other person (excluding the Consultant Indemnified Parties) against Consultant or any Consultant Indemnified Party, except claims arising from Consultant's own gross negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of any Consultant Indemnified Parties or Merchant's customers by Merchant or any Merchant Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law.

(ii)      Consultant's Indemnification

Consultant hereby indemnifies, defends, and holds Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, principals, and affiliates (other than Consultant or the Consultant Indemnified Parties) (collectively, the "Merchant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or grossly negligent acts or omissions of Consultant or the Consultant Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Consultant; (c) any liability or other claims made by the Consultant's Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Consultant's conduct of the Sale, except claims arising from Merchant's own negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortuous or otherwise actionable treatment of the Merchant Indemnified Parties or Merchant's customers by Consultant or any of the Consultant Indemnified Parties and (e) any claims made by any party engaged by Consultant as an employee, agent, representative or independent contractor arising out of such engagement.

**Section 9.**      **Insurance**

(A)      Merchant's Insurance Obligations

Merchant shall maintain, throughout the Sale Term, liability insurance policies  (including, without limitation, products liability, comprehensive commercial general liability insurance, and auto liability insurance), with at least the coverage limits currently existing thereunder, covering injuries to persons and property in or in connection with the Stores and/or the Merchandise, and shall cause Consultant to be named an additional insured with respect to all such policies.  At Consultant's request, Merchant shall provide Consultant with a

certificate or certificates evidencing the insurance coverage required hereunder and that Consultant is an additional insured thereunder.  In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all applicable statutory requirements.

    (B)    <u>Consultant's Insurance Obligations</u>

Consultant shall maintain, throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive commercial general liability, and auto liability insurance) on an occurrence basis in an amount of at least one million dollars ($1,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Consultant's provision of services at the Stores.  Consultant shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a certificate or certificates evidencing the insurance coverage required hereunder.  In addition, Consultant shall maintain throughout the Sale Term, workers compensation insurance compliance with all statutory requirements.  Further, should Consultant employ or engage third parties to perform any of Consultant's undertakings with regard to this Agreement, Consultant will ensure that such third parties are covered by Consultant's insurance or maintain all of the same insurance as Consultant is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance.

**Section 10.**        **<u>Representations, Warranties, Covenants and Agreements</u>**

    (A)    <u>Merchant's Representations, Warranties, Covenants and Agreements</u>.

Merchant warrants, represents, covenants, and agrees that (a) Merchant is a company duly organized, validly existing, and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder (subject to Bankruptcy Court approval) and maintains its principal executive office at the address set forth herein; (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Merchant and this Agreement constitutes a valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for Merchant to fully perform all of its obligations herein; (c) all ticketing of Merchandise at the Stores has been and will be done in accordance with Merchant's customary ticketing practices; (d) all normal course hard markdowns on the Merchandise have been, and will be, taken consistent with customary Merchant's practices; and (e) the Stores will be operated in the ordinary course of business in all respects, other than any necessary reduction in business hours, which determination shall be within Merchant's sole discretion, and any other ordinary course modifications expressly mutually agreed to by Merchant and Consultant. Between execution of this Agreement by both Parties and the earlier to occur of (a) entry of the Approval Order (as defined below) and (b) denial by the Bankruptcy Court of Merchant's motion seeking entry of the Approval Order, Merchant shall not enter into an agreement with any entity other than Consultant to conduct the Sale or a similar sale at all or any of the Stores.

    (B)    <u>Consultant's Representations, Warranties, Covenants and Agreements</u>.

Consultant warrants, represents, covenants and agrees that: (a) Consultant is a company duly organized, validly existing, and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform Consultant's obligations hereunder, and maintains its principal executive office at the addresses set forth herein; (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Consultant and this Agreement constitutes a valid and binding obligation of Consultant enforceable against Consultant in accordance with its terms and conditions, and the consent of no other entity or person is required for Consultant to fully perform all of its obligations herein; (c) Consultant shall conduct the sale in accordance with the terms of this Agreement; (d) no

non-emergency repairs or maintenance in the Stores will be conducted without Merchant's prior written consent; and (e) Consultant will not take any disciplinary action against any employee of Merchant.

**Section 11.**      **Termination**

The following shall constitute "Termination Events" hereunder:

(a)      Merchant's or Consultant's failure to perform any of their respective material obligations hereunder, which failure remains uncured for seven (7) business days after receipt of written notice thereof to the defaulting Party;

(b)      Any representation or warranty made by Merchant or Consultant is untrue in any material respect as of the date made or at any time and throughout the Sale Term;

(c)      The Sale is terminated or materially interrupted or impaired for any reason other than an event of default by Consultant or Merchant; or

(d)      Merchant or Consultant, in its sole and reasonable business judgement, elects to terminate this Agreement.

(e)      The Bankruptcy Court does not approve Merchant's entry into and performance under this Agreement on or before June 1, 2020.

If a Termination Event occurs, the non-defaulting Party (in the case of an event of default) or either Party (if the Sale is otherwise terminated or materially interrupted or impaired) may, in its discretion, elect to terminate this Agreement by providing seven (7) business days' written notice thereof to the other Party, and, in the case of an event of default, in addition to terminating this Agreement, pursue any and all rights and remedies and damages resulting from such default. If this Agreement is terminated, Merchant shall be obligated to pay Consultant all undisputed amounts due under this Agreement through such termination date.

**Section 12.**      **Notices**

All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by facsimile, or a recognized overnight delivery service, or email, as follows:

If to Consultant:

Great American Group, LLC
21255 Burbank Blvd., Suite 400
Woodland Hills, CA 91367
Attention:  Scott K. Carpenter
and Marina Fineman
Tel: (818) 746-9309
Email:
scarpenter@greatamerican.com
mfineman@greatamerican.com

If to the Merchant:

Tuesday Morning Corporation
6250 LBJ Freeway
Dallas, Texas 75240
Attention: Bridgett Zeterberg and
Steven Becker

Email:
bzeterberg@tuesdaymorning.com
sbecker@tuesdaymorning.com

With a copy (which shall not constitute notice) to:

Haynes and Boone, LLP
2323 Victory Avenue
Suite 700
Dallas, TX 75219
Attn: Ian Peck
Email:
ian.peck@haynesboone.com

**Section 13.** **Independent Consultant**

Consultant's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect, except with respect to ordinary course sales of Merchandise through the Sale. No employer/employee, principal/agent, joint venture, or other such relationship is created by this Agreement. Merchant shall have no control over the hours that Consultant or its employees or assistants or the Supervisors work or the means or manner in which the services that will be provided are performed and Consultant is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.

**Section 14.** **Non-Assignment**

Neither this Agreement nor any rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party. No modification, amendment, or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon either Party unless made in writing and signed by a duly authorized representative or agent of such Party. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors, and permitted assigns.

**Section 15.** **Severability**

If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative, or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable. If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties.

**Section 16.** **Governing Law, Venue, Jurisdiction, and Jury Waiver**

This Agreement and its validity, construction and effect shall be governed by and enforced in accordance with the internal laws of the State of Texas (without reference to the conflict of laws provisions therein). The parties agree that all claims, controversies, or disputes arising with regard to this Agreement shall be tried and litigated only in the state courts or federal courts located in Dallas County, Texas and each party hereto submits to the exclusive jurisdiction and venue of such courts relative to any such claim, controversy or dispute. Merchant and Consultant waive their respective rights to trial by jury of any cause of action, claim, counterclaim, or cross-complaint in any action, proceeding, and/or hearing brought by either Party against the other on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Merchant and Consultant, any claim of injury or damage or the enforcement of any remedy under any law, statute, or regulation, emergency or otherwise, now or hereafter in effect. Upon Merchant's commencement of

9

the Bankruptcy Cases, the Bankruptcy Court shall have jurisdiction over all disputes arising from this Agreement or the interpretation or enforcement hereof, and each Party hereby waives any defenses or objections thereto based on lack of jurisdiction, improper venue, and/or forum non conveniens.

**Section 17.**     **Entire Agreement**

This Agreement, together with all additional schedules and exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof. No covenants, agreements, representations, or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement.  All prior agreements, discussions, and negotiations with respect to the subject matter of this Agreement are entirely superseded by this Agreement.

**Section 18.**     **Execution**

This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile, or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument. This Agreement, and any amendments hereto, to the extent signed and delivered by means of electronic mail, a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

**Section 19.**     **Bankruptcy Court Approval**

Forthwith upon Merchant's commencement of the Bankruptcy Cases, and in no case later than three (3) days after the petition date, Merchant shall file a motion to assume this Agreement under section 365 of the Bankruptcy Code, and  utilize its commercially reasonable efforts to ensure that such motion is approved by an order (the "Approval Order") that provides, among other things, as follows:  (i) approval and/or assumption of this Agreement; (ii) the payment of all fees and reimbursement of expenses hereunder to Consultant without further order of the court, free and clear of all liens, claims and encumbrances, and on a weekly basis without further order of the Bankruptcy Court and otherwise in accordance with this Agreement; (iv) approval of the transaction contemplated hereby; (iii) authorizing the Sale without the necessity of complying with state and local rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that could otherwise govern the Sale; (iv) authorizing the Sale notwithstanding restrictions in leases, reciprocal easement agreements or other contracts that purport to restrict the Sale or the necessity of obtaining any third party consents; and (v) authorizing Merchant to take such further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement. From and after entry of the Approval Order, Consultant shall conduct the Sale in accordance with the terms of the Approval Order in all material respects.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, Consultant and Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

Great American Group, LLC

By:  Scott K. Carpenter
Its:  President, GA Retail Solutions

Tuesday Morning Corp

By:  Steven Becker
Its:  Chief Executive Officer

4829-3953-1963 v.8                    11

**<u>Exhibit A</u>**

**Stores**

## Exhibit A
## Closures - 129 Locations

| # | Store | RE | RVP | State | Rentable SF | Total SF (Per Lease) | Store Address |
|---|-------|----|----|-------|-------------|----------------------|---------------|
| 8 | WASH | AG | GV | VA | 9,409 | 9,409 | 3500 Carlin Springs Road, Bailey's Crossroads, VA 22041 |
| 20 | ATLSA | AG | GV | GA | 12,096 | 12,096 | Parkway Pointe, 3101 Cobb Parkway SE, Suite 120, Atlanta, GA 30339 |
| 38 | LITT | AG | DB | AR | 10,697 | 10,697 | Bowman Heights Shopping Center, 301 S. Bowman Road, Little Rock, AR 72211 |
| 47 | JACK | AG | GV | FL | 19,364 | 19,364 | Tuesday Morning Plaza, 291 Blanding Blvd, Orange Park, FL 32073 |
| 51 | WASH | AG | GV | VA | 6,005 | 6,005 | Vienna Shopping Center, 134-136 Maple Avenue West, Vienna, VA 22182 |
| 63 | ATLA | AG | GV | GA | 18,300 | 18,300 | Fayette Pavilion III, 240 Pavilion Pkwy, Fayetteville, GA 30214 |
| 64 | WASH | AG | GV | VA | 7,660 | 7,660 | Sugarland Crossing Shopping Center, 47100 Community Plaza, Suite 135 (Store 60), Sterling, VA 20164 |
| 71 | DALL | AG | DB | TX | 11,488 | 11,488 | 7750 E. Belt Line Rd., Ste 100, Richardson, TX 75081 |
| 76 | ATLA | AG | GV | GA | 20,164 | 20,164 | The Village at Peachtree Corners, 5270 Peachtree Parkway, Norcross, GA 30092 |
| 97 | ORLA | AG | GV | FL | 30,000 | 30,000 | Colonial Shoppes Bear Lake, 3035 E. Semoran Blvd, Suite 140, Apopka, FL 32703 |
| 116 | CHIC | AG | SC | IL | 10,094 | 10,094 | Naper West Plaza, 596 S. IL Route 59, Naperville, IL 60540 |
| 125 | KNOX | AG | GV | TN | 8,579 | 8,579 | The Shops At Western Plaza, 4409 Kingston Pike, Knoxville, TN 37919 |
| 130 | RICH | AG | GV | VA | 12,225 | 12,225 | Pocono Crossing, 10364 Midlothian Turnpike, Richmond, VA 23235 |
| 133 | DALL | AG | DB | TX | 8,796 | 8,796 | Irving Towne Center, 3461 W. Airport Frwy, Ste 118, Irving, TX 75062 |
| 134 | ATLA | AG | GV | GA | 14,981 | 14,981 | Georgetown Shopping Center, 4400 Chamblee-Dunwoody Rd., Ste 100, Dunwoody, GA 30338 |
| 143 | RALE | AG | GV | NC | 10,791 | 10,791 | Plantation Point, 6411 Triangle Plantation Dr, Raleigh, NC 27616 |
| 157 | CLEV | AG | DB | OH | 8,250 | 8,250 | River Square, 19975 Detroit Road, Rocky River, OH 44116 |
| 190 | CHAT | AG | GV | TN | 10,530 | 10,530 | Eastgate Town Center, 5600 Brainerd Road, Suite K26, Chattanooga, TN 37411 |
| 204 | OMAH | BBI | SC | NE | 13,608 | 13,608 | Westwood Plaza, 12119 West Center Rd, Omaha, NE 68144 |

## Exhibit A
## Closures - 129 Locations

| # Store | RE | RVP | State | Rentable SF | Total SF (Per Lease) | Store Address |
|---|---|---|---|---|---|---|
| 229 IND | 88 | SC | IN | 12,659 | 12,659 | Shoppes at County Line 8700 Hardegan St. Indianapolis, IN 46227 |
| 260 FORT | AG | DB | TX | 7,690 | 7,690 | Courtside Plaza Shopping Center 5800 SH 20 West Arlington, TX 76017 |
| 264 CHIC | 88 | SC | IL | 11,998 | 11,998 | Rice Lake Square 229 Rice Lake Square, Ste 200 Wheaton, IL 60189-2280 |
| 273 IND | 88 | SC | IN | 10,860 | 10,860 | Willow Lake East 2621 Lake Circle Dr. Indianapolis, IN 46268 |
| 297 SANF | 88 | SC | CA | 10,000 | 10,000 | Union Landing 31531 Courthouse Dr. Union City, CA 94587 |
| 301 LOSA | 88 | SC | CA | 8,140 | 8,140 | Sierra Vista Plaza 1601 N. Placentia Avenue Placentia, CA 92870 |
| 338 CSRP | 88 | SC | IA | 11,996 | 11,996 | Collins Road Square 1250 Twixt Town Rd. Marion, IA 52302-3079 |
| 350 CBUS | AG | GV | GA | 14,644 | 14,644 | Cross Country Plaza 3201 Macon Road Columbus, GA 31906 |
| 369 LOSA | 88 | SC | CA | 8,166 | 8,166 | Hastings Ranch Shopping Center 3765 East Foothill Blvd Pasadena, CA 91107 |
| 377 LOSA | 66 | SC | CA | 9,500 | 9,500 | Westchester Village 8801 South Sepulveda Blvd. Westchester, CA 90045 |
| 380 BALT | AG | GV | MD | 11,545 | 11,545 | Goucher Commons 800 Goucher Blvd. Towson, MD 21286 |
| 383 HARR | 88 | GV | PA | 7,500 | 7,500 | Carpet Mart Plaza 5103 Carlisle Pike Mechanicsburg, PA 17050 |
| 397 PRES | 88 | SC | CA | 10,000 | 10,000 | Blackstone & Barstow Shopping Center 530 N. Blackstone Ave Fresno, CA 93710 |
| 398 FTLA | AG | GV | FL | 10,800 | 10,800 | Emerald Woods Plaza 3900 North 46th Street Hollywood, FL 33021 |
| 414 MONM | 88 | GV | NJ | 9,977 | 9,977 | Union Square Shopping Center 500 Highway 35 Suite B/8A0 Middletown, NJ 07748 |
| 419 PLMB | AG | GV | FL | 8,508 | 8,508 | Treasure Shoppes 115 N. Hwy. US 1 Tequesta, FL 33469 |
| 424 WASH | AG | GV | VA | 10,257 | 10,257 | Village Center Shopping Center 5615 Stone Road Suite # 3 Centreville, VA 20120 |
| 429 WICH | 88 | DB | KS | 12,077 | 12,077 | 2058 N. Maize Rd. Wichita, KS 67205 |
| 462 SACR | 88 | SC | CA | 8,698 | 8,698 | Laguna Pavilion 7440 Laguna Blvd., Ste 106 Elk Grove, CA 95758 |
| 480 AUST | AG | DB | TX | 9,990 | 9,990 | Plaza 183 13410 Research Blvd. Austin, TX 78750 |

Page 2 of 7

## Exhibit A
## Closures - 129 Locations

| # Store | RE | RVP | State | Remote SF | Total SF (Per Lease) | Store Address |
|---|---|---|---|---|---|---|
| 501 CCEA | 88 | GV | NJ | 8,950 | 8,950 | Bey Lea Plaza 1232 Hooper Ave., Ste 10 Toms River, NJ 08753 |
| 504 DALL | AG | DB | TX | 9,422 | 9,422 | Airport Village 819 Airpark Road Suite 14 Richardson, TX 75080 |
| 511 MORR | 88 | GV | NJ | 11,000 | 11,000 | Castle Ridge Plaza 385 State Rt 10 West East Hanover, NJ 07936 |
| 515 ALBN | 88 | GV | NY | 12,000 | 12,000 | Crossgates Commons 161 Washington Avenue Extension Albany, NY 12205 |
| 534 SEAT | 88 | SC | WA | 9,051 | 9,051 | Roxehill Plaza 12242 NE 85th Street Kirkland, WA 98033 |
| 557 VIRG | AG | GV | VA | 8,520 | 8,520 | London Bridge Shopping Center 2944 Virginia Beach Blvd Spaces 7E-8 Virginia Beach, VA 23464 |
| 560 MONT | AG | DB | AL | 13,524 | 13,524 | Promenade Montgomery 2572 Eastern Blvd Montgomery, AL 36117 |
| 576 FRED | AG | GV | VA | 10,000 | 10,000 | Gateway Village / Fredericksburg Design Center 2340 Plank Road Fredericksburg, VA 22401 |
| 581 FTLA | AG | GV | FL | 14,472 | 14,472 | Turtle Crossing 4396 N. State Rd 7 Coral Springs, FL 33073 |
| 590 DALL | AG | DB | TX | 11,801 | 11,801 | Best Buy S/C 9304 N. Central Expressway Dallas, TX 75231 |
| 595 BUFF | 88 | DB | NY | 11,911 | 11,911 | Eastview Plaza 8190-6250 Transit Road Amherst, NY 14221 |
| 596 DNCH | AG | GV | FL | 12,014 | 12,014 | Bellair Plaza 2455 N. Atlantic Ave. Daytona Beach, FL 32118-3301 |
| 600 PITT | 88 | DB | PA | 8,000 | 8,000 | Southland Four Seasons S/C 641-643 Clairton Blvd Stonebrook #45-46 Pleasant Hills, PA 15236 |
| 622 IFLS | 88 | SC | ID | 8,465 | 8,465 | Teton Village Plaza 2191 S. 17th Street Idaho Falls, ID 83404 |
| 636 COLO | 88 | SC | CO | 7,152 | 7,152 | Stetson Cross Shopping Center 1833 S. Nevada Ave. Colorado Springs, CO 80906 |
| 645 MNSP | 88 | SC | MN | 11,421 | 11,421 | Southdale Square 2640 W 66th St Richfield, MN 55423 |
| 657 SLOB | 88 | SC | CA | 8,100 | 8,100 | Marigold Center 3860-1 Broad Street Suite I San Luis Obispo, CA 93401 |
| 659 TACO | 88 | SC | WA | 9,100 | 9,100 | Michaels Center 3701 S. Cedar St. Tacoma, WA 98409 |

Tuesday Morning Copy of Exhibit A 129 Store Closures - TM

## Exhibit A
## Closures - 129 Locations

| # | Store | RE | RVP | State | Rentable SF | Total SF (Per Lease) | Store Address |
|---|---|---|---|---|---|---|---|
| 669 | CINC | | BB | DB | OH | 9,000 | 9,000 | Springdale Plaza 673 East Kemper Road Springdale, OH 45246 |
| 684 | LOSA | | BB | SC | CA | 6,120 | 6,120 | Rico Plaza 43 Calle De Industrias San Clemente, CA 92672 |
| 688 | RCNY | | BB | DB | NY | 14,908 | 14,908 | Gildersleeve Court 8900 Pittsford-Victor Road Victor, NY 14564 |
| 705 | SALT | | BB | SC | UT | 9,000 | 9,000 | Gateway Crossing Shopping Center 385 S. 500 W. Bountiful, UT 84010 |
| 708 | NAPL | | AG | GV | FL | 7,500 | 7,500 | Gulf Gate Plaza 2645 Tamiami Trail Naples, FL 34112 |
| 714 | PLMB | | AG | GV | FL | 12,075 | 12,075 | Wentward Shopping Center 2471 Okeechobee Blvd., Suite 2905 E West Palm Beach, FL 33409 |
| 722 | CONW | | AG | DB | AR | 16,875 | 16,875 | Kroger Center 206 W. Oak St. Conway, AR 72032 |
| 724 | ORLA | | AG | GV | FL | 12,000 | 12,000 | Loop West Shopping Center 2003 W Osceola Pkwy Kissimmee, FL 34741 0731 |
| 750 | POCA | | BB | SC | ID | 7,584 | 7,584 | Yellowstone Plaza 875 Yellowstone Ave. Pocatello, ID 83201 |
| 757 | TAMP | | AG | GV | FL | 8,629 | 8,629 | Barclay Square 13611 W. Waters Rd. Largo, FL 33774 |
| 761 | STLO | | BB | SC | MO | 10,480 | 10,480 | Watson Plaza Shopping Center 233 Watson Plaza St. Louis, MO 63126 |
| 762 | STLO | | BB | SC | MO | 10,198 | 10,198 | Chesterfield Commons Technology Park 1700 Clarkson Rd. Chesterfield, MO 63005 |
| 766 | SANF | | BB | SC | CA | 6,275 | 6,275 | Camello Plaza 1630 Contra Costa Blvd., Suite F Pleasant Hill, CA 94523 |
| 774 | SALS | | AG | GV | MD | 11,954 | 11,954 | The Centre at Salisbury 2300 N Salisbury Blvd. Salisbury, MD 21801 |
| 776 | ROAN | | AG | GV | VA | 10,000 | 10,000 | Midway Shopping Center 3165 N. Franklin St. Christiansburg, VA 24073 |
| 778 | TAMP | | AG | GV | FL | 7,500 | 7,500 | Tyrone Gardens 931 Tyrone Blvd. North St. Petersburg, FL 33710 |
| 793 | HOUS | | AG | DB | TX | 7,200 | 7,200 | Plantation Plaza 105 Dixie Dr. Clute, TX 77531 |
| 797 | DETR | | BB | SC | MI | 6,125 | 6,125 | New Towne Plaza 44804 Ford Rd. Space No. B-100 Canton, MI 48187 |
| 8604 | SALT | | AG | GV | MD | 12,000 | 12,000 | Beltway Crossing Shopping Center 6322 Ritchie Hwy., Suite B Glen Burnie, MD 21061 |

Page 4 of 7

5/15/2020

## Exhibit A
## Closures - 129 Locations

| # | Store | RE | RVP | State | Rentable SF | Total SF (Per Lease) | Store Address |
|---|-------|----|----|-------|-------------|----------------------|---------------|
| 808 | CHIC | BB | SC | IL | 13,007 | 13,007 | Butterfield Plaza, 1510 Butterfield Road, Downers Grove, IL 60515 |
| 812 | SEAT | BB | SC | WA | 10,173 | 10,173 | SeaTac Village Shopping Center, 1719 South 320th St, Federal Way, WA 98003 |
| 817 | HOUS | AG | DB | TX | 8,460 | 8,460 | Miramar Shopping Center, 2124 Bayport Blvd, Seabrook, TX 77586 |
| 805 | LOSA | BB | SC | CA | 10,000 | 10,000 | 3844 Carson Center #A, Corner Carson, Carson, CA 90810 |
| 800 | LOSA | BB | SC | CA | 8,000 | 8,000 | The Commons At Aliso Town Center, 26635 Aliso Creek Rd, Aliso Viejo, CA 92656 |
| 808 | SEAT | BB | SC | WA | 8,460 | 8,460 | Parkway Super Center, 17232 South Center Parkway, Tukwila, WA 98188 |
| 840 | LUPK | AG | DB | TX | 10,594 | 10,594 | Crestwood Village Shopping Center, 306 S. Chestnut St, Lufkin, TX 75901 |
| 863 | MANH | BB | SC | KS | 7,200 | 7,200 | Town East Center, 441 E. Poyntz Ave, Manhattan, KS 66502 |
| 892 | OMAH | BB | SC | NE | 9,576 | 9,576 | Eagle Run Shopping Center, 15303 West Maple Rd, Omaha, NE 68164 |
| 900 | ATLA | AG | DB | GA | 18,278 | 18,278 | Brighten Park, 2450 Briarcliff Road, Atlanta, GA 30329-3404 |
| 912 | COLU | BB | DB | OH | 14,732 | 14,732 | Easton Square, 3864 Morse Road, Columbus, OH 43230 |
| 920 | CHIC | AG | GV | IN | 8,460 | 8,460 | Martinsville Plaza, 1655 East 86th Ave, Merrillville, IN 46410 |
| 925 | NASH | AG | GV | TN | 8,359 | 8,359 | 4708 Harding Pike, Nashville, TN 37215 |
| 945 | WHBA | BB | SC | PA | 13,831 | 13,831 | Wilkes Barre Commons, 3460 Wilkes Barre Blvd, Wilkes Barre, PA 18702 |
| 966 | GADS | AG | DB | AL | 10,004 | 10,004 | Rainbow Plaza Shopping Center, 407 George Wallace Dr, Ste #10, Gadsden, AL 35903 |
| 966 | EURE | BB | SC | CA | 7,920 | 7,920 | The Eureka Mall, 800 W. Harris St., Ste 16A, Eureka, CA 95503 |
| 1004 | PORT | BB | SC | OR | 12,766 | 12,766 | Prime Square 205, 9800 SE Washington St, Portland, OR 97216 |
| 1035 | CULL | AG | GV | AL | 8,000 | 8,000 | Town Square Shopping Center, 1649 Town Square SW, Cullman, AL 35055 |
| 1060 | WASH | AG | GV | VA | 8,758 | 8,758 | Waramen Towne Center, 619 Frost Avenue, Warrenton, VA 20186 |
| 1900 | WASH | AG | GV | VA | 8,450 | 8,450 | The Market at Shelton Store, 901 Germantville Rd, Stafford, VA 22556 |

Tuesday Morning Copy of Exhibit A 129 Store Closures - TM

5/15/2020

## Exhibit A
## Closures - 129 Locations

| # Store | RE | RVP | State | Rentable SF | Total SF (Per Lease) | Store Address |
|---|---|---|---|---|---|---|
| 1073 PITT | BB | DB | PA | 11,780 | 11,780 | Penn Center East / 2430 Village Penn Hwy / Pittsburgh, PA 15235 |
| 1075 CLEV | BB | DB | OH | 9,600 | 9,600 | Scion Square Shopping Center / 33507 Aurora Rd, / Solon, OH 44139 |
| 1094 SANA | AG | DB | TX | 8,648 | 8,648 | Village at Stone Oak / 2600 TPC Pkwy, Ste 110 / San Antonio, TX 78258 |
| 1095 WASH | AG | GV | VA | 7,000 | 7,432 | Fairfax Circle Shopping Center / 9709 Fairfax Blvd, / Fairfax, VA 22031 |
| 1107 DALL | AG | DB | TX | 9,380 | 9,380 | Murphy Marketplace / 104 North Murphy Rd, / Suite 200 / Murphy, TX 75094 |
| 1127 MREY | BB | SC | CA | 9,839 | 9,839 | 642 Lighthouse Ave / Monterey, CA 93940 |
| 1160 SOME | BB | GV | NJ | 11,047 | 11,047 | Blue Star Shopping Center / 1151-73 Route 22 West / Store 400 / Watchung, NJ 07069 |
| 1163 SEAT | BB | SC | WA | 14,242 | 14,242 | 825 156th Avenue NE / Bellevue, WA 98007 |
| 1164 BERG | BB | GV | NJ | 15,140 | 15,140 | Paramus Plaza / 165 Route 4 West, / Store #3 / Paramus, NJ 07652 |
| 1168 MIDD | BB | GV | NJ | 21,300 | 21,300 | Middlesex Mall / 6701 Hadley Rd, / South Plainfield, NJ 07080 |
| 1169 DETR | BB | SC | MI | 18,131 | 18,131 | Gratiot Center / 31953 Gratiot Ave / Roseville, MI 48066 |
| 1171 BERG | BB | GV | NJ | 10,100 | 10,100 | The Ramsey Square Shopping Center / 1300 New Jersey 17 #6 / Ramsey, NJ 07446 |
| 1172 PLMB | AG | GV | FL | 9,300 | 9,300 | Buckingham Plaza / 310 South State Road 7 / Royal Palm Beach, FL 33414 |
| 1173 HOUS | AG | DB | TX | 12,000 | 12,000 | The Market at Crestview / 4381 E. Sam Houston Pkwy S. / Pasadena, TX 77505-3949 |
| 1176 SANF | BB | SC | CA | 9,378 | 9,378 | Santa Rita Square / 3170 Santa Rita Rd, / Pleasanton, CA 94566 |
| 1183 BLMI | BB | SC | IN | 9,923 | 9,923 | Fresh Thyme Plaza / 3600 W. 3rd Street / Bloomington, IN 47404 |
| 1185 FTLA | AG | GV | FL | 13,500 | 13,500 | Westfork Plaza / 15991 Pines Blvd, / Pembroke Pines, FL 33027 |
| 1187 MNSP | BB | SC | MN | 15,732 | 15,732 | Woodbury Village Shopping Center / 7100 Valley Creek Plaza, / Suite 226 / Woodbury, MN 55125 |
| 1194 PHIL | BB | GV | PA | 12,780 | 12,780 | Towne Corner Shopping Center / 200 N West End Blvd / Quakertown, PA 18951-2305 |

Tuesday Morning Copy of Exhibit A 129 Store Closures - TM

## Exhibit A
## Closures - 129 Locations

| # | Store | RE | RVP | State | Rentable SF | Total SF (Per Lease) | Store Address |
|---|---|---|---|---|---|---|---|
| 1195 | VISA | 88 | SC | CA | 12,000 | 12,000 | Rockwood Creek East, 4255 S. Mooney Blvd, Visalia, CA 93277 |
| 1203 | HARR | 88 | GV | PA | 13,534 | 13,534 | Colonial Commons, 5098 Jonestown Rd, Ste..., Harrisburg, PA 17112 |
| 1205 | PITT | 88 | GV | PA | 13,000 | 13,000 | North Hills Village, 4801 McKnight Rd, Pittsburgh, PA 15237 |
| 1207 | WILM | AG | GV | DE | 12,600 | 12,600 | Concord Square, 4421 Concord Pike, Wilmington, DE 19803 |
| 1210 | DBCH | AG | GV | FL | 12,022 | 12,022 | Tomoka Town Center, 1115 Cornerstone Blvd, Suite B, Daytona Beach, FL 32117-1553 |
| 1214 | GRBY | 88 | SC | WI | 20,448 | 20,448 | Green Bay Plaza, 1481-1505 W. Mason Street, Green Bay, WI 54304 |
| 1215 | NAPL | AG | GV | FL | 12,000 | 12,000 | Coconut Point Town Center, 8012 Mediterranea Dr, Estero, FL 33928 |
| 1216 | ATLA | AG | GV | GA | 11,200 | 11,200 | McDonough Commons, 1341 Hwy 20 W, Ste 110, McDonough, GA 30253-7309 |
| 1217 | USSA | 88 | SC | CA | 14,347 | 14,347 | Conejo Valley Plaza, 1350 North Moorpark Rd, Thousand Oaks, CA 91360 |
| 1223 | SEAT | 88 | SC | WA | 14,354 | 14,354 | Alderwood Parkway Place, 19225 Alderwood Mall Pkwy, Suite 110, Lynnwood, WA 98036-4810 |
| 1224 | SANF | 88 | SC | CA | 13,967 | 13,967 | Nut Tree Shopping, 1661 E. Monte Vista Ave, Vacaville, CA 95688 |
| 1226 | BOCA | AG | GV | FL | 17,960 | 17,960 | Mission Bay Plaza, 20418 State Rd 7, Boca Raton, FL 33498 |
| 1227 | TUCS | 88 | SC | AZ | 20,138 | 20,138 | Northmall Centre, 4841 North Stone Ave, Ste 115, Tucson, AZ 85704 |
| a | ATLA | AG | GV | GA | 12,000 | 12,000 | Canton Exchange Shopping Center, 2243 Cumming Hwy, Ste 130, Canton, GA 30115-8073 |

**<u>Exhibit B</u>**

**Expense Budget**

## Tuesday Morning
## Agent Expense Budget
## Exhibit B

|  | 6/1/2020 Start |
|---|---|
| Number of Stores | 129 |
| Est. Sale Start Date | 06/01/20 |
| Est. End Date | 08/10/20 |
| # of Days | 70 |
| Est. Avg. Sale Term (weeks) | 10.0 |

| | |
|---|---|
| **Estimated Beginning Inventory at Retail:** | **$ 64,500,000** |
| **Estimated Beginning Inventory at Cost:** | **$ 32,250,000** |

| | |
|---|---|
| **Estimated Sales** | **$ 38,700,000** |

| **GA Expenses** | **Total** | **Per Store** |
|---|---|---|
| Advertising - Signs & Displays | $ 212,850 | 1,650 |
| Advertising - Email, Digital and Social | $ 65,000 | 504 |
| Supervision - 1 | 758,000 | 5,876 |
| Travel | 69,000 | 535 |
| Subtotal - Expenses | 1,104,850 | 8,565 |

**Footnotes:**

1) Assumes Supervision team of 1 Lead, 1 F&A and 13 Field Supervisors for 10 wks

## FIRST AMENDMENT TO CONSULTANT AGREEMENT

This FIRST AMENDMENT (this "Amendment") to the "Consultant Agreement" dated December 5, 2019  (the "Agreement"), is entered into this 19th day of May, 2020 (the "Effective Date"), by and between Great **American Group, LLC**, a California limited liability company ("Consultant"), with offices located at 21255 Burbank Blvd., Suite 400 South, Woodland Hills, California 91367, and **Tuesday Morning Corp., a** Delaware corporation ("Merchant"), having a principal place of business at 6250 LBJ Freeway, Dallas, Texas 75240.

WHEREAS, Merchant and Consultant entered into the Agreement for the provision of certain services, as described in the Agreement; and

WHEREAS, Merchant and Consultant wish to amend the Agreement upon the terms and subject to the conditions set forth in this Amendment.

1.      Exhibit A. The additional Stores listed on **Attachment 1** hereto shall supplement, and be added and incorporated in its entirety into, **Exhibit A** of the Agreement.

2.      Exhibit B. The Expense Budget attached as **Exhibit B** to the Agreement is hereby deleted in its entirety and replaced and substituted by the Expense Budget attached hereto as **Attachment 2**, which shall be deemed to be **Exhibit B** to the Agreement.

3.      Definitions: Incorporation by Reference. The recitals set forth above are incorporated herein by reference. All attachments to this Amendment are hereby incorporated into the Agreement. Unless, otherwise specified, all terms used herein shall have those meanings ascribed to them in the  Agreement.

4.      No Waiver. Nothing contained in this Amendment shall be deemed or constitute a waiver of any of the parties' rights and remedies under the Agreement.

5.      Entire Agreement. This Amendment, as to its subject matter, exclusively and completely states the rights, duties and obligations of the parties and supersedes all prior and contemporaneous representations, letters, proposals, discussions and understandings by or between the parties. Except as expressly modified herein, the terms of the Agreement (including all exhibits and attachments thereto) remain in full force and effect. This Amendment may only be amended in a writing signed by the authorized representatives of both parties. In the event of a conflict with the terms of this Amendment and the terms of the Agreement, the terms of this Amendment shall prevail. The parties, by their representatives signing below, agree with the terms of this Amendment and further certify that their respective signatories are duly authorized this Amendment.

6.      Effective Date. This Amendment shall become effective as of the Effective Date and become a part of the Agreement between the Parties.

TUESDAY MORNING CORP.,
a Delaware corporation

By:  _/s/ Steven Becker_
Name: Steven Becker
Its: Chief Executive Officer

Date: May 20, 2020

**GREAT AMERICAN GROUP, LLC**,
a California limited liability company

By: _____
Name:  Scott K. Carpenter

Its: President, GA Retail Solutions

Date: May 20, 2020

**Attachment 1**

**Additional Stores (Supplement to Exhibit A to the Agreement)**

**Additional Stores.** The Stores set forth below shall supplement **Exhibit A** of the Agreement and shall be incorporated into, and made part of, **Exhibit A** of the Agreement.

| Store No. | Store | City | State |
|---|---|---|---|
| | | | |
| 277 | MADI | MADISON | WI |
| 518 | ATLA | ATLANTA | GA |
| 621 | YOUN | YOUNGSTOWN | OH |
| 122 | TOPE | TOPEKA | KS |

Attachment 2

Expense Budget (Exhibit B to the Agreement)

Expense Budget. The Expense Budget attached as Exhibit B to the Agreement is hereby deleted in its entirety and replaced and substituted by the Expense Budget attached hereto, which shall be deemed to be Exhibit B to the Agreement.

4841-3264-3255

**Tuesday Morning**
**Agent Expense Budget**
**Exhibit B**

| | **6/8/2020 Start** |
|---|---|
| **Number of Stores** | 133 |
| **Est. Sale Start Date** | 06/08/20 |
| **Est. End Date** | 08/17/20 |
| **# of Days** | 70 |
| **Est. Avg. Sale Term (weeks)** | 10.0 |

| | |
|---|---|
| **Estimated Beginning Inventory at Retail:** | $ 51,363,694 |
| **Estimated Beginning Inventory at Cost:** | $ 23,372,771 |
| **Estimated Transfer Inventory at Retail[1]:** | $ 5,431,781 |
| **Estimated Transfer Inventory at Cost[1]:** | $ 2,471,771 |
| **Estimated Sales** | $ 33,914,000 |

| **Agent Expenses** | **Total** | **Per Store** |
|---|---|---|
| Advertising - Signs & Displays | $ 219,450 | 1,650 |
| Advertising - Email, Digital and Social | $ 65,000 | 489 |
| Supervision - 1 | 758,000 | 5,699 |
| Travel | 69,000 | 519 |
| Subtotal - Expenses | 1,111,450 | 8,357 |

**Footnotes:**

1) Assumes Supervision team of 1 Lead, 1 F&A and 13 Field Supervisors for 10 wks

## SECOND AMENDMENT TO CONSULTANT AGREEMENT

This SECOND AMENDMENT (this "Amendment") to the "Consultant Agreement" dated December 5, 2019 (the "Agreement"), is entered into this 2nd day of June, 2020 (the "Effective Date"), by and between **Great American Group, LLC**, a California limited liability company ("Consultant"), with offices located at 21255 Burbank Blvd., Suite 400 South, Woodland Hills, California 91367, and **Tuesday Morning Corp.,** a Delaware corporation ("Merchant"), having a principal place of business at 6250 LBJ Freeway, Dallas, Texas 75240.

WHEREAS, Merchant and Consultant entered into the Agreement for the provision of certain services, as described in the Agreement;

WHEREAS, Merchant and Consultant entered into the "First Amendment to Consultant Agreement", dated May 19, 2020 to amend the list of closing Stores and the Expense Budget; and

WHEREAS, Merchant and Consultant wish to further amend the Agreement upon the terms and subject to the conditions set forth in this Amendment.

1.     Consultant's Fee.  Section 6.(ii) of the Agreement is hereby amended by adding the following paragraph to the end of Section 6.(ii), which shall be, and is hereby, incorporated into the Agreement as though fully set forth therein:

In the event that Merchant decides to implement a chainwide store liquidation, and to close all of its existing stores, as consideration for its services under this Agreement, the portion of the Base Fee that is based on the sale of Merchandise shall increase to one and three-quarters of one percent (1.75%) of all Gross Proceeds of Merchandise, in order to reflect the significant increase in resources that will be required to manage a liquidation project of such magnitude. In the event of such occurrence, for the avoidance of doubt, the Base Fee shall be equal to (a) one and three-quarters of one percent (1.75%) of all Gross Proceeds of Merchandise, calculated from the first dollar recovered, *plus* (b) fifteen percent (15.0%) of all Gross Proceeds of FF&E.

2.     Definitions; Incorporation by Reference.  The recitals set forth above are incorporated herein by reference. All attachments to this Amendment, if any, are hereby incorporated into the Agreement. Unless, otherwise specified, all terms used herein shall have those meanings ascribed to them in the Agreement.

3.     No Waiver.  Nothing contained in this Amendment shall be deemed or constitute a waiver of any of the parties' rights and remedies under the Agreement.

4.     Entire Agreement.  This Amendment, as to its subject matter, exclusively and completely states the rights, duties and obligations of the parties and supersedes all prior and contemporaneous representations, letters, proposals, discussions and understandings by or between the parties.  Except as expressly modified herein, the terms of the Agreement (including all exhibits and attachments thereto) remain in full force and effect.  This Amendment may only be amended in a writing signed by the authorized representatives of both parties.  In the event of a conflict with the terms of this Amendment and the terms of the Agreement, the terms of this Amendment shall prevail.  The parties, by their representatives signing below, agree with the terms of this Amendment and further certify that their respective signatories are duly authorized this Amendment.

*[Remainder of the Page Intentionally Left Blank]*

5.    <u>Effective Date</u>. This Amendment shall become effective as of the Effective Date and become a part of the Agreement between the Parties.

**TUESDAY MORNING CORP.,**
a Delaware corporation

By: _____
Name:  Steven Becker
Its:  Chief Executive Officer

Date: June ___, 2020

**GREAT AMERICAN GROUP, LLC,**
a California limited liability company

By: _____
Name:  Scott K. Carpenter
Its:  President, GA Retail Solutions

Date: June 2, 2020

<u>**Schedule 2**</u>

**SALE GUIDELINES**

## Sale Guidelines[1]

1.  The Sales shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

2.  The Sales shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sales shall be conducted on Sunday unless the Merchants had been operating such Store on a Sunday.

3.  On "shopping center" property, Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; *provided* that Consultant may solicit customers in the Stores themselves. On "shopping center" property, Consultant shall not use any flashing lights or amplified sound to advertise the Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.  At the conclusion of the Sales, Consultant shall vacate the Stores in broom clean condition, and shall leave the Stores in the same condition as on Sale Commencement Date, ordinary wear and tear excepted; provided, however, that the Merchants and the Consultant hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Store.  The Consultant and Merchants may abandon any furniture, fixtures and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking) ("FF&E") not sold in the Sale at the Stores at the conclusion of the Sales, without cost or liability of any kind to Consultant. Any abandoned FF&E left in a Store after a lease is rejected shall be deemed abandoned. Following abandonment, any person asserting rights, liens, claims, encumbrances, and/or interests (including, without limitation, the landlords) in the FF&E under non-bankruptcy law may freely exercise such rights, liens, claims, encumbrances, and/or interests in the FF&E, without further notice or order from the Court, without any liability to the Debtors, and without waiver of any claim such landlord may have against the Merchants. As of the Sale Termination Date, Consultant may abandon, in place and without further responsibility or liability of any kind, any FF&E located at a Store.

5.  Consultant may advertise the Sales as a "store closing", "sale on everything", "everything must go", "everything on sale" or similar-themed sale. All signs, banners, ads and other advertising collateral, promotions, and campaigns will be approved by the Merchants, prior to purchase.

6.  Consultant shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sales; *provided* that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchants and Consultant shall not use neon or day-glo on its display, hanging signs, or interior banners.

---

[1] Capitalized terms used but not defined in these Sale Guidelines shall have the meanings given to them in the Store Closing Sales Motion and Store Closing Sales Order.

Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines. In addition, the Merchants and Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sales are being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet. In addition, the Merchants and Consultant shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Interim Order or Final Order. Nothing contained in these Sale Guidelines shall be construed to create or impose upon Consultant any additional restrictions not contained in the applicable lease agreement.

7.  Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

8.  Except with respect to the hanging of exterior banners, Consultant shall not make any alterations to the storefront or exterior walls of any Stores.

9.  Consultant shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sales. The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

10.  Consultant shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

11.  Subject to the provisions of the Consulting Agreement, Consultant shall have the right to sell all Owned FF&E, approved by the Merchants. Consultant may advertise the sale of the Owned FF&E in a manner consistent with these guidelines. The purchasers of any Owned FF&E sold during the sale shall be permitted to remove the Owned FF&E either through the back shipping areas at any time, or through other areas after applicable business hours. As of the Sale Termination Date or the Vacate Date, as applicable, Consultant may abandon, in place and without further responsibility, any FF&E.

12.  At the conclusion of the Sales at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases. The Merchants, Consultant and their agents and representatives shall continue to have access to the Stores as provided for in the Consulting Agreement.

13.  Rent that becomes due post-petition shall be paid by the Merchants as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease. Consultant shall have no responsibility to the landlords therefor.

14.  The rights of landlords against Merchants for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

15.  The Consultant and landlords of the closing Stores are authorized to enter into agreements

4847-1341-6381

("Side Letters") modifying these Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Consultant and any such landlords. In the event of any conflict between these Sale Guidelines and any Side Letter, the terms of such Side Letter shall control.

16.     If and to the extent that the landlord of any Store affected hereby contends that Consultant or Merchants are in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchants and Consultant as follows:

        If to Consultant:

        Great American Group, LLC
        21255 Burbank Blvd., Suite 400
        Woodland Hills, CA 91367
        Attention:  Scott K. Carpenter
        and Marina Fineman
        Tel: (818) 746-9309
        Email:
        scarpenter@greatamerican.com
        mfineman@greatamerican.com

        If to the Merchant:

        Tuesday Morning Corporation
        6250 LBJ Freeway
        Dallas, Texas 75240
        Attention: Bridgett Zeterberg and
        Steven Becker
        Email:
        bzeterberg@tuesdaymorning.com
        sbecker@tuesdaymorning.com

        With a copy (which shall not constitute notice) to:

        Haynes and Boone, LLP
        2323 Victory Avenue
        Suite 700
        Dallas, TX 75219
        Attn: Ian Peck
        Email:
        ian.peck@haynesboone.com

4847-1341-6381