## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:   **Beckham Jewelry, LLC, Debtor**                              **Case No. 25-01234-JAW**
                                                                        **Chapter 11**

## AMENDED PLAN OF REORGANIZATION UNDER SUBCHAPTER V OF CHAPTER 11

Beckham Jewelry, LLC, Debtor-in-Possession in the above entitled Chapter 11, proposes the following Plan of Reorganization.

### ARTICLE I: DEFINITIONS

For purposes of this Plan, the following terms shall have the meanings ascribed to them below:

1.1      "Administrative Expense Claim" means a Claim entitled to priority under §503(b) of the Bankruptcy Code.

1.2      "Allowed Claim" means a Claim against the Debtor that has been scheduled and not disputed, or a timely filed proof of claim that is not disputed.

1.3      "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended.

1.4      "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Mississippi.

1.5      "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

1.6      "Cash" means legal tender of the United States of America.

1.7      "Cause of Action" means any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or

unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, that the Debtor may hold against any Entity.

1.8    "Chapter 11 Case" means the case commenced by the Debtor under Chapter 11 of the Bankruptcy Code, styled as In re: Beckham Jewelry, LLC, Case No. 25-01234-JAW, pending in the Bankruptcy Court.

1.9    "Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.10    "Class" means a category of Claims or Equity Interests designated pursuant to this Plan.

1.11    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order.

1.12    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1191 of the Bankruptcy Code.

1.13    "Debtor" means Beckham Jewelry, LLC, as debtor and debtor-in-possession in the Chapter 11 Case.

1.14    "Disposable Income" means the income that is received by the Debtor and that is not reasonably necessary to be expended for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the Debtor, including reasonably necessary capital expenditures.

1.15    "Effective Date" means the date which is fourteen (14) days after entry of the Confirmation Order, unless stayed.

1.16    "Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.17    "Equity Interest" means any equity security in the Debtor as defined in section 101(16) of the Bankruptcy Code.

1.18    "General Unsecured Claim" means any Claim that is not entitled to priority and is not secured by collateral.

1.19    "Net Operating Income" means the Debtor's gross income less all operating expenses, including but not limited to rent, utilities, payroll, insurance, taxes, and other costs necessary for the continuation, preservation, or operation of the Debtor's business.

1.20    "Plan" means this Plan of Reorganization Under Subchapter V of Chapter 11, including all exhibits and schedules hereto, as the same may be amended, supplemented, or modified from time to time.

1.21    "Priority Claim" means any Claim entitled to priority under sections 507(a)(2) through 507(a)(10) of the Bankruptcy Code.

1.22    "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

1.23    "Quarterly Distribution Date" means the first day of the first calendar quarter following the Effective Date, and the first day of each subsequent calendar quarter thereafter during the term of the Plan.

1.24    "Reorganized Debtor" means the Debtor, or any successor thereto, on or after the Effective Date.

1.25    "Secured Claim" means any Claim that is secured by a lien on property in which the Debtor has an interest, to the extent of the value of the creditor's interest in the Debtor's interest in such property.

1.26    "Subchapter V Trustee" means the trustee appointed under 11 U.S.C. §1183 for the Debtor's Chapter 11 Case.

1.27    Estimated Claims. Except for the Secured Claim of Kapitus, all Claim amounts stated in this Plan are estimates based on filed proofs of claim, schedules, and ongoing reconciliation. The Allowed amount of any Claim shall be determined pursuant to the Bankruptcy Code and orders of this Court, and Plan distributions shall be adjusted accordingly.

## ARTICLE II: BACKGROUND

2.1    Beckham Jewelry, LLC previously operated as a retail and custom jewelry store. Due to high overhead and poor retail performance, the Debtor filed this Subchapter V Chapter 11 case to conduct a liquidation its retail inventory and transition to an appointment-based custom design and repair business. A Court-approved liquidation sale generated approximately $260,000 net proceeds for the estate. The Debtor has assumed a new month-to-month office lease at modest rent and will continue operations on a leaner cost structure.

2.2    The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code May 14, 2025. The Debtor elected to proceed under Subchapter V of Chapter 11 pursuant to 11 U.S.C. § 1182(1). On May 15, 2025, the United States Trustee appointed Craig Geno as the Subchapter V Trustee pursuant to 11 U.S.C. § 1183(a).

2.3    Since the petition date, the Debtor has operated its business and managed its property as a debtor-in-possession pursuant to sections 1184 and 1186 of the Bankruptcy Code. The Debtor has successfully transitioned from a traditional retail jewelry operation to a more sustainable appointment-based custom design and repair business model, which has significantly reduced overhead costs while maintaining the ability to generate revenue.

2.4    The Debtor has filed this Plan to provide for the treatment of Claims against and Equity Interests in the Debtor, and to implement a reorganization that will allow the Debtor to continue its business operations while providing meaningful distributions to creditors.

## ARTICLE III: CLASSIFICATION OF CLAIMS AND INTERESTS

3.1     Pursuant to section 1122 of the Bankruptcy Code, the following Classes of Claims and Equity Interests are designated under this Plan.

3.2     Class 1 consists of all Administrative Expense Claims, including the fees and expenses of Debtor's counsel, Thomas C. Rollins, Jr., CPA Josh Norris, and the compensation and expenses of the Subchapter V Trustee, Craig M. Geno.  This class also includes compensation previously authorized for payment of a critical vender.  (Dk # 152)

3.3     Class 2 consists of all Priority Tax Claims, including the claims of the Internal Revenue Service, the Mississippi Department of Revenue, and the Hinds County Tax Collector.

3.4     Class 3 consists of the Secured Claim of Kapitus.

3.5     Class 4 consists of all General Unsecured Claims, including the claims of trade creditors and any claims arising from the rejection of executory contracts or unexpired leases, such as any lease rejection claim filed by TDLDC.

3.6     Class 5 consists of the Equity Interests in the Debtor, specifically the membership interest of Brian Beckham, which shall be retained subject to the performance of the Plan.

## ARTICLE IV: TREATMENT OF CLAIMS AND INTERESTS

4.1     Treatment of Claims:

**Class 1 – Administrative Claims:** Allowed Administrative Expense Claims as of the Effective Date, including the fees and expenses of Debtor's counsel, the Subchapter V Trustee, the CPA, and the Bookkeeper, are estimated to total approximately $44,971.42 and shall be paid from the $85,000 Effective Date Distribution (see section 5.1) in accordance with the priorities of the Bankruptcy Code.

Administrative Expense Claims incurred after the Effective Date shall be paid in the ordinary course of business as they become due and shall be paid in addition to the fixed Plan payments described below.

**Class 2 – Priority Tax Claims:** Priority Tax Claims of the Internal Revenue Service, Mississippi Department of Revenue and Hinds County Tax Collector are estimated to total approximately $46,617.66. These claims shall be paid in full through the Debtor's post-confirmation Plan payments described in Section 5.1 below, in compliance with 11 U.S.C. §1129(a)(9)(C).  Payments shall be applied first to Priority Tax Claims until paid in full before any distributions are made to Class 4.  All Priority Tax Claims shall be paid in full within five (5) years of the Petition Date.

**Class 3 – Secured Claims:** The Allowed Secured Claim of Kapitus in the amount of $38,226.65 shall be paid in full in Cash on the Effective Date from the $85,000 Effective Date Distribution (see section 5.1), which includes funds held in the Debtor's segregated cash-collateral account for the benefit of Kapitus in the amount of $20,597.60. Upon payment in full, all liens and UCC financing statements held by Kapitus shall be deemed fully satisfied and released. This treatment renders Class 3 unimpaired.

**Class 4 – General Unsecured Claims:** Holders of Allowed General Unsecured Claims shall receive distributions from the Debtor's fixed Plan payments described in Section 5.1.
No distributions shall be made to Class 4 until all Administrative Expense Claims and Priority Tax Claims have been paid in full.

**Class 5 – Equity Interests:** The ownership interest of Brian Beckham shall be retained throughout the duration of this Plan, subject to the Debtor's performance of the Plan. Mr. Beckham will continue to manage the Debtor's business operations during the term of the Plan. No distributions shall be made to Mr. Beckham on account of his Equity Interest until the completion of the Plan and until all Allowed Claims have been paid in accordance with its terms.

## ARTICLE V: MEANS FOR IMPLEMENTATION

5.1     The Debtor shall make the following Plan payments:

a)     An $85,000 Effective Date Distribution, which includes $20,597.60 held in the Debtor's segregated cash-collateral account for the benefit of Kapitus, shall be applied first to the Secured Claim of Kapitus, then to Administrative Expense Claims, and any excess to Priority Tax Claims.

b)     Three (3) annual payments of $34,399.36 on January 31, 2027, January 31, 2028, and January 31, 2029, for a total of $103,198.08.  These payments shall be applied in the following order:

i.      Remaining Priority Tax Claims until paid in full;

ii.     Thereafter, to General Unsecured Claims, pro rata, until at least $101,956.00 has been distributed to Priority and General Unsecured Claims in the aggregate.

The annual payments set forth above satisfy any requirement to commit projected disposable income.

5.2     The Debtor shall continue to exist as a Mississippi limited liability company following the Effective Date, with all powers under applicable state law and without prejudice to

any right to alter or terminate such existence under applicable state law upon completion of the Plan.

5.3    On the Effective Date, all property of the estate and all property acquired by the Debtor under the Plan shall revest in the Debtor free and clear of all Claims and interests, except as otherwise provided in the Plan or the Confirmation Order. The Debtor shall thereafter hold and use such property in the ordinary course of its business, subject to the provisions of the Plan.

5.4    Brian Beckham shall continue to serve as the sole manager of the Debtor and shall remain responsible for the Debtor's day-to-day operations, including implementing the Plan and making all distributions required under the Plan.

5.5    After confirmation of a consensual Subchapter V Plan, the Debtor shall not be required to file Monthly Operating Reports or post-confirmation financial reports unless otherwise ordered by the Court. Upon reasonable written request, the Debtor shall provide to any impaired creditor no more than once per year a copy of its most recent federal income tax return and a certification that Plan payments are current.

5.6    Unless otherwise waived, relinquished, or settled by the Debtor in writing, all claims, rights, defenses, setoffs, and causes of action of the Debtor, whether arising under the Bankruptcy Code or non-bankruptcy law, are expressly preserved and revested in the Debtor on the Effective Date. The Debtor reserves the right to prosecute, settle, or abandon such causes of action in its discretion.

5.7    Role of Subchapter V Trustee

(a) If the Plan is confirmed consensually under 11 U.S.C. §1191(a), the Subchapter V Trustee shall be discharged upon the filing of the Notice of Substantial Consummation.

(b) If the Plan is confirmed non-consensually under 11 U.S.C. §1191(b), the Subchapter V Trustee shall remain in place for the duration of the Plan with the duties set forth in 11 U.S.C. §1183(b)(3).

5.8     The Debtor shall file a Notice of Effective Date within fourteen (14) days after the Effective Date.  In the event of confirmation under 11 U.S.C. §1191(a), the Debtor shall file a Notice of Substantial Consummation, upon which the Subchapter V Trustee shall be discharged.

5.9     The Subchapter V Trustee shall file any final application for compensation within sixty (60) days after the filing of the Notice of Substantial Consummation (for consensual confirmation) or within sixty (60) days after completion of Plan payments (for non-consensual confirmation).

## ARTICLE VI: EXECUTORY CONTRACTS AND LEASES

6.1     On the Effective Date, the Debtor shall be deemed to have assumed the month-to-month office lease previously approved by order of the Court.

6.2     Except as expressly provided in Section 6.1, all other executory contracts and unexpired leases of the Debtor not previously assumed or rejected shall be deemed rejected as of the Effective Date.

6.3     Any claim for damages arising from the rejection of an executory contract or unexpired lease pursuant to this Article must be filed with the Bankruptcy Court within thirty (30) days following the date of rejection. Any such claims not timely filed shall be forever barred. Allowed claims for rejection damages shall be classified and treated as Class 4 General Unsecured Claims under this Plan.

6.4     To the extent of any monetary defaults under the month-to-month office lease or any other executory contract or unexpired lease assumed pursuant to this Article, the Debtor

shall cure such defaults promptly following the Effective Date, or as otherwise agreed by the non-debtor party and the Debtor.

## ARTICLE VII: DISTRIBUTIONS

7.1    All distributions under the Plan shall be made by the Debtor. Distributions to holders of Allowed Claims shall be made in accordance with the classification and treatment of such Claims as set forth in Article IV of this Plan.

7.2    Distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth in the Debtor's schedules, unless a different address is provided in a timely filed proof of claim or in a written notice served on the Debtor by the holder of such Claim.

7.3    If any distribution to a holder of an Allowed Claim is returned as undeliverable, no further distributions shall be made to such holder unless and until the Debtor is notified of the holder's current address in writing. Undeliverable distributions shall be held for the benefit of such holder until the earlier of (i) 90 days after the date of the attempted distribution, at which time such distribution shall revert to the Debtor, or (ii) the date on which the holder provides the Debtor with an updated address.

7.4    Distributions under the Plan shall be made by check or, at the Debtor's option, by wire transfer or other electronic means.

7.5    No fractional payments or distributions shall be made under the Plan. Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding down to the nearest whole dollar.

7.6     The Debtor shall not be required to make any distribution of less than $25.00 on account of any Allowed Claim unless a request therefor is made in writing by the holder of such Claim.

7.7     The Debtor may, but shall not be required to, set off or recoup against any Claim any claims that the Debtor may have against the holder of such Claim. Neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such claim the Debtor may have.

7.8     To the extent a Claim entitled to distribution under the Plan is comprised of both principal and interest, such distribution shall be allocated first to the principal amount of the Claim, and thereafter to any interest allowed as part of such Claim.

## ARTICLE VIII: FEASIBILITY

8.1     The Debtor's business model is feasible due to reduced rent and overhead coupled with continued demand for custom jewelry and repair services. The attached Budget (Exhibit A) reflects monthly expenses of approximately $11,708.75, which can be supported by projected revenues, and the Debtor's financial projections show sufficient Net Operating Income to fund both ongoing operations and the distributions required under this Plan. Having successfully transitioned from a traditional retail jewelry operation to a sustainable appointment-based custom design and repair business, the Debtor has significantly lowered overhead while preserving the ability to generate revenue. The managing member, Brian Beckham, brings extensive experience in the jewelry industry and a loyal customer base that is expected to continue supporting the business in its new format.

8.2     Based on the Debtor's financial projections and the reduced expense structure, the Plan is not likely to be followed by further reorganization or liquidation. The Debtor believes

that it will be able to make all payments required under the Plan and continue operating as a viable business enterprise.

## ARTICLE IX: BEST INTERESTS OF CREDITORS AND LIQUIDATION ANALYSIS

9.1     Pursuant to 11 U.S.C. § 1129(a)(7), the Plan satisfies the "best interests of creditors" test. The Debtor has prepared a liquidation analysis, which is attached hereto as Exhibit B. This analysis demonstrates that holders of Allowed Claims would receive less in a hypothetical Chapter 7 liquidation than they will receive under the terms of this Plan.

9.2     In a Chapter 7 liquidation, a trustee would be appointed to liquidate the Debtor's assets. The trustee would incur additional administrative expenses, including trustee fees of up to 25% of the first $5,000, 10% of the next $45,000, 5% of the next $950,000, and 3% of any amount in excess of $1,000,000. These additional administrative expenses would reduce the amount available for distribution to creditors.

9.3     Furthermore, a Chapter 7 liquidation would not include the value of the Debtor's ongoing business operations, which will generate additional funds for distribution to creditors under this Plan. The Debtor's custom jewelry and repair business has significant value as a going concern, which would be lost in a liquidation scenario.

9.4     Based on the liquidation analysis attached as Exhibit B, unsecured creditors would receive approximately $101,955 in a Chapter 7 liquidation. Under this Plan, Priority and General Unsecured Creditors will receive at least $101,955.00, satisfying 11 U.S.C. §1129(a)(7).

## ARTICLE X: RETENTION OF JURISDICTION

10.1     Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising

out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including, but not limited to:

10.1.1  Allowing, disallowing, determining, liquidating, classifying, estimating, or establishing the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

10.1.2  Deciding and resolving all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

10.1.3  Resolving any matters related to: (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is party or with respect to which the Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom; and (b) any dispute regarding whether a contract or lease is or was executory or expired;

10.1.4  Ensuring that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

10.1.5  Adjudicating, deciding, or resolving any motions, adversary proceedings, contested or litigated matters, and any other matters, and granting or denying any applications involving the Debtor that may be pending on the Effective Date;

10.1.6  Entering and implementing such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

10.1.7  Entering an order or final decree concluding or closing the Chapter 11 Case;

10.1.8  Resolving any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.1.9  Issuing injunctions, entering and implementing other orders, or taking such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

10.1.10     Enforcing any orders previously entered by the Bankruptcy Court; and

10.1.11     Hearing and determining such other matters as may be necessary or appropriate to carry out the provisions of the Plan and to enforce the Confirmation Order."

### ARTICLE XI: INVALIDATION OF LIENS AND DISCHARGE

11.1     All liens securing claims which are not allowed pursuant to the provisions of the Plan or Bankruptcy Code §§502 and 506 shall be invalidated and deemed null and void and of no further force in effect. The provisions of the confirmed plan shall bind all creditors and parties in

interest whether they accept the plan or file a proof of claim. Unless otherwise specifically provided to the contrary herein or in the confirmation Order, on or after confirmation, all holders of Claims or Interests shall be precluded from asserting any claim against Beckham Jewelry, LLC or its assets or properties.

11.2    Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise expressly provided in this Plan or the Confirmation Order, upon the Effective Date, which shall be fourteen (14) days after the entry of the Confirmation Order, all pre-petition debts, claims, liens, encumbrances, and liabilities of any kind or nature whatsoever against the Debtor or any of its assets or properties, including, without limitation, interest accrued on such claims from and after the Petition Date, shall be immediately and forever discharged, released, and extinguished.

11.3    On and after the Effective Date, the Debtor and its estate shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims and debts that arose before the Confirmation Date, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not: (i) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (ii) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code; or (iii) the holder of a Claim based upon such debt has accepted the Plan.

11.4    If the plan is confirmed non-consensually, then the discharge will be granted pursuant to 11 U.S.C. §§ 1191(b), 1192.

11.5    The discharge granted hereunder shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim.

11.6    Except as otherwise provided in the Plan or Confirmation Order, on and after the Effective Date, all entities who have held, currently hold, or may hold a debt, Claim, or other

liability that is discharged are permanently enjoined from taking any of the following actions on account of any such discharged debt, Claim, or other liability: (i) commencing or continuing in any manner any action or other proceeding against the Debtor or its property; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Debtor or its property; (iii) creating, perfecting, or enforcing any lien or encumbrance against the Debtor or its property; (iv) asserting any setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtor; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

11.7    Nothing in this Plan shall be deemed to discharge, release, or otherwise affect any debt or Claim that is not dischargeable under section 1141(d)(2) or section 1141(d)(3) of the Bankruptcy Code or other applicable law.

## ARTICLE XII: EVENTS OF DEFAULT

12.1    An "Event of Default" shall occur only upon one or more of the following:

    a)   The Debtor fails to make any Plan payment when due and such failure is not cured within the applicable cure period;

    b)   The Debtor materially fails to make any required distribution under the Plan;

    c)   The Debtor materially fails to comply with a material payment or disclosure obligation expressly required by this Plan"

    d)   The Debtor ceases operations or liquidates substantially all assets outside the ordinary course without Court approval;

    e)   The Debtor otherwise materially breaches a material provision of this Plan and fails to cure such breach after notice.

12.2   No Event of Default shall exist unless:

    a)   A creditor entitled to payment under the Plan serves written notice of default on the Debtor and Debtor's counsel; and

    b)   The Debtor fails to cure such default within thirty (30) days after service of the notice (or such longer period as the Court may allow).

Payments shall be deemed timely if mailed or transmitted within the cure period.

12.3   Upon an uncured Event of Default, any creditor whose Claim is impaired under the Plan may seek enforcement by filing a motion in the Bankruptcy Court.

12.4   After notice and a hearing, the Court may grant any of the following remedies:

    a)   Compel performance of the Plan;

    b)   Authorize direct payment to creditors through a registry or disbursing agent;

    c)   Modify the Plan under 11 U.S.C. §1193;

    d)   Convert the case to Chapter 7 or dismiss under 11 U.S.C. §1112(b);

    e)   Grant such other relief as is equitable and appropriate.

No creditor may exercise collection remedies, enforce liens, levy, garnish, foreclose, or pursue state-law remedies based on a Plan default without first obtaining an order of the Bankruptcy Court.  No Event of Default shall automatically terminate the Plan, revest estate property, reinstate claims, or revoke the discharge.  All remedies require Bankruptcy Court order after notice and a hearing.

Respectfully submitted,

By:    /s/ Thomas C. Rollins, Jr.
       Thomas C. Rollins, Jr. (MSBN 103469)
       The Rollins Law Firm
       P.O. Box 13767

Jackson, MS 39236
601.500.5333
trollins@therollinsfirm.com
Attorney for Beckham Jewelry, LLC

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

IN RE:   **Beckham Jewelry, LLC, Debtor**                    Case No. 25-01234-JAW
                                                             Chapter 11

**EXHIBIT A - BUDGET**

| Expenses | |
|---|---:|
| Advertising | $125.00 |
| Contract Labor | $750.00 |
| Dues & Subscriptions | $836.25 |
| Insurance | $750.00 |
| Professional Fees | $1,000.00 |
| Rent | $1,600.00 |
| Tax | $350.00 |
| Office Supplies | $37.50 |
| Payroll | $800.00 |
| Postage & Shipping | $70.00 |
| Supplies | $57.50 |
| Utilities (Estimated) | $600.00 |
| Workers' Comp Ins | $232.50 |
| Owner's Payroll | $4,200.00 |
| Misc. | $300.00 |
| **Total Expenses** | **$11,708.75** |

The Debtor projects monthly gross income of approximately $12,000 during the months of January through October of each year (after cost of goods sold and sales taxes). Consistent with historical performance in the jewelry industry, revenues are expected to increase during the holiday season, with projected gross income of approximately $27,500 per month in November

and December (after cost of goods sold and sales taxes). These seasonal variations reflect the nature of the Debtor's custom jewelry and repair business, where customer demand and gift purchases peak during the fourth quarter.

The budget includes an owner's payroll of $4,200 per month, which represents compensation for Brian Beckham's full-time labor, management, and specialized expertise in custom jewelry design and repair. This compensation is necessary for the continued operation of the Debtor's business and for generating the revenues projected above.

Based on these projected revenues and expenses, the Debtor will generate approximately $174,904 in annual gross income, which is sufficient to cover $140,505 in annual operating expenses and the $34,399.36 in annual Plan payments required under the Plan. Accordingly, the Debtor anticipates being able to meet all obligations under the Plan while continuing to operate its business.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:   **Beckham Jewelry, LLC, Debtor**                    Case No. 25-01234-JAW
                                                                                              **Chapter 11**

## EXHIBIT B – LIQUIDATION ANALYSIS

| Item | Scheduled Value | Estimated Ch. 7 Recovery | Notes |
|---|---|---|---|
| **Cash & A/R** | $7,465.00 | $7,465.00 | Full value assumed |
| **Inventory** | $496,000.00 | $134,507 | Based on actual GOB sale results |
| **Fixtures/Equipment** | $145,900 | $29,180 (20%) | Office furniture, tools, safes |
| **Machinery/Signage** | $12,000.00 | $2,400 (20%) | |
| **Collectibles (artwork/mural)** | $28,000.00 | $8,400 (30%) | |
| **Total Assets (Ch. 7 recovery)** | $689,365 | ~$181,952 | Before costs |

In evaluating the best interest of creditors test, the Debtor has conducted a hypothetical

Chapter 7 liquidation analysis. The Debtor's schedules reflect total assets of approximately

$723,365. However, upon further investigation, it was discovered that one scheduled item had

been materially overstated. Specifically, the schedules included safes with an aggregate value of

$90,000 within the fixtures and equipment category, with one safe alone listed at $80,000. After

consultation with local safe companies and inspection of the property, it was determined that this

safe is only worth approximately $6,000. Adjusting for this correction reduces the scheduled

value of fixtures and equipment by $74,000, from $219,900 to $145,900.

In a forced liquidation scenario, cash and accounts receivable of $7,465 would be fully

recoverable. Fixtures and equipment, as corrected, would be expected to realize no more than

twenty percent of the adjusted $145,900 scheduled value, resulting in approximately $29,180.

Machinery and signage with a scheduled value of $12,000 would be discounted to twenty

percent, yielding $2,400. Artwork and murals listed at $28,000 would be expected to sell at roughly thirty percent of value, or $8,400.

Based on the Debtor's actual professionally managed going-out-of-business sale, and the appropriate wholesale and melt valuation for remaining inventory, a hypothetical Chapter 7 trustee would realize approximately $134,507.55 from the Debtor's inventory.  A detailed explanation is found on the next page.

Altogether, the Chapter 7 recovery value of assets, after correcting the safe value, is estimated at approximately $181,880.00 before administrative costs.

From this amount, the estate would be reduced by the costs of liquidation. A Chapter 7 trustee would be entitled to a commission and other administrative expenses in the approximate amount of $40,000. Additional professional and auctioneer fees are estimated at $5,000 (to sell remaining inventory after GOB sale). After deducting these expenses, the net distributable estate would be reduced to roughly $136,880. From this, secured claims in the amount of $38,226.65 held by Kapitus would be paid in full.  This would leave approximately $101,955 for distribution to priority unsecured and general unsecured creditors.  Debtors plan proposes to pay more than $101,955.00 to priority and general unsecured creditors.

**\*\*Revised Inventory Valuation**
(Response to Subchapter V Trustee Objection)\*\*

The Subchapter V Trustee has objected to the Debtor's prior liquidation analysis on the ground that inventory should be valued using a going-out-of-business ("GOB") methodology rather than a bulk or auction discount. The Debtor agrees that the appropriate methodology depends on the nature of the inventory and has revised its liquidation analysis accordingly. This revised analysis is based on the Debtor's actual professionally managed GOB sale, which constitutes the best evidence of what a Chapter 7 trustee would realize from liquidation of the Debtor's inventory.

### Composition of Inventory

The Debtor scheduled inventory with a total book value of $496,000, consisting of:

- Finished jewelry: $350,000

- Loose stones and precious metals and other: $146,000

Following the GOB sale:

- Approximately 85% of finished jewelry was sold through retail liquidation;

- Approximately 15% of finished jewelry remained unsold and must be liquidated through wholesale or bulk channels; and

- Loose stones and precious metals remaining after the sale have a book value of $75,000.

### Actual GOB Sale Results – Finished Jewelry (85%)

The Debtor sold approximately 85% of its finished jewelry inventory through a professionally managed retail GOB sale and received $243,111.58 in gross receipts for Debtor-

owned inventory. A Chapter 7 trustee would necessarily incur the same statutory and operational costs to conduct such a sale.

## A. Mandatory Sale Deductions

| Item | Amount |
|------|--------|
| **Gross GOB receipts** | $243,111.58 |
| Sales tax (7%) | (17,017.81) |
| Liquidator commission | (26,742.00) |
| **Net after tax and commission** | $199,351.77 |

## B. Hard Liquidation Expenses (Reimbursed to Sale Consultant)

| Category | Amount |
|----------|--------|
| Marketing & advertising | $27,545.70 |
| Consultant professional fees | $5,250.00 |
| Consulting / sale management | $2,400.00 |
| Consultant travel | $400.00 |
| Shipping / freight | $1,063.19 |
| Supplies (tags, bags, signage, etc.) | $310.33 |
| **Total hard liquidation expenses** | $36,969.22 |

Net after hard liquidation expenses:

$$\$199,351.77 - \$36,969.22 = \$162,382.55$$

**C. Wind-Down Operating Carry**

The store was required to remain open for approximately four months to prepare for, conduct, and wind down the GOB sale. These operating carry costs include rent, utilities, insurance, payroll (which was higher during the sale period), security, point-of-sale systems, and administrative overhead. A Chapter 7 trustee would be required to incur comparable expenses.

$$4 \text{ months} \times \$14,000 = \$56,000$$

Net realized from finished jewelry sold through the GOB sale:

$$\$162,382.55 - \$56,000 = \$106,382.55$$

**3. Remaining Finished Jewelry (15%)**

The remaining 15% of finished jewelry was fully exposed to the market during the GOB sale but did not sell. As a result, it would be liquidated by a Chapter 7 trustee through wholesale or bulk channels rather than retail.

Book value of remaining finished jewelry:

$$\$350,000 \times 15\% = \$52,500$$

Bulk liquidation value at 25% of book:

$$\$52,500 \times 25\% = \$13,125$$

**4. Loose Stones and Precious Metals**

Loose stones and precious metals are not retail items and cannot be liquidated through a GOB sale. They are instead liquidated through melt or wholesale channels, which in the trade yield approximately 20% of book value.

Remaining book value: $75,000

$$\$75,000 \times 20\% = \$15,000$$

## 5. Final Chapter 7 Inventory Liquidation Value

| Component | Net to Estate |
|---|---|
| Finished jewelry sold at GOB (85%) | $106,382.55 |
| Remaining finished jewelry (15%) @ 25% bulk | $13,125.00 |
| Loose stones & metals @ 20% melt | $15,000.00 |
| **Total Chapter 7 inventory value** | $134,507.55 |

## Conclusion

Based on the Debtor's actual professionally managed going-out-of-business sale, and the appropriate wholesale and melt valuation for non-retail inventory, a hypothetical Chapter 7 trustee would realize approximately $134,507.55 from the Debtor's inventory.

This valuation applies the correct liquidation methodology required by the Subchapter V Trustee—using retail GOB liquidation for finished jewelry and wholesale/melt liquidation for inventory that cannot be sold at retail—and therefore satisfies the §1129(a)(7) best-interests-of-creditors test.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

IN RE:    **Beckham Jewelry, LLC, Debtor**                    **Case No. 25-01234-JAW**
                                                                                    **Chapter 11**

**EXHIBIT C – PLAN PAYMENT SUMMRARY**

This Exhibit summarizes the payments to be made under the Plan and the projected application of those payments among Classes of Claims.

Total Plan Funding

| Source | Amount |
|---|---|
| Effective Date Distribution | $85,000.00 |
| Three Annual Payments (3 × $34,399.36) | $103,198.08 |
| Total Plan Funding | $188,198.08 |

Effective Date Distribution – $85,000.00

| Application | Amount |
|---|---|
| Kapitus – Allowed Secured Claim | $38,226.65 |
| Administrative Expense Claims (estimated) | $44,971.42 |
| Applied to Priority Tax Claims | $1,801.93 |
| Total | $85,000.00 |

Remaining after Effective Date:

| Claim Category | Balance |
|---|---|
| Priority Tax Claims (originally $46,617.66) | $44,815.73 |
| General Unsecured Claims (approx.) | $330,000.00 |

Annual Plan Payments

The Debtor shall make three annual Plan payments of **$34,399.36** on January 31, 2027, January 31, 2028, and January 31, 2029, for a total of **$103,198.08**.

Payments are applied in the following order:

1. Remaining Priority Tax Claims

2. General Unsecured Claims (pro rata)

Projected Distribution of Annual Payments

| Payment | Priority Taxes | Unsecured Creditors | Total |
|---|---|---|---|
| Year 1 – Jan 31, 2027 | $34,399.36 | $0.00 | $34,399.36 |
| Year 2 – Jan 31, 2028 | $10,416.37 | $23,982.99 | $34,399.36 |
| Year 3 – Jan 31, 2029 | $0.00 | $34,399.36 | $34,399.36 |
| Totals | $44,815.73 | $58,382.35 | $103,198.08 |

Total Projected Distributions Under the Plan

| Class | Amount |
|---|---|
| Kapitus (Secured Claim) | $38,226.65 |
| Administrative Expense Claims | $44,971.42 |
| Priority Tax Claims | $46,617.66 |
| General Unsecured Claims | $58,382.35 |
| Total Distributions | $188,198.08 |